UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

CATSKILL MOUNTAINS CHAPTER OF TROUT
UNLIMITED, INC., THEODORE GORDON
FLYFISHERS, INC., CATSKILL-DELAWARE
NATURAL WATER ALLIANCE, INC., FEDERATED
SPORTSMEN'S CLUBS OF ULSTER COUNTY, INC.,
RIVERKEEPER, INC. and WATERKEEPER ALLIANCE,
INC.,

                              Plaintiffs,                    Civ. No. 08-_____

                              v.                        08 CIV. 5606

UNITED STATES ENVIRONMENTAL PROTECTION      **COMPLAINT FOR**
AGENCY and STEPHEN L. JOHNSON, in his official   **DECLARATORY**
capacity as ADMINISTRATOR OF THE UNITED          **JUDGMENT AND**
STATES ENVIRONMENTAL PROTECTION AGENCY,          **INJUNCTIVE RELIEF**

                              Defendants.              **JUDGE KARAS**
-----------------------------------------------------------------x


## INTRODUCTION

1.      This is an action for declaratory judgment and injunctive relief challenging the

legality of 40 C.F.R. § 122.3(i), a final rule promulgated by defendants United States

Environmental Protection Agency ("EPA") and Stephen L. Johnson, in his official capacity as

Administrator of the EPA ("Administrator"), entitled "National Pollutant Discharge Elimination

System (NPDES) Water Transfers Rule" (hereinafter "Final Rule"). The Final Rule was signed

by the Administrator on June 9, 2008, and has been published in the Federal Register at 73 Fed.

Reg. 33697 (June 13, 2008). The Final Rule purports to exempt discharges of pollutants from

point sources between distinct waters of the United States ("interbasin pollutant transfers") from

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

the unambiguous, mandatory permit requirements contained in the Clean Water Act, 33 U.S.C. §§ 1311, 1342.  A true and correct copy of the Final Rule is annexed hereto at "Tab A."

2.    This action arises under, and alleges violations of, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706.  In particular, EPA's actions in promulgating the permitting exemption contained at 40 C.F.R. § 122.3(i) were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations (i.e., *ultra vires*) under 5 U.S.C. § 706(2)(C).

3.    Plaintiffs seek a declaration from the Court that EPA's actions as described herein violate the Clean Water Act, and an injunction directing EPA to repeal and rescind 40 C.F.R. § 122.3(i).

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory judgment), 2202 (injunctive relief), as well as 5 U.S.C. § 706 (APA).  There is a present and actual controversy between the parties and plaintiffs have challenged a final agency action pursuant to 5 U.S.C. §§ 551(13), 704.  The Court may issue injunctive relief pursuant to 28 U.S.C. § 2202, 5 U.S.C. § 705, 5 U.S.C. § 706(1), 5 U.S.C. § 706(2)(A) & (C), as well as pursuant to its general equitable powers.

5.    While this Court has jurisdiction over the subject matter of this action, because there is or may be a dispute between the parties with respect to whether original jurisdiction to review the Final Rule lies in this Court, pursuant to 28 U.S.C. § 1331, or in the circuit courts of appeals, pursuant to 33 U.S.C. § 1369(b)(1) (*see* Final Rule, 73 Fed. Reg. 33687 under "Dates"), and because the statute of limitations for a circuit court challenge is only 120 days, *id.*, in order

to protect their rights, plaintiffs anticipate filing a petition in the U.S. Court of Appeals for the Second Circuit to challenge the Final Rule on similar grounds as those asserted herein.

      6.     Venue is properly vested in this court pursuant to 28 U.S.C. § 1391(e), because at least one of the plaintiffs resides in the district and defendants maintain offices in the district.

## PARTIES

      7.     Plaintiff Catskill Mountains Chapter of Trout Unlimited, Inc. ("CMCTU") is a domestic not-for-profit corporation organized under the laws of the State of New York, and based in Ulster County in the State of New York.  CMCTU and its approximately 200 members are dedicated to conserving, protecting, and restoring the cold water trout and salmon fisheries of the Catskills and Delaware regions of New York State.  Members of CMCTU use and enjoy the waterways in New York State and other states for a number of activities, including, but not limited to, fishing.  Some members of CMCTU are professional fly-fishing instructors and guides that use many waterways in New York State for their businesses.

      8.     Plaintiff Theodore Gordon Flyfishers, Inc. ("TGF") is a domestic not-for-profit corporation organized under the laws of the State of New York and based in New York County in the State of New York.  TGF is a conservation and fly-fishing group whose dual mission is to preserve and enhance the cold water fisheries of the Catskills and Delaware regions.  TGF focuses on proper stream management, protection of wild trout, and promoting catch and release practices.  Formed in 1962, TGF earned its reputation as an advocate of clean waters and healthy fisheries in critical legal fights; notably: defeating a pumped storage plan for Schoharie Creek, which would have destroyed the fishery; protecting the Bashakill wetlands at the entrance to the Catskills; defeating the proposed dam at Tocks Island; and helping to write the Wild and Scenic

Rivers Law.  Members of TGF use and enjoy many waterways in New York State and other states for a number of activities, including, but not limited to, fishing.

9.       Plaintiff Catskill-Delaware Natural Water Alliance, Inc. ("C-DNWA") is a domestic not-for-profit corporation organized under the laws of the State of New York and based in Ulster County in the State of New York.  C-DNWA and its members are dedicated to preserving and enhancing the environmental resources, beauty, and quality of the waters of the Catskills and Delaware regions of New York State.  Members of C- DNWA use and enjoy the waterways of New York State and other states for a number of activities; including, but not limited to, fishing.

10.       Plaintiff Federated Sportsmen's Clubs of Ulster County, Inc. ("FSC") is a domestic not-for-profit corporation organized under the laws of the State of New York and based in Ulster County in the State of New York.  FSC and its approximately 4,000 members and 40 clubs are dedicated to conserving, preserving, and protecting the fisheries of Ulster County, in New York State.  Members of FSC use and enjoy the waterways in New York State and other states for a number of activities; including, but not limited to, fishing.

11.       Plaintiff Riverkeeper, Inc. ("Riverkeeper"), is a domestic not-for-profit corporation organized under the laws of the State of New York with its offices at 828 South Broadway, Tarrytown, Westchester County, New York.  Riverkeeper's mission is to protect and enhance the water quality of the Hudson River and its tributaries for the benefit of its ecosystems and human communities.  To further these goals, Riverkeeper actively seeks federal and state agency implementation of environmental laws and, where necessary, initiates enforcement actions on behalf of its members and itself.

12.     Plaintiff Waterkeeper Alliance, Inc. ("Waterkeeper Alliance"), is a domestic not-for-profit corporation organized under the laws of the State of New York with its offices at 50 South Buckhout Street, Suite 302, Irvington, Westchester County, New York.  Waterkeeper Alliance is a membership organization with two classes of members. It maintains individual supporting members in communities across the United States, Canada and elsewhere.  It supports these members by advocating on behalf of their interests in local and national fora, including legislative bodies, government agencies, and courts of law, and keeping them informed about environmental issues that impact their communities and communities around the country.  A second class of Waterkeeper Alliance members is composed of a coalition of Basinkeepers, Baykeepers, Bayoukeepers, Canalkeepers, Channelkeepers, Coastkeepers, Creekkeepers, Deltakeepers, Gulfkeepers, Inletkeepers, Lakekeepers, Riverkeepers, Shorekeepers, Soundkeepers, Streamkeepers, and Waterkeepers chartered and licensed by Waterkeeper Alliance.  Waterkeeper Alliance supports these members by providing a centralized access point for sharing scientific, legal and administrative resources with its programs across the nation, by expanding on local Waterkeeper abilities to affect environmental compliance and policy on a national level, by sponsoring educational and capacity building programs for member organizations, by providing legal support to member programs and by administering the trademarks covering the above names.

13.     All of the plaintiffs herein, with the exception of Waterkeeper Alliance, were co-plaintiffs in an action styled *Catskill Mountains Chapter of Trout Unlimited, Inc., et al. v. City of New York*, No. 1:00-CV-511 (N.D.N.Y.) (these parties are hereinafter collectively referred to as the "Esopus Creek plaintiffs").  In that case, the Second Circuit held that interbasin pollutant

transfers (specifically, the discharge of mud and silt through a water supply tunnel into a world-renowned trout stream in the Catskill Mountains) constitutes the discharge of a pollutant from a point source and therefore requires a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402 of the Clean Water Act. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481 (2d Cir. 2001) ("*Catskills I*") (cited in the Final Rule, 73 Fed. Reg. at 33699-701 (June 13, 2008)). The Esopus Creek plaintiffs subsequently prevailed at trial and established that defendant New York City had violated the Clean Water Act by discharging pollutants without a NPDES permit into navigable waters. After judgment was entered, New York City appealed, requesting that the Second Circuit reconsider its prior holding in light of the "holistic approach" taken by EPA in its interim guidance, which also forms the basis for the Final Rule. See 73 Fed. Reg. 33697 ("This rule is consistent with EPA's June 7, 2006, proposed rule, which was based on an August 5, 2005, interpretive memorandum . . . ."). The Second Circuit adhered to its earlier interpretation, and expressly rejected EPA's legal rationale for the Final Rule as contrary to the plain statutory meaning of the Clean Water Act. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 83-85 (2d Cir. 2006) ("*Catskills II*"), *cert. denied*, 127 S. Ct. 1373 (2007).

14. All of the plaintiffs herein filed comments in opposition to the Final Rule when it was first proposed in 2006. Plaintiffs' comments are contained in the administrative record for the Final Rule.

15. Plaintiffs and their members regularly use and enjoy the fish, wildlife, water, and other natural resources of the waters of the United States for a variety of recreational, aesthetic,

educational, and scientific purposes, including, but not limited to, boating, fishing, swimming, wildlife observation, interpretative field trips, photography, nature study, and aesthetic appreciation. Plaintiffs and their members intend to continue to do all of the foregoing on an ongoing basis in the future and thereby do and will continue to derive recreational, aesthetic, scientific, educational, conservational, and economic benefits from the natural resources of these aquatic ecosystems. Defendants' failure to properly regulate interbasin pollutant transfers pursuant to the explicit requirements of the Clean Water Act has harmed, and continues to harm, Plaintiffs' and their members' recreational, aesthetic, scientific, educational, conservational, and economic interests in the natural resources of these waters.

16.     Defendant Environmental Protection Agency ("EPA") is the federal agency with primary responsibility for implementing the Clean Water Act. EPA promulgated the NPDES permitting exemption for interbasin pollutant transfers found in the Final Rule.

17.     Defendant Stephen L. Johnson is the Administrator of the EPA acting in his official capacity. Administrator Johnson signed the Final Rule on June 9, 2008.

## BACKGROUND

**The Clean Water Act**

18.     The Clean Water Act explicitly prohibits the discharge of any pollutant from any point source into navigable waters except when such a discharge is in compliance with a permit authorized by the Act's NPDES permitting regime. 33 U.S.C. §§ 1311(a), 1342, 1362.

19.     The term "navigable waters" under the Clean Water Act means the waters of the United States, including the territorial seas. 33 U.S.C. § 1362(7).

20.     The term "point source" under the Clean Water Act is defined as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Accordingly, any natural or artificial diversion or canal designed and used to channel or transport water constitutes a point source under the Clean Water Act.

21.     The term "pollutants" under the Clean Water Act includes, but is not limited to, "biological materials, . . . heat, . . . rock, sand, . . . industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

22.     The term "pollution" under the Clean Water Act is defined as "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19).

23.     The phrase "discharge of a pollutant" under the Clean Water Act includes "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

**EPA's Regulatory Exemption of Water Transfers**

24.     Water transfers often introduce pollutants to the receiving water body that have significant impacts on the environment, including: the introduction of invasive species, chemical pollutants, and excess nutrients; increased sedimentation and alteration of basic abiotic parameters (warm water into cold water habitat, or salt water into fresh water); and the resulting detrimental effects on native species.  Interbasin pollutant transfers also often carry significant public health threats including: contamination of drinking water supplies by toxic by-products from the interaction of chlorine used in treatment processes with total organic carbons, dissolved solids, nutrients, and algae; addition of harmful biota and cyanobacteria that produce toxins

harmful to humans and wildlife; and addition of toxic biological and chemical effluents already present in the transferred water from earlier pollutant discharges.

25.     Through the Final Rule, EPA has categorically exempted from NPDES permitting requirements "discharges from a water transfer," a phrase that is defined as "an activity that conveys waters of the United States to another water of the United States without subjecting the water to intervening industrial, municipal, or commercial use." 40 C.F.R. § 122.3(i).

26.     Under the Final Rule, EPA has determined that persons discharging pollutants into a receiving water body via a water transfer activity are not required to obtain a NPDES permit.

27.     The Final Rule exempts discharges of highly polluted water into unpolluted water regardless of any resulting violation of water quality standards in the receiving water body. 40 C.F.R. § 122.3(i).  Remarkably, despite having received hundreds of comments and an enormous amount of data during the comment period that demonstrate the serious human health and environmental impacts of unregulated interbasin pollutant transfers, EPA makes no effort in the Final Rule to review these undeniable adverse impacts.  Under the Final Rule, salt water could be transferred into fresh water, sediment-laden water could be sent into clear drinking water reservoirs, warm waters could be pumped into cold water habitats (such as trout streams), chemical-laden waters could be dumped into waters employed in farm and ranch irrigation, and invasive species could be pumped into waters not yet infested.  EPA does not explain how the Final Rule, which leaves such transfers of pollutants unregulated by NPDES permits, can possibly be consistent with the fundamental "objective" of the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. §

1251(a). EPA's failure to evaluate the actual and potential adverse impacts of inter-basin transfers of pollutants in the Final Rule was arbitrary, capricious, and an abuse of discretion.

28.     The categorical exemption of interbasin pollutant transfers from NPDES permit requirements contained in the Final Rule is inconsistent with the plain language of the Clean Water Act, *Catskills I & Catskills II*, and thus in excess of EPA's statutory authority under the statute.

29.     In addition, because the Final Rule will surely facilitate the introduction and spread of invasive species, EPA has also violated Presidential Executive Order 13112, entitled "Invasive Species." *See* 64 Fed. Reg. 6183 (February 9, 1999). Executive Order 13112 was issued "to prevent the introduction of invasive species and provide for their control and to minimize the economic, ecological, and human health impacts that invasive species cause." *Id.* 6183. In order to effectuate this purpose, the Order requires that all Federal agencies whose activities may affect the introduction or spread of invasive species must, among other things, prevent the introduction of invasive species and "not authorize, fund, or carry out actions that it believes are likely to cause or promote the introduction or spread of invasive species." *Id.* at 6184. There is an exception to this directive if the agency determines, and makes public such determination, that the benefits of the actions in question clearly outweigh any potential harm that may be caused by invasive species. *See id.* The agency is also required to take all feasible and prudent measures to minimize the risk of harm. *See id.* EPA did not mention Executive Order 13112 in the proposed rule and, remarkably, EPA still does not mention it in the Final Rule despite having received extensive comments with supporting data about the risks of the rule concerning invasive species.

**Procedural Background**

30.     On August 5, 2005, EPA issued an interpretive memorandum entitled "Agency Interpretation on Application of Section 402 of the Clean Water Act to Water Transfers."

31.     On June 7, 2006, EPA published for comment the "National Pollutant Discharge Elimination System (NPDES) Water Transfers Proposed Rule." 71 Fed. Reg. 32,887 (June 7, 2006).

32.     On June 9, 2008, Administrator Johnson took final agency action when he signed the Final Rule.

33.     On June 13, 2008, the Final Rule was published in the Federal Register. This rule created 40 C.F.R. § 122.3(i), to be effective as of August 12, 2008. Accordingly, EPA's promulgation of the Final Rule is now ripe for judicial review.

**CLAIMS FOR RELIEF**

**First Cause of Action**

34.     Plaintiffs hereby reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth in full herein.

35.     The interbasin pollutant transfer exemption from NPDES permit requirements set forth in the Final Rule is inconsistent with, and in excess of, EPA's authority under the Clean Water Act.

36.     EPA's unlawful promulgation of the Final Rule is subject to review under Section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2).

**Second Cause of Action**

37.     Plaintiffs hereby reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if set forth in full herein.

38.     The interbasin pollutant transfer exemption from NPDES permit requirements set forth in the Final Rule is arbitrary, capricious, an abuse of discretion and not in accordance with the plain statutory language of the Clean Water Act.

39.     EPA's unlawful promulgation of the Final Rule is subject to judicial review under Section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that the Court:

(1)     Adjudge and declare that the interbasin pollutant transfer exemption from NPDES permit requirements promulgated in 40 C.F.R. § 122.3(i) is unlawful because it is inconsistent with, and in excess of, EPA's statutory authority under the Clean Water Act;

(2)     Adjudge and declare that all discharges of a pollutant as described in 40 C.F.R. § 122.3(i) into the waters of the United States are required to obtain NPDES permits;

(3)     Adjudge and declare that EPA's promulgation of 40 C.F.R. § 122.3(i) was arbitrary, capricious, an abuse of discretion and not in accordance with law;

(4)     Order EPA immediately to repeal 40 C.F.R. § 122.3(i);

(5)     Issue a stay of the rule until such time as it is ruled upon by the court or repealed by EPA;

(6)     Award plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

(7)     Grant plaintiffs such additional and further relief as the Court may deem just, proper
and necessary.

Respectfully submitted,

Karl S. Coplan (KC3877)
Daniel E. Estrin (DE3085)
Pace Environmental Litigation Clinic, Inc.
78 North Broadway
White Plains, New York 10603
(914) 422-4343 (tel)
(914) 422-4347 (fax)

Dated:     June 20, 2008
           White Plains, New York

parts 51 and 52. See, 72 FR 72607, December 21, 2007.

EPA is now correcting the entirety of that first full paragraph at 73 FR 23958 by replacing it with the following paragraph:

"The 'reasonable possibility' standard identifies, for sources and reviewing authorities, the circumstances under which a major stationary source undergoing a modification that does not trigger major NSR must keep records. EPA's December 2007 action clarified the meaning of the term 'reasonable possibility' through changes to the federal rule language in 40 CFR parts 51 and 52. In the present case, although Alabama's rules include the term 'reasonable possibility,' Alabama's rules require recordkeeping for facilities for which there is a reasonable possibility as well as those for which there is not. Therefore, Alabama's SIP revisions are approvable."

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: June 4, 2008.

**Russell L. Wright, Jr.,**
*Acting Regional Administrator, Region 4.*
[FR Doc. E8–13348 Filed 6–12–08; 8:45 am]
BILLING CODE 6560-50-P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 122

[EPA-HQ-OW-2006-0141; FRL-8579-3]

RIN 2040-AE86

### National Pollutant Discharge Elimination System (NPDES) Water Transfers Rule

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Final rule.

**SUMMARY:** EPA is issuing a regulation to clarify that water transfers are not subject to regulation under the National Pollutant Discharge Elimination System (NPDES) permitting program. This rule defines water transfers as an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use. This rule focuses exclusively on water transfers and does not affect any other activity that may be subject to NPDES permitting requirements.

This rule is consistent with EPA's June 7, 2006, proposed rule, which was based on an August 5, 2005, interpretive memorandum entitled "Agency Interpretation on Applicability of Section 402 of the Clean Water Act to Water Transfers."

**DATES:** This final rule is effective on August 12, 2008. For judicial review purposes, this action is considered issued as of 1 p.m. eastern daylight time (e.d.t.) on June 27, 2008, as provided in 40 CFR 23.2. Under section 509(b)(1) of the Clean Water Act, judicial review of the Administrator's action can only be had by filing a petition for review in the United States Court of Appeals within 120 days after the decision is considered issued for purposes of judicial review.

**ADDRESSES:** The administrative record is available for inspection and copying at the Water Docket, located at the EPA Docket Center (EPA/DC), EPA West 1301 Constitution Ave., Room 3334, NW., Washington DC 20460. The administrative record is also available via EPA Dockets (Edocket) at *http://www.regulations.gov* under docket number EPA–HQ–OW–2006–0141. The rule and key supporting documents are also electronically available on the Internet at *http://www.epa.gov/npdes/agriculture.*

**FOR FURTHER INFORMATION CONTACT:** For additional information contact Virginia Garelick, Water Permits Division, Office of Wastewater Management (4203M), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington,

DC 20460; telephone number: 202–564–2316; fax: 202–564–6384; e-mail address: *garelick.virginia@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

I. General Information
  A. Does This Action Apply to Me?
  B. How Can I Get Copies of This Document and Other Related Information?
  C. Under What Legal Authority Is This Final Rule Issued?
  D. What is the Comment Response Document?
II. Background and Definition of Water Transfers
III. Rationale for the Final Rule
  A. Legal Framework
  B. Statutory Language and Structure
  C. Legislative History
IV. Public Comment
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review
  B. Paperwork Reduction Act
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act
  J. Executive Order 12898: Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act

## I. General Information

### A. Does This Action Apply to Me?

This action applies to those involved in the transfer of waters of the United States. The following table provides a list of standard industrial codes for operations potentially covered under this rule.

### TABLE 1.—ENTITIES POTENTIALLY REGULATED BY THIS RULE

| Category | NAICS | Examples of potentially affected entities |
|---|---|---|
| Resource management parties (includes state departments of fish and wildlife, state departments of pesticide regulation, state environmental agencies, and universities). | 924110 Administration of Air and Water Resource and Solid Waste Management Programs. | Government establishments primarily engaged in the administration, regulation, and enforcement of water resource programs; the administration and regulation of water pollution control and prevention programs; the administration and regulation of flood control programs; the administration and regulation of drainage development and water resource consumption programs; and coordination of these activities at intergovernmental levels. |

TABLE 1.—ENTITIES POTENTIALLY REGULATED BY THIS RULE—Continued

| Category | NAICS | Examples of potentially affected entities |
|---|---|---|
| | 924120 Administration of Conservation Programs. | Government establishments primarily engaged in the administration, regulation, supervision and control of land use, including recreational areas; conservation and preservation of natural resources; erosion control; geological survey program administration; weather forecasting program administration; and the administration and protection of publicly and privately owned forest lands. Government establishments responsible for planning, management, regulation and conservation of game, fish, and wildlife populations, including wildlife management areas and field stations; and other administrative matters relating to the protection of fish, game, and wildlife are included in this industry. |
| | 237110 Water and Sewer Line and Related Structures Construction. | This category includes entities primarily engaged in the construction of water and sewer lines, mains, pumping stations, treatment plants and storage tanks. |
| | 237990 Other Heavy and Civil Engineering Construction. | This category includes dam Construction and management, flood control structure construction, drainage canal and ditch construction, flood control project construction, and spillway, floodwater, construction. |
| Public Water Supply | 221310 Water Supply | This category includes entities engaged in operating water treatment plants and/or operating water supply systems. The water supply system may include pumping stations, aqueducts, and/or distribution mains. The water may be used for drinking, irrigation, or other uses. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by this action. This table lists the types of entities that EPA is now aware could potentially be affected by this action. Other types of entities not listed in the table could also be affected. To determine whether your facility is affected by this action, you should carefully examine the applicability criteria in 40 CFR 122.3. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the preceding **FOR FURTHER INFORMATION CONTACT** section.

*B. How Can I Get Copies of This Document and Other Related Information?*

1. *Docket.* EPA has established an official public docket for this action under Docket ID No. EPA–HQ–OW–2006–0041. The official public docket consists of the documents specifically referenced in this action, any public comments received, and other information related to this action. Although listed in the index, some information, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *http://www.regulations.gov* or in hard copy at the Water Docket in the EPA Docket Center, EPA West, 1301 Constitution Ave., NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone

number for the Public Reading Room is (202) 566–1744, and the telephone number for the Water Docket is (202) 566–2426.

2. *Electronic Access.* You may access this **Federal Register** document electronically through the EPA Web site under the **Federal Register** listings at *http://www.regulations.gov.*

*C. Under What Legal Authority Is This Final Rule Issued?*

This final rule is issued under the authority of sections 402 and 501 of the Clean Water Act., 33 U.S.C. 1342 and 1361.

*D. What Is the Comment Response Document?*

EPA received a large number of comments on the proposed rule, including thousands of form letters. EPA evaluated all of the comments submitted and prepared a Comment Response Document containing both the comments received and the Agency's responses to those comments. The Comment Response Document complements and supplements this preamble by providing more detailed explanations of EPA's final action. The Comment Response Document is available at the Water Docket.

**II. Background and Definition of Water Transfers**

Water transfers occur routinely and in many different contexts across the United States. Typically, water transfers route water through tunnels, channels, and/or natural stream water features, and either pump or passively direct it

for uses such as providing public water supply, irrigation, power generation, flood control, and environmental restoration. Water transfers can be relatively simple, moving a small quantity of water a short distance, or very complex, transporting substantial quantities of water over long distances, across both State and basin boundaries. Water transfers may be of varying complexities and sizes; there may be multiple reservoirs, canals, or pumps over the course of the transfer, or the route may be a more direct connection between the donor and the receiving waterbody. There are thousands of water transfers currently in place in the United States, including sixteen major diversion projects in the western States alone. Examples include the Colorado-Big Thompson Project in Colorado and the Central Valley Project in California.

Water transfers are administered by various federal, State, and local agencies and other entities. The Bureau of Reclamation administers significant transfers in western States to provide approximately 140,000 farmers with irrigation water. With the use of water transfers, the Army Corps of Engineers keeps thousands of acres of agricultural and urban land in southern Florida from flooding in former areas of Everglades wetlands. Many large cities in the west and the east would not have adequate sources of water for their citizens were it not for the continuous redirection of water from outside basins. For example, both the cities of New York and Los Angeles depend on water transfers from distant watersheds to meet their

**33699**

municipal demand. In short, numerous States, localities, and residents are dependent upon water transfers, and these transfers are an integral component of U.S. infrastructure.

The question of whether or not an NPDES permit is required for water transfers arises because activities that result in the movement of waters of the U.S., such as trans-basin transfers of water to serve municipal, agricultural, and commercial needs, typically move pollutants from one waterbody (donor water) to another (receiving water). Although there have been a few isolated instances where entities responsible for water transfers have been issued NPDES permits, Pennsylvania is the only NPDES permitting authority that regularly issues NPDES permits for water transfers. Pennsylvania began issuing permits for water transfers in 1986, in response to a State court decision mandating the issuance of such permits. See *DELAWARE Unlimited v. DER*, 508 A.2d 348 (Pa. Cmwlth. 1986). In addition, some Courts of Appeals have required NPDES permits for specific water transfers associated with the expansion of a ski resort and the supply of drinking water. See, e.g., *Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273 (1st Cir. 1996); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481 (2nd Cir 2001), aff'd, *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77 (2nd Cir 2006). Otherwise, however, water transfers have not been regulated under section 402 of the Clean Water Act (CWA or the Act).

The Supreme Court recently addressed the issue of whether an NPDES permit is necessary for the mere transfer of water in *South Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004). The Supreme Court in Miccosukee vacated a decision by the 11th Circuit, which had held that a Clean Water Act permit was required for transferring water from one navigable water into another, a Water Conservation Area in the Florida Everglades. The Court remanded the case for further fact-finding as to whether the two waters in question were "meaningfully distinct." [1] If they were not, an NPDES permit would not be required. The Court declined to resolve the question of whether water transfers require NPDES permits when the waterbodies at issue are meaningfully distinct. The Court noted

that some legal arguments made by the parties regarding this question had not been raised in the lower court proceedings and noted that these arguments would be open to the parties on remand. *Id.* at 109.

On August 5, 2005, EPA issued a legal memorandum entitled "Agency Interpretation on Applicability of section 402 of the Clean Water Act to Water Transfers" ("interpretive memorandum"). The principal legal question addressed in the interpretive memorandum was whether the movement of pollutants from one water of the U.S. to another by a water transfer is the "addition" of a pollutant potentially subjecting the activity to the permitting requirement under section 402 of the Act. Based on the statute as a whole and consistent with the Agency's longstanding practice, the interpretive memorandum concluded that Congress generally expected water transfers would be subject to oversight by water resource management agencies and State non-NPDES authorities, rather than the permitting program under section 402 of the CWA.

On June 7, 2006, EPA proposed regulations based on the analysis contained in the interpretive memorandum to expressly state that water transfers are not subject to regulation under section 402 of the CWA. The Agency proposed to define water transfers as "an activity that conveys waters of the United States to another water of the United States without subjecting the water to intervening industrial, municipal, or commercial use." The Act reserves the ability of States to regulate water transfers under State law and this proposed rulemaking was not intended to interfere with this State prerogative. *See* CWA section 510.

EPA is issuing a final regulation that is nearly identical to the proposed rule. (Minor changes have been made for clarity.) Through today's rule, the Agency concludes that water transfers, as defined by the rule, do not require NPDES permits because they do not result in the "addition" of a pollutant. Consistent with the proposed rule, EPA defines water transfers in the following manner: "Water transfer means an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use." In order to constitute a "water transfer" under this rule, and, therefore, be exempt from the requirement to obtain an NPDES permit, the water being conveyed must be a water of the

U.S.[2] prior to being discharged to the receiving waterbody. If the water that is being conveyed is not a water of the U.S. prior to being discharged to the receiving body, then that activity does not constitute a water transfer under today's rule. Additionally, the water must be conveyed from one water of the U.S. to another water of the U.S. Conveyances that remain within the same water of the U.S., therefore, do not constitute water transfers under this rule, although movements of water within a single water body are also not subject to NPDES permitting requirements. As the rule makes clear, in order to be a water transfer under the rule, the water must be conveyed without being subjected to an intervening industrial, municipal, or commercial use.

Consider water that is being moved from Reservoir A to Reservoir B in a different watershed. In order to get from Reservoir A to Reservoir B, the water must first be released through a dam. The water then travels down River A, which is considered a water of the U.S. Next, the water is conveyed from River A to River B through a tunnel. Finally, the water travels down River B, also a water of the U.S., and flows into Reservoir B. There are several points in this example where water is conveyed from one body to another, but not all of those points would themselves constitute a "water transfer" because they are not the conveyance of "waters of the United States to another water of the United States." The first example is the release from Reservoir A to River A. This does not constitute a water transfer under EPA's definition because the water on both sides of the dam is part of the same water of the U.S.[3] The next movement is the release from River A into River B, through a tunnel. This release constitutes a water transfer under the scope of this rule because it conveys water from one water of the U.S. to another water of the U.S. without subjecting the water to an intervening industrial, municipal or

---

[1] At the time of this rulemaking, the District Court has stayed its proceedings until resolution of a similar case in the same District Court, *Friends of the Everglades v. South Florida Water Management District.*

[2] Waters of the U.S. are defined for purposes of the NPDES program in 40 CFR 122.2 and this rulemaking does not seek to address what is within the scope of that term.

[3] It should be noted, however, that this release would still not require an NPDES permit because EPA and the Federal courts have determined that a discharge from a dam does not result in an "addition" of a pollutant unless the dam itself discharges a pollutant such as grease into the water passing through the dam. See *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982); *National Wildlife Fed'n v. Consumers Power Company*, 862 F.2d 580 (6th Cir. 1988). Cf. *S.D. Warren Co. v. Maine Board of Environmental Protection*, 126 S.Ct. 1843 (2006) (Certification under CWA section 401 may be needed in some instances).

commercial use. Therefore, unless this conveyance itself introduces pollutants into the water being conveyed, the release will not require an NPDES permit under today's rule. River B's subsequent flow into Reservoir B, which is formed by a dam on Reservoir B, does not constitute a water transfer because it is merely movement within the same water of the U.S., and, as discussed above, would not require an NPDES permit for such movement.

The remainder of the preamble to this final rule is organized as follows. Section III discusses the rationale for the final rule based on the language, structure, and legislative history of the Clean Water Act. Section IV summarizes and responds to the major comments received in response to the scope of the proposed rule. Section V reviews statutory provisions and various executive orders.

## III. Rationale for the Final Rule

On June 7, 2006, EPA published a proposed rule that would exclude from NPDES permit requirements discharges from water transfers that do not subject the water to an intervening industrial, municipal, or commercial use, so long as pollutants are not introduced by the water transfer activity itself. This proposal, like EPA's August 5, 2005, interpretive memorandum, explained that no one provision of the Act expressly addresses whether water transfers are subject to the NPDES program but described the indicia of Congressional intent that water transfers not be so regulated. Therefore, today's rule appropriately defers to congressional concerns that the statute not unnecessarily burden water quantity management activities and excludes water transfers from the NPDES program. This section will review the legal framework for evaluating EPA's interpretation of the CWA, explain the Agency's interpretation of the CWA, including a brief survey of prior litigation over the relevant statutory terms, and outline the relevant legislative history.

### A. Legal Framework

Under what is traditionally viewed as *Chevron* analysis, a court examining the legality of an agency's interpretation of a statute is to first ask whether the statute speaks clearly to the precise question at issue and must give effect to the unambiguously expressed intent of Congress if such unambiguous intent can be discerned. *Chevron U.S.A. Inc.* v. *NRDC*, 467 U.S. 837, 842–843 *(Chevron); National Ass. of Homebuilders, et al.* v. *Defenders of Wildlife, et al.*, 127 S.Ct. 2518, 2534

(2007) *(NAHB)*. To the extent that a statute does not speak clearly to the specific issue, the Agency interpretation must be upheld if it is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843; *NAHB*, 127 S.Ct. at 2534. Courts are required to accept an agency's reasonable interpretation of a statute, even if this interpretation differs from what the court believes to be the "best" statutory interpretation. *National Cable and Telecommunications Ass'n, et. al.* v. *Brand X, et al.*, 545 U.S. 967, 980 (2005) *(Brand X)*.

Deference to an agency interpretation of a statute under *Chevron* is appropriate where Congress has authorized an agency to make rules carrying the force of law, and such authorization is apparent where the agency is empowered to make rules or adjudicate issues or there are other indications of comparable congressional intent. *United States* v. *Mead Corp.*, 533 U.S. 218 (2001). Congress has expressly authorized EPA to prescribe regulations as are necessary to administer the CWA, and today's rule has been promulgated to address the question whether water transfers require NPDES permits. CWA section 501(a); 33 U.S.C. 1361(a); 71 FR 32887 (June 7, 2006).

As discussed below, EPA has reviewed the language, structure and legislative history of the CWA and concludes that today's rule, which clarifies that NPDES permits are not required for transfers of waters of the United States from one water body to another, is a permissible construction of the statute. Taken as a whole, the statutory language and scheme support the conclusion that permits are not required for water transfers.

### B. Statutory Language and Structure

The Clean Water Act prohibits the discharge of a pollutant by any person except in compliance with specified statutory sections, including section 402. CWA section 301(a). The term "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." CWA section 502(12). The legal question addressed by today's rule is whether a water transfer as defined in the new regulation constitutes an "addition" within the meaning of section 502(12).

The term "addition" has been interpreted by courts in a variety of contexts that are relevant here. Several courts of appeals have determined that water flowing through dams and hydroelectric facilities does not constitute an addition of a pollutant under the CWA. Specifically, the Court

of Appeals for the D.C. Circuit agreed with EPA that the term "addition" may reasonably be limited to situations in which "the point source itself physically introduces a pollutant into a water from the outside world." *National Wildlife Fed'n* v. *Gorsuch*, 693 F.2d 156, 175 (D.C. Cir. 1982) *(Gorsuch)* (accepting EPA's view that the requirement for an NPDES permit "is established when the pollutant first enters the navigable water, and does not change when the polluted water later passes through the dam from one body of navigable water (the reservoir) to another (the downstream river).") The Court of Appeals for the Sixth Circuit reached the same conclusion with regard to a hydropower facilities operating on Lake Michigan. *National Wildlife Fed'n* v. *Consumers Power Co.* 862 F.2d 580, 584 (6th Cir. 1988) *(Consumers Power)* (agreeing with the *Gorsuch* Court's conclusion that EPA's construction of "addition" is a permissible one). Both the *Gorsuch* and *Consumers Power* courts accorded deference to EPA's interpretation of the CWA, and specifically to its interpretation of the term "addition." *Gorsuch*, 693 F.2d at 166–167; *Consumers Power*, 862 F.2d at 584.

Three other Courts of Appeals, however, have concluded that where a water transfer involves distinct waters of the United States, the transfer constitutes an "addition" of pollutants. *Dubois* v. *U.S. Dept. of Agriculture, et al.*, 102 F.3d 1273, 1298–1300 (1st Cir. 1996); *Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *City of New York*, 273 F.3d 481, 491–93 (2nd Cir. 2001) *(Catskill I)*; *Miccosukee Tribe of Indians* v. *South Florida Water Management District*, 280 F.3d 1364 (11th Cir. 2002), *vacated by Miccosukee*, 541 U.S. at 112.[4] These three Courts of Appeals construed the term "addition"

---

[4] EPA recognizes that the approach adopted by these three courts is at odds with today's rule. None of these three courts, however, viewed the question of statutory interpretation through the lens of *Chevron* deference. *DuBois*, 102 F.3d at 1285, n. 15 (*Chevron* does not apply because the court "was not reviewing an agency's interpretation of the statute that it was directed to enforce."); *Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *City of New York*, 451 F.3d 77, 82 (2nd Cir. 2006) *(Catskill II)* ("The City concedes that this EPA interpretation is not entitled to *Chevron* deference."); *Catskill I*, 273 F.3d at 490 (Declining to apply *Chevron* deference, but acknowledging that "[i]f the EPA's position had been adopted in a rulemaking or other formal proceeding, deference of the sort applied by the *Gorsuch* and *Consumers Power* courts might be appropriate."); *Miccosukee*, 280 F.3d at 1367, n. 4 ("The EPA is no party to this case; we can ascertain no EPA position applicable to [the water transfer at issue] to which to give any deference, much less *Chevron* deference."). Moreover, the approaches adopted by the *Gorsuch* and *Consumers Power* courts is compatible with today's rule.

so as to include transfers of water from one body to another distinct body (*Catskill I*, 273 F.3d at 491 ("EPA's position * * * is that for there to be an 'addition,' a 'point source must introduce the pollutant into navigable water from the outside world.' We agree with this view *provided that 'outside world' is construed as any place outside the particular water body to which pollutants are introduced.*") (internal citations omitted, emphasis added); *Catskill II*, 451 F.3d at 82–85) or transfers that cause water to move in a direction it would not ordinarily flow (*DuBois*, 102 F.3d at 1297; *Catskill I*, 273 at 493–94 (explaining *DuBois*); *Miccosukee*, 280 F.3d at 1368–69).

In pending litigation, on the other hand, the United States has taken the position that the Clean Water Act generally does not subject water transfers to the NPDES program:

The statute defines "'discharge of a pollutant'" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. 1362(12). When the statutory definition of "'navigable waters'"—*i.e.*, "the waters of the United States," 33 U.S.C. 1362(7)—is inserted in place of "navigable waters," the statute provides that NPDES applies only to the "*addition* of any pollutant *to the waters* of the United States." Given the broad definition of "pollutant," transferred (and receiving) water will always contain intrinsic pollutants, but the pollutants in transferred water are already *in* "the waters of the United States" before, during, and after the water transfer. Thus, there is no "addition"; nothing is being added "*to*" "the waters of the United States" by virtue of the water transfer, because the pollutant at issue is already part of "the waters of the United States" to begin with. Stated differently, when a pollutant is conveyed along with, and already subsumed entirely within, navigable waters and the water is not diverted for an intervening use, the water never loses its status as "waters of the United States," and thus nothing is added to those waters from the outside world.

Brief for the United States in *Friends of the Everglades* v. *South Florida Water Management Dist.*, No. 07–13829–H (11th Cir.).

The Agency has concluded that, taken as a whole, the statutory language and structure of the Clean Water Act indicate that Congress generally did not intend to subject water transfers to the NPDES program. Interpreting the term "addition" in that context, EPA concludes that water transfers, as defined by today's rule, do not constitute an "addition" to navigable waters to be regulated under the NPDES program. Instead, Congress intended to leave primary oversight of water transfers to state authorities in cooperation with Federal authorities.

In interpreting the term "addition" in section 502(12) of the statute, EPA is guided by several principles. "Addition" is a general term, undefined by the statute. Partly for this reason, the courts have accorded substantial discretion to EPA in interpreting the term in the context of the "dams" cases. *Gorsuch*, 693 F.2d at 175 (finding the statute capable of supporting multiple interpretations, the legislative history unhelpful, and concluding that Congress would have given EPA discretion to define "addition" had it expected the meaning of the term to be disputed); *Consumers Power*, 862 F.2d at 584–85 (agreeing with the analysis in *Gorsuch*). Moreover, several alternative ways of interpreting the term "addition" have been proposed in the context of water transfers. As noted above, EPA's longstanding position is that an NPDES pollutant is "added" when it is introduced into a water from the "outside world" by a point source. *Gorsuch*, 693 F.2d at 174–175. Under one interpretation, advanced by the 2nd Circuit in *Catskill Mountain*, "the outside world" means anywhere outside the particular waterbody receiving the pollutant, and so a permit in that case was required for movement of pollutants between distinct waterbodies. *Catskill I*, 273 F.3d at 491. EPA does not agree with this understanding of the term "outside world" as evinced by its long-standing practice of generally not requiring NPDES permits for transfers between water bodies, which it has defended against court challenges asserting that such transfers do require such permits. Rather, EPA believes that an addition of a pollutant under the Act occurs when pollutants are introduced from outside the waters being transferred.

As noted above, various courts have reached different conclusions in determining when movement of waters of the United States containing pollutants constitutes an "addition" of a pollutant. To resolve the confusion created by these conflicting approaches, the Agency has looked to the statute as a whole for textual and structural indices of Congressional intent on the question whether water transfers that do not themselves introduce new pollutants require an NPDES permit.

Statutory construction principles instruct that the Clean Water Act should be interpreted by analyzing the statute as a whole. *United States* v. *Boisdore's Heirs*, 49 U.S. 113, 122 (1850). The Supreme Court has long explained "in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and its object and

policy." *Id. See also*, *Gustafond* v. *Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995), *Smith* v. *United States*, 508 U.S. 223, 233 (1993), *United States Nat'l Bank of Or.* v. *Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993). In general, the "whole statute" interpretation analysis means that "a statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole." Norman J. Singer, *Statutes and Statutory Construction* vol. 2A § 46:05, 154 (6th ed., West Group 2000). As the Second Circuit has explained with regard to the CWA:

Although the canons of statutory interpretation provide a court with numerous avenues for supplementing and narrowing the possible meaning of ambiguous text, most helpful to our interpretation of the CWA in this case are two rules. First, when determining which reasonable meaning should prevail, the text should be placed in the context of the entire statutory structure [quoting *United States* v. *Dauray*, 215 F.3d 257, 262 (2d Cir. 2000)]. Second, "absurd results are to be avoided and internal inconsistencies in the statute must be dealt with." *United States* v. *Turkette*, 452 U.S. 576, 580 (1981).

*Natural Res. Def. Council* v. *Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001). *See also*, Singer, vol. 3B § 77:4, at 256–258.

A holistic approach to the text of the CWA is needed here in particular because the heart of this matter is the balance Congress created between federal and State oversight of activities affecting the nation's waters. The purpose of the CWA is to protect water quality. Congress nonetheless recognized that programs already existed at the State and local levels for managing water quantity, and it recognized the delicate relationship between the CWA and State and local programs. Looking at the statute as a whole is necessary to ensure that the analysis herein is consonant with Congress's overall policies and objectives in the management and regulation of the nation's water resources.

While the statute does not define "addition," sections 101(g), 102(b), 304(f), and 510(2) provide a strong indication that the term "addition" should be interpreted in accordance with the text of the more specific sections of the statute. In light of Congress' clearly expressed policy not to unnecessarily interfere with water resource allocation and its discussion of changes in the movement, flow or

circulation of any navigable waters as sources of pollutants that would not be subject to regulation under section 402, it is reasonable to interpret "addition" as not including the mere transfer of navigable waters.

The specific statutory provisions addressing the management of water resources—coupled with the overall statutory structure—provide textual support for the conclusion that Congress generally did not intend for water transfers to be regulated under section 402. The Act establishes a variety of programs and regulatory initiatives in addition to the NPDES permitting program. It also recognizes that the States have primary responsibilities with respect to the "development and use (including restoration, preservation, and enhancement) of land and water resources." CWA section 101(b).

Congress also made clear that the Clean Water Act is to be construed in a manner that does not unduly interfere with the ability of States to allocate water within their boundaries, stating:

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by [the Act]. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water sources.

CWA section 101(g). While section 101(g) does not prohibit EPA from taking actions under the CWA that it determines are needed to protect water quality,[5] it nonetheless establishes in the text of the Act Congress's general direction against unnecessary Federal interference with State allocations of water rights.

Water transfers are an essential component of the nation's infrastructure for delivering water that users are entitled to receive under State law. Because subjecting water transfers to a federal permitting scheme could unnecessarily interfere with State decisions on allocations of water rights, this section provides additional support for the Agency's interpretation that, absent a clear Congressional intent to the contrary, it is reasonable to read the

statute as not requiring NPDES permits for water transfers. See United States v. Bass, 404 U.S. 336, 349 (1971) ("unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.")

An additional statutory provision, section 510(2), provides:

Except as expressly provided in this Act, nothing in this Act shall * * * be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

Like section 101(g), this provision supports the notion that Congress did not intend administration of the CWA to unduly interfere with water resource allocation.

Finally, one section of the Act— 304(f)—expressly addresses water management activities. Mere mention of an activity in section 304(f) does not mean it is exclusively nonpoint source in nature. See Miccosukee 541 U.S. at 106 (noting that section 304(f)(2)(F) does not explicitly exempt nonpoint sources if they also fall within the definition of point source). Nonetheless, section 304(f) is focused primarily on addressing pollution sources outside the scope of the NPDES program. See H.R. Rep. No. 92–911, at 109 (1972), reprinted in Legislative History of the Water Pollution Control Act Amendments of 1972, Vol. 1 at 796 (Comm. Print 1973) ("[t]his section * * * on * * * nonpoint sources is among the most important in the 1972 Amendments") (emphasis added). This section directed EPA to issue guidelines for identifying and evaluating the nature and extent of nonpoint sources of pollution,[6] as well as processes, procedures and methods to control pollution from, among other things, "changes in the movement, flow or circulation of any navigable waters or ground waters, including changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities." CWA 304(f)(2)(F) (emphasis added).

While section 304(f) does not exclusively address nonpoint sources of pollution, it nonetheless "concerns nonpoint sources" (Miccosukee, 541 U.S. at 106) and reflects an understanding by Congress that water movement could result in pollution, and that such pollution would be managed by States under their nonpoint source

program authorities, rather than the NPDES program. Today's rule accords with the direction to EPA and other federal agencies in section 101(g) to work with State and local agencies to develop "comprehensive solutions" to water pollution problems "in concert with programs for managing water resources."

The text of these sections of the Act together demonstrate that Congress was aware that there might be pollution associated with water management activities, but chose to defer to comprehensive solutions developed by State and local agencies for controlling such pollution. Because the NPDES program focuses on discharges from point sources of pollutants, it is not the kind of comprehensive program that Congress believed was best suited to addressing pollution, which is the term used for the nonpoint source program. It is this type of non-point source pollution that may be associated with water transfers.

In several important ways, water transfers are unlike the types of discharges that were the primary focus of Congressional attention in 1972. Discharges of pollutants covered by section 402 are subject to "effluent" limitations. Water transfers, however, are not like effluent from an industrial, commercial or municipal operation. Rather than discharge effluent, water transfers convey one water of the U.S. into another. Additionally, the operators of water control facilities are generally not responsible for the presence of pollutants in the waters they transport. Rather, those pollutants often enter "the waters of the United States" through point and nonpoint sources unassociated with those facilities and beyond control of the project operators. Congress generally intended that pollutants be controlled at the source whenever possible. See S. Rep. No. 92–414, p. 77 (1972) (justifying the broad definition of navigable waters because it is "essential that discharge of pollutants be controlled at the source").[7] The pollution from transferred waters is more sensibly addressed through water resource planning and land use regulations, which attack the problem at its source. See, e.g., CWA section 102(b) (reservoir planning); CWA section 208(b)(2)(F) (land use planning to

---

[5] PUD No. 1 of Jefferson County. v. Wash. State Dep't. of Ecology, 511 U.S. 700, 720 (1994) ("Sections 101(g) and 510(2) preserve the authority of each State to allocate water quantity as between users; they do not limit the scope of water pollution controls that may be imposed on users who have obtained, pursuant to state law, a water allocation.").

[6] Sources not regulated under sections 402 or 404 are generically referred to as "nonpoint sources." See Consumers Power, 862 F.2d at 582 ("'nonpoint source' is shorthand for and 'includes all water quality problems not subject to section 402'") (quoting Gorsuch, 693 F.2d at 166) (internal quotation marks omitted).

[7] Recognition of a general intent to control pollutants at the source does not mean that dischargers are responsible only for pollutants that they generate; rather, point sources need only convey pollutants into navigable waters to be subject to the Act. See Miccosukee at 105. Municipal separate storm sewer systems, for example, are clearly subject to regulation under the Act. CWA section 402(p).

reduce agricultural nonpoint sources of pollution); CWA section 319 (nonpoint source management programs); and CWA section 401 (state certification of federally licensed projects). Congress acknowledged this when it directed Federal agencies to co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce, and eliminate pollution in concert with programs for managing water sources.

The Agency, therefore, concludes that, taken as a whole, the statutory language and structure of the Clean Water Act indicate that Congress generally did not intend to subject water transfers to the NPDES program. Interpreting the term "addition" in that context, EPA concludes that water transfers, as defined by today's rule, do not constitute an "addition" to navigable waters to be regulated under the NPDES program. Rather, Congress intended to leave primary oversight of water transfers to state authorities in cooperation with Federal authorities.

*C. Legislative History*

The legislative history of the Clean Water Act also supports the conclusion that Congress generally did not intend to subject water transfers to the NPDES program. First, the legislative history of section 101(g) reveals that "[i]t is the purpose of this [provision] to insure that State [water] allocation systems are not subverted." 3 Congressional Research Serv., U.S. Library of Congress, Serial No. 95–14, A Legislative History of the Clean Water Act of 1977, at 532 (1978); *see PUD No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700, 721 (1994).

Notably, the legislative history of the Act discusses water flow management activities in the context of the nonpoint source program only. In discussing section 304(f), the House Committee Report specifically mentioned water flow management as an area where EPA would provide technical guidance to States for their nonpoint source programs, rather than an area to be regulated under section 402.

This section and the information on such nonpoint sources is among the most important in the 1972 Amendments. * * * The Committee, therefore, expects the Administrator to be most diligent in gathering and distribution of the guidelines for the identification of nonpoint sources and the information on processes, procedures, and methods for control of pollution from such nonpoint sources as * * * *natural and manmade changes in the normal flow of surface and ground waters.*

H.R. Rep. No. 92–911, at 109 (1972) (emphasis added).

In the legislative history of section 208 of the Act, the House Committee report noted that in some States, water resource management agencies allocating stream flows are required to consider water quality impacts. The Report stated:

[I]n some States water resource development agencies are responsible for allocation of stream flow and are required to give full consideration to the effects on water quality. To avoid duplication, the Committee believes that a State which has an approved program for the handling of permits under section 402, and which has a program for water resource allocation should continue to exercise the primary responsibility in both of these areas and thus provide a balanced management control system.

H.R. Rep. No. 92–911, at 96 (1972).

Thus, Congress recognized that the new section 402 permitting program was not the only viable approach for addressing water quality issues associated with State water resource management. The legislative history makes clear that Congress generally did not intend a wholesale transfer of responsibility for water quality away from water resource agencies to the NPDES authority. Rather, Congress encouraged States to obtain approval of authority to administer the NPDES program under section 402(b) so that the NPDES program could work in concert with water resource agencies' oversight of water management activities to ensure a "balanced management control system." *Id.*

In sum, the language, structure, and legislative history of the statute all support the conclusion that Congress generally did not intend to subject water transfers to the NPDES program. Water transfers are an integral part of water resource management; they embody how States and resource agencies manage the nation's water resources and balance competing needs for water. Water transfers also physically implement State regimes for allocating water rights, many of which existed long before enactment of the Clean Water Act. Congress was aware of those regimes, and did not want to impair the ability of these agencies to carry them out. EPA's conclusion that the NPDES program does not apply to water transfers respects Congressional intent, comports with the structure of the Clean Water Act, and gives meaning to sections 101(g) and 304(f) of the Act.

Based on these reasons, today's rule is within EPA's authority and consistent with the CWA.

**IV. Public Comment**

EPA received many comments from the public and a number of states stating

that the Agency does not have authority to exclude from the requirement to obtain NPDES permits, a specific class of dischargers (in this case, water transfers). These commenters were concerned that the proposed rule could jeopardize the NPDES and water quality standards (WQS) programs. In particular, they feared that point source regulation of discharges from impoundments used to settle mining wastes might fall outside the scope of section 402 if the proposed rule were finalized. In response to these comments, the Agency believes that impoundments used to settle mining process water or waste water would generally constitute "waste treatment systems" designed to meet the requirements of the CWA and would be excluded from the definition of "waters of the United States." See 40 CFR 122.2 (definition of "Waters of the United States"). The addition of pollutants from a waste treatment system to a water of the United States triggers the permitting requirement, and today's rule therefore does not affect the permitting of such facilities.

Some commenters argued that the proposed rule is inconsistent with section 404 of the CWA (permits for dredged or fill material). They stated that dredged material is listed as a pollutant under section 502 of the CWA and that the proposed rule implies that dredged material never requires a permit unless the dredged material originates from a waterbody that is not a water of the U.S. EPA believes that today's final rule will not have an effect on the 404 program. The statutory definition of "pollutant" includes "dredged spoil," which by its very nature comes from a waterbody. 33 U.S.C. 1362(6); 40 CFR 232.2; *United States v. Hubenka*, 438 F.3d 1026, 1035 (10th Cir. 2006); *United States v. Deaton*, 209 F.3d 331, 335–336 (4th Cir. 2000); *Borden Ranch Partnership v. United States*, 261 F.3d 810, 814 (9th Cir. 2001). Because Congress explicitly forbade discharges of dredged material except as in compliance with the provisions cited in CWA section 301, today's rule has no effect on the 404 permit program, under which discharges of dredged or fill material may be authorized by a permit. 33 U.S.C. 1344.

As explained above, EPA disagrees that Congress generally intended water transfers to obtain NPDES permits. EPA believes that this action will add clarity to an area in which judicial decisions have created uncertainty, and for reasons previously described in section III of this preamble, concludes that Congress generally intended to leave the

oversight of water transfers to authorities other than the NPDES program. Congress made clear that the CWA is not to be construed in a manner that does not unduly interfere with the ability of States to allocate water within their boundaries. Specific statutory provisions in the CWA addressing the management of water resources denote that Congress generally did not intend for water transfers to be regulated under section 402 of the CWA. Rather, sections 101(b), 208, and 304(f), in particular, establish a variety of programs and regulatory initiatives that more appropriately address water transfers. EPA's conclusion that the NPDES program does not apply to water transfers respects Congressional intent and comports with the structure of the CWA.

*Definition of a Water Transfer*

In the proposed rule, EPA specifically requested comment on whether the proposed definition of a water transfer properly achieves the Agency's objective. Many commenters supported the Agency's proposed definition, either generally or explicitly. On the other hand, some commenters found the proposed definition too narrow and suggested that the Agency defer to state law. Others found the definition overly broad and suggested that it may encompass too many activities. These concerns, among others, are addressed in the following discussions.

In response to the comment suggesting that the proposed definition of a water transfer is too narrow and should also include transfers between waterbodies defined as waters of the State, even where they do not constitute waters of the United States under the CWA, EPA believes that making such a change would not be appropriate because the NPDES program only applies to waters of the U.S. The same commenter also suggested that EPA defer to state law in defining a water transfer. In response, the Agency finds that a definition applicable nationwide is important to provide consistency in the application of this rule. However, nothing in this rule precludes a State, under State law, from regulating water transfers that are not subject to section 402 of the Clean Water Act. States may not exclude from NPDES permit requirements sources that are point sources under Federal law, including those that do not meet the definition of a water transfer in today's rule. For example, a point source that subjects waters of the United States to an intervening industrial, municipal or commercial use could not be exempted

from NPDES permitting requirements under State law.

This rule expressly states that "discharges from a water transfer" are not subject to NPDES permitting. The Agency defines a water transfer as "an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use." A water transfer is an engineered activity that diverts a water of the U.S. to a second water of the U.S. Thus, commenters who read the natural convergence of two rivers as being a water transfer are incorrect, though such natural convergences also do not require NPDES permits.

Some commenters sought clarification of certain elements of the term "water transfer" while others suggested changes they believed would either clarify or improve the scope of the term. Commenters suggested that EPA change the use of the term "activity" to either "occasion," "instance," or "occurrence," such that the definition would read: "water transfer means an instance in which waters of the U.S. are conveyed * * *." The commenters' concern is that the term "activities" narrows the rule to only human directed or controlled events rather than any instance in which water supplies are moved. The Agency disagrees that the change is necessary. By "activity," the Agency means any system of pumping stations, canals, aqueducts, tunnels, pipes, or other such conveyances constructed to transport water from one water of the U.S. to another water of the U.S. Such a system may consist of a single tunnel or pumping station or it may require the use of multiple facilities along the course of the transfer to reach the second water of the U.S.

*Intervening Industrial, Municipal, or Commercial Use*

A discharge of a pollutant associated with a water transfer resulting from an intervening commercial, municipal, or industrial use, or otherwise introduced to the water by a water transfer facility itself would require an NPDES permit as any discharge of a pollutant from a point source into a water of the U.S. would. The most frequent comment on the proposed definition was that the phrase "intervening industrial, municipal, or commercial use" was unclear or overbroad.[8] EPA disagrees

that this phrase is unclear or overbroad, and provides clarification and examples of intervening uses below.

For example, if the water is withdrawn to be used as cooling water, drinking water, irrigation, or any other use such that it is no longer a water of the U.S. before being returned to a water of the U.S., the water has been subjected to an intervening use.[9] In contrast, a water pumping station, pipe, canal, or other structure used solely to facilitate the transfer of the water is not an intervening use.

The reintroduction of the intake water and associated pollutants from an intervening use through a point source is an "addition" and has long been subject to NPDES permitting requirements. *See, e.g.*, 40 CFR 122.2 (definition of process wastewater); 40 CFR 125.80 through 125.89 (regulation of cooling towers); 40 CFR 122.45(g) (regulations governing intake pollutants for technology-based permitting); 40 CFR Part 132, Appendix F, Procedure 5–D (containing regulations governing water quality-based permitting for intake pollutants in the Great Lakes). Moreover, a discharge from a waste treatment system, for example, to a water of the United States, would not constitute a water transfer and would require an NPDES permit. *See* 40 CFR 122.2. In these situations, the reintroduction of water and that water's associated pollutants physically introduces pollutants from the outside world and, therefore, is an "addition" subject to NPDES permitting requirements. The fact that some of the pollutants in the discharge from an intervening use may have been present in the source water does not remove the need for a permit, although, under some circumstances, permittees may receive "credit" in their effluent limitations for such pollutants. See 40 CFR 122.45(g) (regulations governing intake pollutants for technology-based permitting); 40 CFR Part 132, Appendix F, Procedure 5–

---

[8] EPA's discussion of intervening uses is not intended to address or exclude any other activity that is currently subject to NPDES permitting. For example, this rule does not affect EPA's longstanding position that, if water is withdrawn from waters of the U.S. for an intervening industrial, municipal or commercial use, the

reintroduction of the intake water and associated pollutants is an "addition" subject to NPDES permitting requirements. Nor does this rule change EPA's position, upheld by the Supreme Court in *Miccosukee*, that the definition of "discharge of a pollutant" in the CWA includes coverage of point sources that do not themselves generate pollutants. The Supreme Court stated, "A point source is, by definition, a 'discernible, confined, and discrete *conveyance*' section 1362(14) (emphasis added). That definition makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters,' which are, in turn, defined as 'the waters of the United States.' Section 1362(7)." *Miccosukee*, 541 U.S. at 105.

[9] Note that return flows from irrigated agriculture are exempt from the requirement to obtain a NPDES permit under both the Act itself and 40 CFR 122.3. Today's rule does not affect that exemption.

D (containing regulations governing water quality-based permitting for intake pollutants in the Great Lakes.

Similarly, an NPDES permit is normally required if a facility withdraws water from a water of the U.S., removes preexisting pollutants to purify the water, and then discharges the removed pollutants (perhaps in concentrated form) back into the water of the U.S. while retaining the purified water for use in the facility. An example of this situation is a drinking water treatment facility which withdraws water from streams, rivers, and lakes. The withdrawn water typically contains suspended solids, which are removed to make the water potable. The removed solids are a waste material from the treatment process and, if discharged into waters of the U.S., are subject to NPDES permitting requirements, even though that waste material originated in the withdrawn water. *See, e.g., In re City of Phoenix, Arizona Squaw Peak & Deer Valley Water Treatment Plants,* 9 E.A.D. 515, 2000 WL 1664964 (EPA Envtl. App. Bd. Nov. 1, 2000) (rejecting, on procedural grounds, challenges to NPDES permits for two drinking water treatment plants that draw raw water from the Arizona Canal, remove suspended solids to purify the water, and discharge the solids back into the Canal); *Final NPDES General Permits for Water Treatment Facility Discharges in the State of Massachusetts and New Hampshire,* 65 FR 69,000 (2000) (NPDES permits for discharges of process wastewaters from drinking water treatment plants).

The Clean Water Act also clearly imposes permitting requirements on publicly owned treatment works, and large and medium municipal separate storm sewer systems. *See* CWA sections 402(a), 402(p)(1)–(4). Congress amended the Clean Water Act in 1987 specifically to add new section 402(p) to better regulate stormwater discharges from point sources. Water Quality Act of 1987, Public Law 100–4, 101 Stat. 7 (1987). Again, this interpretation regarding water transfers does not affect EPA's longstanding regulation of such discharges. These examples are mentioned to illustrate what is meant by "intervening industrial, municipal, or commercial use," and are situations not associated with water transfers.

*Hydroelectric Operations*

Some commenters, including State agencies with hydroelectric resources, utilities, and water districts expressed concern that if hydroelectric operations incidental to a water transfer were considered an intervening use, the water transfer would be disqualified from the

exemption. Utilities often take advantage of the change in elevation over the course of a water transfer by installing hydroelectric facilities. The California State Water Resources Control Board highlighted in their comment that the Central Valley Project includes eleven power plants and that the State Water Project, the Los Angeles Aqueduct, and the All American Canal also contain hydroelectric power plants.

Today's rule does not affect the longstanding position of EPA and the Courts that hydroelectric dams do not generally require NPDES permits. See *Gorsuch,* 693 F.2d 156; *Consumers Power* 862 F.2d 580. EPA agrees that the transfers described in California are excluded from NPDES permitting requirements unless, as discussed below, the hydroelectric facility itself introduces a pollutant such as grease into the water passing though the dam.

*When Water Transfers Introduce Pollutants*

Comments were also submitted regarding pollutants that were added by the water transfer. Commenters expressed concern that water transfers may have significant impacts on the environment, including (1) the introduction of invasive species, toxic blue-green algae, chemical pollutants, and excess nutrients; (2) increased turbidity; and (3) alteration of habitat (e.g., warm water into cold water or salt water into fresh water). In response to these comments, EPA notes that today's rule does not interfere with any of the states' rights or authorities to regulate the movement of waters within their borders. Rather, this rule merely clarifies that NPDES permits are not required for water transfers. States currently have the ability to address potential in-stream and/or downstream effects of water transfers through their WQS and TMDL programs. Nothing in today's rule affects the ability for states to establish WQS appropriate to individual waterbodies or waterbody segments.

The final rule, consistent with the proposed rule, would require NPDES permits for "pollutants introduced by the water transfer activity itself to the water being transferred." Water transfers should be able to be operated and maintained in a manner that ensures they do not themselves add pollutants to the water being transferred. However, where water transfers introduce pollutants to water passing through the structure into the receiving water, NPDES permits are required. *Consumers Power,* 862 F.2d at 588; *Gorsuch,* 693 F.2d at 165, n. 22.

In those instances where a water transfer facility does itself introduce pollutants into the water being transferred, the scope of the required NPDES permit would only be for those added pollutants. Such a permit would not require the water transfer facility to address pollutants that may have been in the donor waterbody and are being transferred.[10] Furthermore, EPA expects these additions will probably be rare. EPA considers the likelihood of such additions to be similar to the frequency of additions of leaks of oil from the turbines at hydroelectric dams. In a review of the NPDES permits issued to dams, EPA was able to identify only a minimal number of permits issued to address this concern.

*Pollutants Incidental to Water Transfers*

Many utilities and water districts commented that it was unclear whether naturally occurring changes to the water would require a permit. For example, as water moves through dams or sits in reservoirs along the transfer, chemical and physical factors such as water temperature, pH, BOD, and dissolved oxygen may change. The Agency views these changes the same way it views changes to water quality caused by water moving through dams (*National Wildlife Fed'n* v. *Gorsuch,* 693 F.2d 156 (D.C. Cir. 1982)); they do not constitute an "addition" of pollutant subject to the permitting requirements of section 402 of the Act.

EPA would also like to make clear that this rule does not change the Agency's position regarding the application of pesticides directly to waters of the United States. See 71 FR 68483; 40 CFR 122.3(h). Ditches and canals are commonly treated with pesticides to control pest species such

---

[10] Because water transfers simply change the flow, direction or circulation of navigable waters, they would not themselves cause the waters being moved to lose their status as waters of the United States. See *Consumers Power,* 862 F.2d at 589. Hence, pollutants moved from the donor water into the receiving water, which are contained in navigable waters throughout the transfer, would not be "added" by the facility and would therefore not be subject to NPDES permitting requirements. This differs from a situation in which, for example, an industrial facility takes in water for the purpose of cooling some part of the facility itself. In such cases, the water used for cooling loses its status as a water of the United States when subjected to an intervening industrial use and, therefore, is subject to NPDES permit requirements for all the pollutants it contains when it is discharged back into a navigable water, generally including those that were in the source water originally. See *Consumers Power,* 862 F.2d at 589. Likewise, discharges from a concentrated aquatic animal production facility, such as excess food provided to animals in net pens (e.g., food that was added to water but not eaten by the fish) would require a NPDES permit because the uneaten, waste food would be considered an "addition" of a pollutant from the facility.

as algae to facilitate flow, and today's rule has no effect on the exclusion provided to such activities from NPDES permit requirements set forth in 40 CFR.122.3(h).

*Designation Authority*

In the preamble to the proposed water transfers rule, EPA solicited public comment on an option that would provide an additional provision allowing the NPDES authority to designate particular water transfers as subject to NPDES permit requirements on a case-by-case basis. EPA received nearly sixty comments from states, municipalities, environmental groups, water districts, industry and others regarding EPA's consideration of this "designation authority" approach. Comments addressing EPA's discussion of such designation authority were mixed regarding their opposition to, or agreement with, this approach. The following paragraphs provide additional details regarding comments the Agency received on this option.

Commenters who opposed the designation option generally believed that this provision would be legally unsupportable and practically unworkable. The most frequently cited reason for opposing this approach was a belief that the Clean Water Act provides no authority to regulate water transfers on a case-by-case basis. Other commenters were concerned that designating some water transfers, but not others, as subject to NPDES permit requirements would result in states treating water transfers in an inconsistent manner. Several commenters stated that the existence of an impairment is not an appropriate or relevant test for determining whether or not an activity should be subject to the NPDES program. Some commenters also stated that EPA already has regulations in place with regard to use impairments, at 40 CFR 131.10, which afford flexibility in responding to unique factual circumstances where uses may be impacted by pollutants not subject to NPDES permitting under section 402.

Other commenters supported inclusion of the designation authority provision in the final rule. Some of these commenters thought this approach would be helpful in instances where the transfer involves interstate waters because NPDES permits would provide a tool to protect receiving water quality—especially in situations in which water quality standards differed in the two relevant states. In addition, several states indicated that being allowed the option of designating water transfers as requiring an NPDES permit on a case-by-case basis was important to

them and cited the following three reasons for supporting this approach: (1) The designation option is consistent with Congress's general direction against unnecessary federal interference with state allocation of water rights and states' flexibility on handling water transfers; (2) states would be unable to require NPDES permits for water transfers on a case-by-case basis in the absence of the designation option; and (3) some water transfers should be considered discharges of pollutants, so it is important to retain NPDES authority in these cases.

Some commenters suggested additional programs and authorities that states can use as an alternative to NPDES permitting such as the 401 water quality certification program or a memorandum of understanding or agreement.

After considering these comments, EPA has decided not to include a mechanism in 123.3 for the permitting authority to designate water transfers on a case-by-case basis as needing an NPDES permit. This conclusion is consistent with EPA's interpretation of the CWA as not subjecting water transfers to the permitting requirements of section 402. Moreover, as discussed elsewhere in this preamble, states currently have the ability to address potential in-stream and/or downstream effects of water transfers through their WQS and TMDL programs and pursuant to state authorities preserved by section 510, and today's final rule does not have an effect on these state programs and authorities.

**V. Statutory and Executive Order Reviews**

*A. Executive Order 12866: Regulatory Planning and Review*

Under Executive Order (EO) 12866 (58 FR 51735, October 4, 1993), this action is a "significant regulatory action." Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for review under EO 12866 and any changes made in response to OMB recommendations have been documented in the docket for this action.

*B. Paperwork Reduction Act*

This action does not impose any new information collection burden because this final rule generally excludes water transfers from requiring an NPDES permit. The Office of Management and Budget (OMB) has previously approved the information collection requirements contained in the existing regulations 40 CFR 122.21 and 123.25 under the provisions of the Paperwork Reduction

Act, 44 U.S.C. 3501 *et seq.* and has assigned OMB control number 2040–0086, EPA ICR number 0226.18.

Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations in 40 CFR are listed in 40 CFR Part 9.

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations, and small governmental jurisdictions.

For purposes of assessing the impacts of today's final rule on small entities, small entity is defined as: (1) A small business as defined by the Small Business Administration's (SBA) regulations at 13 CFR 121.201; (2) a small governmental jurisdiction that is a government of a city, county, town, school district or special district with a population of less than 50,000; and (3) a small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

After considering the economic impacts of today's final rule on small entities, I certify that this action will not have a significant adverse economic impact on a substantial number of small entities. Because EPA is simply codifying the Agency's longtime position that Congress did not generally intend for the NPDES program to regulate the transfer of one water of the

United States into another water of the United States, this action will not impose any requirement on small entities.

*D. Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, and tribal governments and the private sector. Under section 202 of the UMRA, EPA generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with "Federal mandates" that may result in expenditures to State, local, and tribal governments, in the aggregate, or to the private sector, of $100 million or more in any one year. Before promulgating an EPA rule for which a written statement is needed, section 205 of UMRA generally requires EPA to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 do not apply when they are inconsistent with applicable law. Moreover, section 205 allows EPA to adopt an alternative other than the least costly, most cost-effective, or least burdensome alternative if the Administrator publishes with the final rule an explanation why that alternative was not adopted. Before EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including tribal governments, it must have developed under section 203 of the UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA regulatory proposals with significant Federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

EPA has determined that this rule does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and tribal governments, in the aggregate, or the private sector in any one year. EPA is simply codifying the Agency's longtime position that Congress did not generally intend for the NPDES program to regulate the transfer of a water of the United States into another water of the United States. Thus, today's rule is not subject to the requirements of sections 202 and 205 of the UMRA. For the same

reason, EPA has determined that this rule contains no regulatory requirements that might significantly or uniquely affect small governments. Thus, today's rule is not subject to the requirements of section 203 of UMRA.

*E. Executive Order 13132: Federalism*

Executive Order 13132, entitled "Federalism" (64 FR 43255, August 10, 1999), requires EPA to develop an accountable process to ensure "meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications." "Policies that have federalism implications" is defined in the Executive Order to include regulations that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

Under section 6(b) of Executive Order 13132, EPA may not issue a regulation that has federalism implications, that imposes substantial direct compliance costs, and that is not required by statute, unless the Federal government provides the funds necessary to pay the direct compliance costs incurred by State and local governments, or EPA consults with State and local officials early in the process of developing the proposed regulation. Under section 6(c) of Executive Order 13132, EPA may not issue a regulation that has federalism implications and that preempts State law, unless the Agency consults with State and local officials early in the process of developing the proposed regulation.

This final rule does not have Federalism implications. It will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. Today's rule does not change the relationship between the government and the States or change their roles and responsibilities. Rather, this rule confirms EPA's longstanding practice consistent with the Agency's understanding that Congress generally intended for water transfers to be subject to oversight by water resource management agencies and State non-NPDES authorities, rather than the permitting program under section 402 of the CWA. In addition, EPA does not expect this rule to have any impact on local governments.

Further, the revised regulations would not alter the basic State-Federal scheme

established in the Clean Water Act under which EPA authorizes States to carry out the NPDES permitting program. EPA expects the revised regulations to have little effect on the relationship between, or the distribution of power and responsibilities among, the federal and State governments. Thus, Executive Order 13132 does not apply to this rule.

In the spirit of Executive Order 13132, and consistent with EPA policy to promote communications between EPA and State and local governments, EPA specifically solicited comment on the proposed rule from State and local officials. EPA received comments from States that favored and opposed the rule. States that favored the rule were primarily drier, Western states. These States argued that their State laws provide adequate and appropriate authority to address the impacts from water transfers and that permitting would negatively impact State water rights allocations. This latter point was also raised by water districts, which are quasi-governmental entities, and by local governments. States that were opposed to the rule argued that they had an interest in using their NPDES authority to prevent potential water quality impairments caused by water transfers and disagreed with EPA's analysis of the Clean Water Act.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

Executive Order 13175, entitled, "Consultation and Coordination with Indian Tribal Governments" (65 FR 67249, November 9, 2000), requires EPA to develop an accountable process to ensure "meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications."

This final rule does not have tribal implications, as specified in Executive Order 13175. It will neither impose substantial direct compliance costs on tribal governments, nor preempt Tribal law. Today's rule clarifies that Congress did not generally intend for the NPDES program to regulate the transfer of waters of the United States into another water of the United States. Nothing in this rule prevents an Indian Tribe from exercising its own authority to deal with such matters. Thus, Executive Order 13175 does not apply to this rule.

In the spirit of Executive Order 13175, and consistent with EPA policy to promote communications between EPA and tribal governments, EPA specifically solicited additional comments on the proposed rule from tribal officials. Comments from tribal

governments were considered in the development of this final rule. Since the issues identified by tribal governments were not unique to their concerns, EPA has addressed these issues generally in its response to comments.

*G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

Executive Order 13045: "Protection of Children From Environmental Health Risks and Safety Risks" (62 FR 19885, April 23, 1997) applies to any rule that: (1) Is determined to be "economically significant" as defined under E.O. 12866, and (2) concerns an environmental health or safety risk that EPA has reason to believe may have a disproportionate effect on children. If the regulatory action meets both criteria, the Agency must evaluate the environmental health or safety effects of the planned rule on children, and explain why the planned regulation is preferable to other potentially effective and reasonably feasible alternatives considered by the Agency.

This regulation is not subject to Executive Order 13045 because it is not economically significant as defined under E.O. 12866, and because the Agency does not have reason to believe that it addresses environmental health and safety risks that present a disproportionate risk to children. Today's rule would simply clarify Congress' intent that water transfers generally be subject to oversight by water resource management agencies and State non-NPDES authorities, rather than the permitting program under section 402 of the CWA.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This rule is not a "significant energy action" as defined in Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355 (May 22, 2001)) because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. Further, EPA has concluded that this rule is not likely to have any adverse energy effects.

*I. National Technology Transfer and Advancement Act*

Section 12(d) of the National Technology Transfer and Advancement Act of 1995 ("NTTAA"), Public Law 104–113, section 12(d) (15 U.S.C. 272 note) directs EPA to use voluntary consensus standards in its regulatory activities unless to do so would be

inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standard bodies. The NTTAA directs EPA to provide Congress, through OMB, explanations when the Agency decides not to use available and applicable voluntary consensus standards. This rule does not involve technical standards. Therefore, EPA did not consider the use of any voluntary consensus standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations.*

Executive Order (EO) 12898 (59 FR 7629 (Feb. 16, 1994)) establishes federal executive policy on environmental justice. Its main provision directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States.

EPA has determined that this final rule will not have disproportionately high and adverse human health or environmental effects on minority or low-income populations. Today's rule would simply clarify Congress' intent that water transfers generally be subject to oversight by water resource management agencies and State non-NPDES authorities, rather than the permitting program under section 402 of the CWA.

*K. Congressional Review Act*

The Congressional Review Act, 5 U.S.C. section 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as

defined by 5 U.S.C. 804(2). This rule will be effective August 12, 2008.

List of Subjects in 40 CFR Part 122

Environmental protection, Administrative practice and procedure, Confidential business information, Hazardous substances, Reporting and recordkeeping requirements, Water pollution control.

Dated: June 9, 2008.

**Stephen L. Johnson,**
*Administrator.*

■ For the reasons set forth in the preamble, chapter I of title 40 of the Code of Federal Regulations is amended as follows:

## PART 122—EPA ADMINISTERED PERMIT PROGRAMS: THE NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

■ 1. The authority citation for part 122 continues to read as follows:

**Authority:** The Clean Water Act, 33 U.S.C. 1251 *et seq.*

■ 2. Section 122.3 is amended by adding paragraph (i) to read as follows:

### § 122.3 Exclusions.

\*      \*      \*      \*      \*

(i) Discharges from a water transfer. Water transfer means an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use. This exclusion does not apply to pollutants introduced by the water transfer activity itself to the water being transferred.

[FR Doc. E8–13360 Filed 6–12–08; 8:45 am]
**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 180

[EPA–HQ–OPP–2007–0596; FRL–8367–7]

### (Z)-7,8-epoxy-2-methyloctadecane (Disparlure); Exemption from the Requirement of a Tolerance

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes an exemption from the requirement of a tolerance for residues of the (Z)-7,8-epoxy-2-methyloctadecane on all food and feed crops when used to treat trees, shrubs, and pastures resulting in unintentional spray and drift from application as well as unintentional