UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CATSKILL MOUNTAINS CHAPTER OF TROUT
UNLIMITED, INC., THEODORE GORDON
FLYFISHERS, INC., CATSKILL-DELAWARE
NATURAL WATER ALLIANCE, INC.,
FEDERATED SPORTSMEN'S CLUBS OF ULSTER
COUNTY, INC., RIVERKEEPER, INC.,
WATERKEEPER ALLIANCE, INC., TROUT
UNLIMITED, INC., NATIONAL WILDLIFE
FEDERATION, ENVIRONMENT AMERICA,
ENVIRONMENT NEW HAMPSHIRE,
ENVIRONMENT RHODE ISLAND, and
ENVIRONMENT FLORIDA,

                          Plaintiffs,

      v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and GINA MCCARTHY, in
her official capacity as ADMINISTRATOR OF THE
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

                          Defendants.

Consolidated Cases:

Case Nos.  08-CV-5606 (KMK)
              08-CV-8430 (KMK)

OPINION AND ORDER

STATE OF NEW YORK, CONNECTICUT,
DELAWARE, ILLINOIS, MAINE, MICHIGAN,
MINNESOTA, MISSOURI, WASHINGTON, and the
GOVERNMENT OF THE PROVINCE OF
MANITOBA, CANADA,

                          Plaintiffs,

      v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and GINA MCCARTHY, in
her official capacity as ADMINISTRATOR OF THE
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

                          Defendants.

Appearances:

Daniel Eric Estrin, Esq.
Karl Stephen Coplan, Esq.
Edward Teyber
Conor Walline[1]
Pace Environmental Litigation Clinic
White Plains, NY
*Counsel for Environmental Plaintiffs*

James G. Murphy, Esq.
National Wildlife Federation
Montpelier, VT
*Counsel for Environmental Plaintiffs*

Joseph J. Mann, Esq.
National Environmental Law Center
San Francisco, CA
*Counsel for Environmental Plaintiffs*

David Henry Wrinn, Esq.
Connecticut Office of the Attorney General
Hartford, CT
*Counsel for State Plaintiffs*

Eldon V.C. Greenberg, Esq.
Garvey Schubert Barer
Washington, DC
*Counsel for State Plaintiffs*

Gerald T. Karr, Esq.
Illinois Office of Attorney General
Chicago, IL
*Counsel for State Plaintiffs*

Philip Michael Bein, Esq.
Kevin P. Donovan, Esq.
New York State Office of the Attorney General
Albany, NY
*Counsel for State Plaintiffs*

---

[1] Mr. Teyber and Mr. Walline, law students at the Pace University School of Law, were granted permission to appear on behalf of Environmental Plaintiffs pursuant to this Court's Student Practice Rule under the supervision of Mr. Estrin and Mr. Coplan.

2

Thomas A. Harnett, Esq.
Attorney General of Maine
Augusta, ME
*Counsel for State Plaintiffs*

David L. Ormond, Jr., Esq.
Delaware Department of Justice
Wilmington, DE
*Counsel for State Plaintiffs*

Carla Heyl, Esq.
Leah M.P. Hedman, Esq.
Minnesota Office of the Attorney General
St. Paul, MN
*Counsel for State Plaintiffs*

Ronald L. Lavinge, Esq.
Assistant Attorney General, Department of Ecology
Olympia, WA
*Counsel for State Plaintiffs*

Sean Peter Manning, Esq.
Michigan Department of Attorney General
Lansing, MI
*Counsel for State Plaintiffs*

John K. McManus, Esq.
Donald A. Willoh, Esq.
Jennifer S. Frazier, Esq.
Jessica Lynn Blome, Esq.
Shelly A. Woods, Esq.
Missouri Attorney General's Office
Jefferson City, MO
*Counsel for State Plaintiffs*

Bernardo Roman, III, Esq.
Yinet Pino, Esq.
Law Offices of Bernardo Roman, P.A.
Miami, FL
*Counsel for Environmental Intervenor–Plaintiffs*

David Guest, Esq.
Earthjustice
Tallahassee, FL
*Counsel for Environmental Intervenor–Plaintiffs*

3

Daniel Post Filor, Esq.
Natalie Nancy Kuehler, Esq.
Robert William Yalen, Esq.
U.S. Attorney's Office, Southern District of New York
New York, NY
*Counsel for EPA Defendants*

Amy Lynn McCamphill, Esq.
Bridget Therse Eichinger, Esq.
New York City Law Department
New York, NY
*Counsel for Intervenor–Defendant City of New York*

Peter David Nichols, Esq.
Berg Hill Greenleaf & Ruscitti LLP
Boulder, CO
*Counsel for Intervenor–Defendant Western Water Providers*

Annette Marie Quill, Esq.
Colorado Office of The Attorney General
Denver, CO
*Counsel for State Intervenor–Defendants*

James Edward Nutt, Esq.
South Florida Water Management District
West Palm Beach, FL
*Counsel for Intervenor–Defendant South Florida Water Management District*

KENNETH M. KARAS, District Judge:

In the context of water regulation, federal law provides that "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). And, as relevant here, it defines a "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). The Environmental Protection Agency ("EPA") interprets these provisions not to apply to a "water transfer," which it has defined, in a regulation, to mean "an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use." 40 C.F.R. § 122.3(i). Before the Court are multiple motions and cross-motions for summary

4

judgment challenging or defending this regulation as promulgated under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* As with many things legal and nautical, there is much complexity to confront below the surface of this seemingly simple language.  Let's dive in.

## I.  Background

### A.  Statutory History

Congress has long sought to protect the integrity of our Nation's waters by limiting what we put in them.  In 1899, it passed the Rivers and Harbors Act, which made it unlawful, in part, "to throw, discharge, or deposit . . . from or out of any . . . floating craft of any kind, or from the shore . . . any refuse matter of any kind or description whatever . . . into any navigable water of the United States, or into any tributary of any navigable water . . . ."  Rivers and Harbors Appropriations Act of 1899, ch. 425, § 13, 30 Stat. 1152 (codified as amended at 33 U.S.C. § 407).  In addition to limiting the "discharge . . . [of] refuse matter," the Act authorized the Secretary of the Army, acting pursuant to the judgment of the Army Corps of Engineers, to "permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him."  *Id.*

Almost fifty years later, Congress significantly expanded its water-regulation authority when it passed the Federal Water Pollution Control Act of 1948, ch. 758, Pub. L. No. 845, 62 Stat. 1155 (codified as amended at 33 U.S.C. §§ 1251 *et seq*.).  This Act provided, *inter alia*, that

> [t]he pollution of interstate waters in or adjacent to any State or States (whether the matter causing or contributing to such pollution is discharged directly into such waters or reaches such waters after discharge into a tributary of such waters), which endangers the health or welfare of persons in a State other than that in which the discharge originates, is hereby declared to be a public nuisance and subject to abatement as herein provided.

*Id.* § 2(d)(1). Although the Act did not define "pollution," it did define "interstate waters" to mean "all rivers, lakes, and other waters that flow across, or form a part of, State boundaries." *Id.* § 10(e). This part of the Act was slightly amended in 1956, *see* ch. 518, Pub. L. No. 660, § 8(a), 70 Stat. 498, and it was again amended in 1961 to expand the scope of the regulation from "interstate waters" to "interstate or navigable waters," *see* Pub. L. No. 87-88, § 8(a), 75 Stat. 204 ("The pollution of interstate or navigable waters in or adjacent to any State or States . . . which endangers the health or welfare of any persons, shall be subject to abatement . . . ."). The 1961 amendments also modified the definition of "interstate waters," but it did not define the newly added term "navigable waters." *See id.* § 9(e) ("The term 'interstate waters' means all rivers, lakes, and other waters that flow across or form a part of State boundaries, including coastal waters.").

Then, about a decade later, Congress passed the Federal Water Pollution Control Act Amendments of 1972 ("1972 Amendments"), Pub. L. No. 92-500, 86 Stat. 816 (codified as amended at 33 U.S.C. §§ 1251 *et seq.*), which represented a "comprehensive revision of national water quality policy." S. Rep. No. 95-370, at 1 (1977). As relevant here, § 301 of the amended Act provided that, "[e]xcept as in compliance with" certain sections of the Act, "the discharge of any pollutant by any person shall be unlawful." *Id.* § 301(a), 86 Stat. at 844 (codified as amended at 33 U.S.C. § 1311(a)). Separately, the Act defined "discharge of a pollutant" to mean, in relevant part, "any addition of any pollutant to navigable waters from any point source." *Id.* § 502(12), 86 Stat. at 886 (codified as amended at 33 U.S.C. § 1362(12)). It further defined "pollutant" to mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and

6

agricultural waste discharged into water." *Id.* § 502(6), 86 Stat. at 886 (codified as amended at 33 U.S.C. § 1362(6)).  It also defined "point source" to mean "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, . . . or vessel or other floating craft, from which pollutants are or may be discharged." *Id.* § 502(14), 86 Stat. at 887 (codified as amended at 33 U.S.C. § 1362(14)). Finally, the Act defined "navigable waters" to mean "the waters of the United States, including the territorial seas." *Id.* § 502(7), 86 Stat. at 886 (codified as amended at 33 U.S.C. § 1362(7)).

In addition to significantly revising federal water-quality standards, Congress, through § 402 of the Act, created the National Pollutant Discharge Elimination System ("NPDES").  *See id.* § 402, 86 Stat. at 880–83 (codified as amended at 33 U.S.C. § 1342).  Under this program, which explicitly replaced the permit program previously established by the Rivers and Harbors Act of 1899, *see id.* § 402(a)(5), 86 Stat. at 880 (codified as amended at 33 U.S.C. § 1342(a)(5)), the Administrator of the EPA "may . . . issue a permit for the discharge of any pollutant[] . . . notwithstanding [§] 301(a), upon condition that such discharge will meet . . . such conditions as the Administrator determines are necessary to carry out the provisions of this Act." *Id.* § 402(a)(1), 86 Stat. at 880 (codified as amended at 33 U.S.C. § 1342(a)(1)).  After obtaining a permit, any person discharging pollutants in compliance with the permit's terms is deemed to comply with § 301(a)'s ban on pollutant discharges. *Id.* § 402(k), 86 Stat. at 883 (codified as amended at 33 U.S.C. § 1342(k)).  But in addition to providing federal authority to issue permits, Congress also provided state governments with authority to create their own permit programs that, once established, would supersede the EPA's ability to issue permits in that state. Specifically, § 402 provides that "the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the

7

Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact." *Id.* § 402(b), 86 Stat. at 880–82 (codified as amended at 33 U.S.C. § 1342(b)). Thereafter, "the Administrator shall suspend the issuance of permits . . . as to those navigable waters subject to such program unless he [or she] determines [within ninety days of the State's submission] that the State permit program does not meet . . . or does not conform to" various requirements and guidelines in the Act. *Id.* § 402(c)(1), 86 Stat. at 882 (codified as amended at 33 U.S.C. § 1342(c)(1)).[2] Once established, however, the Administrator must continually monitor the state program to ensure that it remains in compliance with the Act. *Id.* §§ 402(c)(2)–(3), 86 Stat. at 882 (codified as amended at 33 U.S.C. § 1342(c)(2)–(3)) (providing that "[a]ny State permit program under this section shall at all times be in accordance with this section and [other] guidelines," and that "[w]henever the Administrator determines . . . that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, . . . the Administrator shall withdraw approval of such program"). And the Administrator may object to, and thereby block, the issuance of any permit pursuant to a state program. *Id.* § 402(d), 86 Stat. at 882 (codified as amended at 33 U.S.C. § 1342(d)). Or the Administrator may waive his or her ability to object to a single permit application, *see id.* § 402(d)(3), 86 Stat. at 882 (codified as amended at 33 U.S.C. § 1342(d)(3)), or to a category of permit applications, *see id.* § 402(e), 86 Stat. at 882 (codified

---

[2] Pursuant to a conforming amendment enacted in 1987, this section currently provides that "the Administrator shall suspend the issuance of permits . . . as to those *discharges* subject to such program . . . ." 33 U.S.C. § 1342(c)(1) (emphasis added); *see* Water Quality Act of 1987, Pub. L. No. 100-4, § 403(b)(2), 101 Stat. 7, 67 ("Section 402(c)(1) is amended by striking out 'as to those navigable waters' and inserting in lieu thereof 'as to those discharges.'").

as amended at 33 U.S.C. § 1342(e)) (waiver of objections to categories of point sources); *id.* § 402(f), 86 Stat. at 882 (codified as amended at 33 U.S.C. § 1342(f)) (authority to "promulgate regulations establishing categories of point sources which [the Administrator] determines shall not be subject to the [approval] requirements" of § 402(d)).

Following the 1972 Amendments, Congress enacted another significant set of Amendments five years later when it passed the Clean Water Act of 1977 ("1977 Amendments"), Pub. L. No. 95-217, 91 Stat. 1566 (codified as amended at 33 U.S.C. §§ 1251 *et seq.*). Although these amendments did not substantially alter the NPDES program under § 402, the pollutant-discharge limitation under § 301(a), or the definitions of any of the previously discussed statutory terms defined in § 502, they did add a policy statement to § 101's "Declaration of Goals and Policy." Where the 1972 Amendments provided that "[t]he objective of th[e] Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 1972 Amendments § 101(a), 86 Stat. at 816 (codified as amended at 33 U.S.C. § 1251(a)), and that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use . . . of land and water resources, and to consult with the Administrator in the exercise of his [or her] authority," *id.* § 101(b), 86 Stat. at 816 (codified as amended at 33 U.S.C. § 1251(b)), the 1977 Amendments added § 101(g), providing that "[i]t is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by th[e] Act," 1977 Amendments § 5(a), 91 Stat. at 1567 (codified as amended at 33 U.S.C. § 101(g)).

Taken together, these provisions of the CWA—prohibiting pollutant discharges, establishing the NPDES program, defining key terms, and clarifying congressional policy

9

goals—comprise the relevant statutory framework within which the Court analyzes the instant

Motions.  But we have only just gotten our feet wet.  The Court will now proceed to discuss

EPA's history of administering and interpreting the Act as it relates to the present case.

### B.  Regulatory History

#### 1.  "Navigable Waters"

As discussed, the CWA defines "navigable waters" to mean "the waters of the United

States." 33 U.S.C. § 1362(7).  In this context, EPA's interpretation of the scope of its regulatory

authority over the Nation's waters has evolved over time, but, in general, it represents an

expansion of the statutory concept of "navigable waters."  Initially, in the immediate aftermath

of Congress's passage of the 1972 Amendments, EPA interpreted "navigable waters" to match

precisely the statutory phrase.  *See* 37 Fed. Reg. 28,390, 28,392 (Dec. 22, 1972) (formerly

codified at 40 C.F.R. § 124.1(n)) ("The definition[] of ['navigable waters'] contained in [§] 502

of the Act shall be applicable to such terms as used in this part . . . .").  Soon thereafter, EPA's

Office of the General Counsel published a memorandum concluding, based on a review of the

legislative history of the 1972 Amendments, that, in defining "navigable waters" to mean "the

waters of the United States," Congress intended that the statute "eliminate[] the requirement of

navigability," but also that "pollution of waters covered by the bill must be capable of affecting

interstate commerce."  Memorandum from the EPA Office of the General Counsel on Water

Pollution, at *1 (Feb. 6, 1973), *available at* 1973 WL 21937 (EPA Office of the General

Counsel).  The memorandum then noted that the Agency would face "a major task to determine,

on a case by case basis, what waters fall within" the statutory category, but it proposed that

at least the following waters would appear to be "waters of the United States":

(1) All navigable waters of the United States;

10

(2) Tributaries of navigable waters of the United States;

(3) Interstate waters;

(4) Interstate lakes, rivers, and streams which are utilized by interstate travelers for recreational or other purposes;

(5) Interstate lakes, rivers, and streams from which fish or shellfish are taken and sold in interstate commerce; and

(6) Interstate lakes, rivers, and streams which are utilized for industrial purposes by industries in interstate commerce.

*Id.*  EPA subsequently adopted the memorandum's recommended interpretation of "navigable waters" in a 1973 rulemaking, noting that, in the newly adopted regulation, "[t]he definition of 'navigable waters' ha[d] been clarified by incorporating additional language."  *See* 38 Fed. Reg. 13,528, 13,528–29 (May 22, 1973) (codifying the memorandum's proposed interpretation at 40 C.F.R. § 125.1(o)).

Approximately two years later, the EPA's Office of the General Counsel again issued a memorandum—this time in the form of a formal opinion—discussing the scope of "navigable waters" as applied to the question of whether discharges of pollutants from "irrigation return flows" required permits under the NPDES program.  *See* In re Riverside Irrigation Dist., Ltd. & 17 Others (June 27, 1975), *available at* 1975 WL 23864 (EPA Office of the General Counsel, Opinion No. 21).  Although the Opinion's conclusion rested primarily on its determination that an irrigation return flow is a "point source" subject to NPDES permit requirements, *see id.* at *2–3, it also discussed its interpretation of "navigable waters" in response to a claim that, if an irrigation return flow were determined to be a "navigable water," it would not be subject to regulation as a "point source."  First, it reaffirmed the 1973 memorandum's case-by-case approach for determining whether any individual water fit within the statutory framework,

11

declining to deem irrigation ditches as a category to be "navigable waters," and instead

concluding that "the waters that are the subject of these permits may well be determined by the

finder of fact, applying the statutory and regulatory test to the facts of these cases, to be

navigable waters within the definition of the Act." *Id.* at *4.  Second, it noted that, even if "any

*given* irrigation ditch [were determined to be] a navigable water, it would still be permittable as a

point source where it discharges into another navigable water body . . . ." *Id.* (emphasis in

original).   Third, it recognized that the term "navigable waters" encompassed not only entire

bodies of water but also individual portions of those bodies, stating that "[i]t is clear that the

intent of Congress in adopting this definition of 'navigable waters' was to broaden the concept of

navigable waters to 'portions thereof, tributaries thereof . . . and the territorial seas and the Great

Lakes.'" *Id.* at *3 (second alteration in original) (emphasis removed) (quoting *United States v.

Holland*, 373 F. Supp. 665, 671 (M.D. Fla. 1974)).  Fourth, and most importantly, it defended

EPA's broad interpretation of the scope of "navigable waters" while explicitly basing its ability

to expand this scope on Congress's intent that EPA would have broad permitting authority over

pollution discharges:

> The clear tenor of the legislative history . . . is that the broad definition of "navigable
> waters" serves to expand the application of the Act and the permit program, not
> narrow it . . . .  [T]o define the waters here at issue as navigable waters and use that
> as a basis for exempting them from the permit requirement appears to fly directly in
> the face of clear legislative intent to the contrary.

*Id.* at *4.  In other words, in its determination that pollutant-discharging point sources that could

also be classified as "navigable waters" would still be subject to NPDES permitting

requirements, the Opinion foreclosed the possibility that it could interpretively expand the scope

of "navigable waters" in a way that restricted its permitting authority.

Subsequent regulations continued to clarify the expansive scope of "navigable waters" by focusing less on the "navigability" component and more on the "interstate commerce" component.  In a 1979 rulemaking, EPA codified a definition of "navigable waters" that it claimed was "slightly revised to clarify its intent and scope," but faithful to "the basic thrust and coverage" of the previous definition.  44 Fed. Reg. 32,854, 32,858 (June 7, 1979).  Per the new regulation,

> [w]aters [would] be considered to be waters of the United States not only if they [we]re actually used, but also if they [could] be susceptible to use, for industrial purposes by industries in interstate commerce.  Thus the regulations [focused], not on the nature of the stream's users, but on the characteristics of the stream itself, and it [would] no longer be necessary to show actual industrial use for a stream to fall within the definition.

*Id.*  Pursuant to the new focus on *potential* use in interstate commerce, the regulation defined "navigable waters" to include "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce," and "[a]ll other waters . . . the use, degradation or destruction of which would affect or could affect interstate or foreign commerce." *Id.* at 32,901 (previously codified at 40 C.F.R. § 122.3(t)).  Moreover, to reinforce the declining emphasis on "navigability," EPA noted in a comment included in the newly codified definition that, "[f]or purposes of clarity the term 'waters of the United States' is primarily used throughout the regulations rather than 'navigable waters.'"  *Id.*

Following the 1979 rulemaking and, in particular, the rulemaking's nod toward replacing "navigable waters" with "waters of the United States" throughout the regulations, EPA eliminated its definition of "navigable waters" while reappropriating that definition's language to define the statutory phrase "waters of the United States."  *See* 45 Fed. Reg. 33,290, 33,298 (May 19, 1980) ("'[N]avigable waters' . . . now appears as the definition of 'Waters of the United

13

States[]' . . . ."). Currently, after a reorganization of the NPDES regulations in 1983, *see* 48 Fed.

Reg. 14,146 (Apr. 1, 1983), EPA's definition of "waters of the United States" appears in 40

C.F.R. § 122.2, which provides, in relevant part:

> *Waters of the United States* or *waters of the U.S.* means:
>
> (a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
>
> (b) All interstate waters, including interstate "wetlands;"
>
> (c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:
>
> > (1) Which are or could be used by interstate or foreign travelers for recreational or other purposes;
> >
> > (2) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
> >
> > (3) Which are used or could be used for industrial purposes by industries in interstate commerce;
>
> (d) All impoundments of waters otherwise defined as waters of the United States under this definition;
>
> (e) Tributaries of waters identified [above];
>
> (f) The territorial sea; and
>
> (g) "Wetlands" adjacent to waters . . . identified [above].

40 C.F.R. § 122.2.

Throughout this regulatory evolution of the EPA's interpretation of its permitting

authority, the Supreme Court remained relatively silent. However, in *United States v. Riverside*

*Bayview Homes, Inc.*, 474 U.S. 121 (1985), it finally dipped its oar in the water. In that case, the

Supreme Court confronted the Army Corps of Engineers' ("the Corps'") assertion of permitting authority over discharges of a pollutant into a "wetland," which assertion the Corps had made under § 404 of the CWA—a provision that, like § 402, allowed the Corps (instead of EPA) to issue permits for discharges into "navigable waters" as defined in § 502(7).  *See* 33 U.S.C. § 1344(a) ("The Secretary [of the Corps] may issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites.").  In holding that the Corps' expansive definition of "navigable waters" to include "wetlands" was "a permissible interpretation of the [CWA]," the Supreme Court held that

> Congress chose to define the waters covered by the Act broadly.  Although the Act prohibits discharges into "navigable waters," the Act's definition of "navigable waters" as "the waters of the United States" makes it clear that the term "navigable" as used in the Act is of limited import.  In adopting this definition of "navigable waters," Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed "navigable" under the classical understanding of that term.

*Riverside Bayview*, 474 U.S. at 133 (citations omitted).  And in accepting the Corps' expansive interpretation of "navigable waters," the Supreme Court explicitly relied on "the evident breadth of congressional concern for protection of water quality and aquatic ecosystems," specifically holding that,

> [i]n view of the breadth of federal regulatory authority contemplated by the Act itself and the inherent difficulties of defining precise bounds to regulable waters, the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act.

*Id.* at 133–34.  Although *Riverside Bayview* did not directly evaluate EPA's similarly expansive interpretation of "navigable waters," its holding was in line with EPA's view that its broad

authority over "navigable waters" flowed from Congress's intent to expand EPA's authority to

prohibit and, where appropriate, to permit pollutant discharges.

The Supreme Court made a splash again over a decade later in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers ("SWANCC")*, 531 U.S. 159 (2001), wherein it limited "navigable waters" as defined in *Riverside Bayview* not to encompass the Corps' new interpretation, which defined "navigable waters" to include a "seasonally ponded, abandoned gravel min[e] . . . used as [a] habitat by migratory bird[s]." *Id.* at 164–65 (internal quotation marks omitted). Although the Supreme Court had previously held that "the term navigable as used in the [CWA] is of limited import," *Riverside Bayview*, 474 U.S. at 133, the Court in *SWANCC* clarified that "Congress' separate definitional use of the phrase 'waters of the United States' [did not] constitute[] a basis for reading the term 'navigable waters' out of the statute," 531 U.S. at 172. Instead, it noted that

> it is one thing to give a word limited effect and quite another to give it no effect whatever. The term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made.

*Id.* It thus found that the Corps' interpretation was foreclosed by the statute, and it rejected the Corps' attempt further to expand the scope of "navigable waters." *See id.* at 174 ("We hold that [the Corps' interpretation of 'navigable waters'] . . . exceeds the authority granted to [the Corps] under § 404(a) of the CWA."). Again, the Supreme Court's holding did not apply directly to the EPA's interpretation. But the EPA subsequently endorsed the Supreme Court's approach in *SWANCC* in a regulation specifying that "[t]he determination of whether a particular cooling pond is or is not 'waters of the United States' is to be made by the permit writer on a case-by-

16

case basis, informed by the principles announced in" that case.  *See* 66 Fed. Reg. 65,256, 65,259 (Dec. 18, 2001).

### 2.  The Water Transfers Rule

Somewhat parallel to the regulations and cases defining the scope of "navigable waters," EPA began to clarify—through positions it took in various court cases—its interpretation of its permitting authority over pollutant discharges resulting from transfers of water within and between navigable waters.  In *National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982), EPA defended its policy of not requiring a permit to transfer water through a dam against the argument that the "release of polluted water through [a] dam into [a] downstream river constitutes the 'addition' of a pollutant to navigable waters 'from' a point source" under § 502(12), triggering EPA's "nondiscretionary duty to regulate" the discharges under § 402.  *Id.* at 165.  It argued, instead, that "for [an] addition of a pollutant from a point source to occur, the point source must *introduce* the pollutant into navigable water from the outside world; dam-caused pollution, in contrast, merely passes through the dam from one body of navigable water . . . into another."  *Id.*  The D.C. Circuit, according "great deference" to the EPA, *id.* at 166 (internal quotation marks omitted), accepted this interpretation, holding that it was "reasonable" and "not inconsistent with congressional intent," *id.* at 183.[3]  Similarly, as an *amicus curiae* in *National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580 (6th Cir. 1988), EPA made many of the same arguments it had made in *Gorsuch* to support a power company defending itself from the claim that it was required to obtain an NPDES permit to operate a hydroelectric dam.  Like the D.C. Circuit in *Gorsuch*, the Sixth Circuit deferred to EPA's interpretation in

---

[3] *Gorsuch* was decided approximately two years before the Supreme Court decided *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which established the prevailing standard for deference to agency rulemaking.

holding that "no pollutant is introduced from the outside world . . . because any [pollutant] released with the . . . water originate[d] in [a navigable water], and [did] not enter the [receiving navigable water] from the outside world."[4]  *Id.* at 585.   In so holding, the court also joined the D.C. Circuit in holding that Congress did not intend to regulate dams as "point sources."  *See id.* at 587–88 (citing 33 U.S.C. § 1314(f)(2)(F); *Gorsuch*, 693 F.2d at 177).  But, because the dams in *Consumers Power*—which removed, held, and altered water—were arguably distinguishable from the dams in *Gorsuch*—which "were . . . located within navigable waters . . . [and] merely pass[ed] on water of already altered quality," *id.* at 589 (internal quotation marks omitted)—the Sixth Circuit offered an additional rationale for excluding the dams at issue from the NPDES program:

> The water which passes through the [dam] never loses its status as water of the United States. . . .   The [dam's] movement or diversion of water from [a navigable water] into a storage reservoir is distinguishable from the diversion of waters of the United States by industrial operations for cooling purposes in which the water loses its status as water of the United States.  The [dam] merely changes the movement, flow, or circulation of navigable waters when it temporarily impounds waters . . . in a storage reservoir, but does not alter their character as waters of the United States. On the other hand, steam/electric industrial operations remove water, which then enters the industrial complex and absorbs heat and other minerals produced by the plant or electric generator before being added to waters of the United States.

*Id.*  The Sixth Circuit thus distinguished between dams, which it had followed the D.C. Circuit in holding were non-point sources of pollution "generally not subject to the NPDES permit requirements," *id.* at 590, and industrial operations, which subjected the water to industrial use before discharging it back into navigable waters.

In the wake of *Gorsuch* and *Consumers Power*, other courts refused to extend these decisions outside the context of dams in cases not directly involving the EPA.  In *Dague v. City*

---

[4] In *Consumers Power*, decided in 1988, the court did apply *Chevron* deference.  *See Consumers Power*, 862 F.2d at 584–85.

*of Burlington*, 935 F.2d 1343 (2d Cir. 1991), *rev'd in part on other grounds*, 505 U.S. 557 (1992) , the Second Circuit held that water transferred between two navigable bodies of water through a "railroad culvert" constituted a "discharge of a pollutant" because the culvert met the statute's definition of a "point source." *See id*. at 1355. And in *Dubois v. U.S. Department of Agriculture*, 102 F.3d 1273 (1st Cir. 1996), the First Circuit held that a ski resort's transfer of water from a river into a pond via a system of pumps and pipes used to make snow was a "discharge of a pollutant" into the pond because "the pipe discharging the water into [the pond was] a point source," and the river and the pond were "not the same body of water." *Id.* at 1296–97. Moreover, in contrast to the Sixth Circuit in *Consumers Power*, the First Circuit held that the water "lost its status as waters of the United States" during the transfer because "the water [left] the domain of nature and [was] subject to private control rather than purely natural processes." *Id.* at 1297. Finally, in *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York ("Catskills I")*, 273 F.3d 481 (2d Cir. 2001), the Second Circuit held that New York City's transfer of water from a reservoir to a creek—both "navigable waters"—via a tunnel—which "plainly qualifie[d] as a point source," *id.* at 493—resulted in the "discharge of a pollutant" without a permit, in violation of § 301(a). *See id.* at 494. The Second Circuit distinguished its holding from *Gorsuch* and *Consumers Power* in two ways. First, it held that EPA's interpretation—on which the City relied—did not deserve deference because it "had [not] been adopted in a rulemaking or other formal proceeding," but was instead "based on a series of informal policy statements . . . and . . . litigation positions." *Id.* at 490. Second, although it agreed with EPA's and other courts' interpretation that an "addition" of a pollutant required that the pollutant be introduced "from the outside world," it defined the "outside world" to be "any place outside the particular water body to which pollutants are introduced." *Id.* at 491 (internal

quotation marks omitted).  Thus, whereas "*Gorsuch* and *Consumers Power* essentially involved the recirculation of water" through a dam, *id.* at 491, the situation the Second Circuit confronted "strain[ed] past the breaking point the assumption of 'sameness'" made in those cases because the water was "artificially diverted from its natural course and travel[led] several miles from the [reservoir] through [the tunnel] to [the creek], a body of water utterly unrelated in any relevant sense to the [reservoir]," *id.* at 492.  Thus, the Second Circuit in *Catskills I* followed its prior decision in *Dague* and the First Circuit's decision in *Dubois* in holding that the transfer of water between two distinct navigable bodies of water through a point source required a permit under § 402.  *See id.* at 492–93.

A few years after *Catskills I*, the Supreme Court addressed the water-transfer issue in *South Florida Water Management District v. Miccosukee Tribe of Indians ("SFWMD")*, 541 U.S. 95 (2004).  In that case, the Miccosukee Tribe challenged the operation of a pumping facility that transferred water from a canal into a nearby reservoir without an NPDES permit. *See id.* at 98.  Initially, the Court rejected the argument that § 301(a) covers only pollutants originating from a point source, holding instead that "a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'" *Id.* at 105. Then, the Supreme Court proceeded to address the argument—made for the first time in the Government's *amicus* brief—that "all the water bodies that fall within the [CWA's] definition of 'navigable waters' . . . should be viewed *unitarily* for purposes of NPDES permitting requirements," and thus that "such permits are *not* required when water from one navigable water body is discharged, unaltered, into another navigable water body." *Id.* at 105–06 (first emphasis added) (some internal quotation marks omitted).  The Court ultimately declined to resolve whether this interpretation—which it called the "unitary waters" approach—was

20

consistent with the statute, holding that EPA's interpretation did not deserve deference because the government "[had] not identif[ied] any administrative documents in which EPA ha[d] espoused that position," *id.* at 107, and that the parties had failed to raise this argument in their memoranda to the courts below or in their petitions for certiorari, *id.* at 109.  Instead, because both parties conceded that a permit would not be required if the canal and the reservoir were "simply two parts of the same water body," *id.*, it remanded the case for a determination of whether the canal and the reservoir were "meaningfully distinct water bodies," *id.* at 112—a factual determination that the district court had made prematurely at the summary-judgment stage, *id.* at 111.

    In light of the Second Circuit's decision in *Catskills I* and the Supreme Court's decision in *SFWMD*, both of which declined to defer to EPA's interpretation of § 301(a) in the context of a water transfer, EPA in 2005 took the first step toward formalizing its interpretation.  In a memorandum issued from the EPA's Office of the General Counsel to all Regional EPA Administrators—referred to as the "Klee Memorandum" because it was issued by EPA General Counsel Ann R. Klee—EPA concluded, after an analysis of the CWA's language, its legislative history, and relevant case law, that "Congress intended to leave the oversight of water transfers to authorities other than the NPDES program."  (Administrative Record ("AR") 5, at 19 (Memorandum from Ann R. Klee to EPA Regional Administrators on Agency Interpretation on Applicability of Section 402 of the Clean Water Act to Water Transfers (Aug. 5, 2005)).)[5]  In

---

[5] In addition to being part of the record in this case, (*see* Dkt. No. 119 (08-CV-5606 Dkt.) (Administrative Record, filed with the Clerk of the Court in CD format pursuant to Dkt. No. 118)), the Administrative Record is also accessible online.  *See National Pollutant Discharge Elimination System (NPDES) Water Transfers Rule*, *Regulations.gov*, http://www.regulations.gov/#!docketDetail;D=EPA-HQ-OW-2006-0141 (last visited Mar. 25, 2014).

clarifying language, the Memorandum defined a "water transfer" as "any activity that conveys or connects navigable waters . . . without subjecting the water to intervening industrial, municipal, or commercial use."  (*Id.* at 1.)  And while the Memorandum explicitly "[did] not address the meaning of the terms[] 'point source,' 'pollutant' or 'navigable waters,'" (*id.* at 18 n.19), it based its conclusion instead entirely on the statutory term "addition," (*see id.* at 18), which it interpreted using a "holistic view" of the statute, "[giving] meaning to those statutory provisions where Congress expressly considered the issue of water resource management, as well as Congress' overall division of responsibility between State and federal authorities under the statute," (*id.* at 13).  The Memorandum also addressed EPA's aforementioned 1975 formal opinion in which it concluded that pollutant discharges from irrigation ditches required NPDES permits, noting that "th[e] opinion did not specifically address the question of whether an 'addition' has occurred when a navigable water is merely conveyed to another navigable water," and that the opinion's practical effect was overridden by subsequent legislation specifically exempting irrigation return flows from regulation.  (*Id.* at 2–3 n.5 (citing 33 U.S.C. § 1342(l)(1) ("The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture . . . ."); *id*. § 1362(14) ("Th[e] term [point source] does not include . . . return flows from irrigated agriculture.")).)  It otherwise concluded that, "[t]o the extent the 1975 [o]pinion . . . conflicts with this Agency interpretation with respect to water transfers, it is superseded."  (*Id.*)

After the Supreme Court decided *SFWMD* and after EPA issued the Klee Memorandum, the Second Circuit was confronted with an opportunity to reconsider its holding in *Catskills I* in an appeal from a district court order (issued after the remand in *Catskills I*) granting summary judgment against the City of New York and assessing a civil penalty for failing to obtain an

NPDES permit.  *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*

*("Catskills II")*, 451 F.3d 77, 80 (2d Cir. 2006).  Holding that the Supreme Court's decision in

*SFWMD* supported its decision in *Catskills I*, *id.* at 83, and accepting the City's concession that

the EPA's interpretation as expressed in the Klee Memorandum did not deserve *Chevron*

deference, *id.* at 82, the Second Circuit reaffirmed its holding in *Catskills I*, *id.* [6]  Notably, in so

doing, it criticized the Klee Memorandum's "'holistic' arguments about the allocation of state

and federal rights" in the CWA because those arguments "simply overlook[ed] [the CWA's]

plain language," which requires that EPA "balance" the "seemingly inconsistent goals" of

"achiev[ing] water allocation goals as well as . . . restor[ing] and maintain[ing] the quality of the

nation's waters."  *Id.* at 84–85.  It thus rejected EPA's interpretation, which "tip[ped] the balance

toward allocation goals," in favor of "honoring . . . the balance that Congress has struck and

remains free to change."  *Id.* at 85.

        Approximately one week before the Second Circuit decided *Catskills II*, EPA initiated

notice-and-comment rulemaking on a proposed rule codifying the Klee Memorandum's position

that transfers of water between navigable bodies of water do not require NPDES permits.  *See* 71

Fed. Reg. 32,887 (June 7, 2006).  EPA received over 18,000 comments on the rule, (*see* AR

1428 at 3 (Response to Public Comments: National Pollutant Discharge Elimination System

(NPDES) Water Transfers Final Rule (40 CFR Part 122); Docket #: EPA-HQ-OW-2006-0141)),

and it responded to the issues raised by these comments in a document filed as part of the

Administrative Record, (*see id.*).  Then, on June 13, 2008, EPA issued its final rule, adding, as

_____

        [6] In accordance with *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Second
Circuit applied so-called *Skidmore* deference, "defer[ring] to the agency interpretation according
to its 'power to persuade,'" *id.* at 235  (some internal quotation marks omitted) (quoting
*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  *See Catskills II*, 451 F.3d at 82.

an "exclusion" to the NPDES program, "[d]ischarges from a water transfer." *See* 73 Fed. Reg. 33,697, 33,708 (June 13, 2008) (codified at 40 C.F.R. § 122.3(i)).  Thus, pursuant to the Water Transfers Rule, EPA's regulations currently read, in relevant part:

> The following discharges do not require NPDES permits:
> . . . .
> (i) Discharges from a water transfer.  Water transfer means an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use.  This exclusion does not apply to pollutants introduced by the water transfer activity itself to the water being transferred.

40 C.F.R. § 122.3(i).

C.  Procedural History

These two rivers of regulatory history—the scope of "navigable waters" and the Water Transfers Rule—have now converged in this Action, where the Court must decide whether EPA's interpretation of the statute sinks or swims.  Wasting no time after EPA issued the final rule on June 13, 2008, one group of plaintiffs—which the Court will refer to as the "Environmental Plaintiffs"[7]—filed a Complaint less than one week later against the agency and its Administrator[8] (collectively, "EPA").  (*See* Dkt. No. 1 (08-CV-5606 Dkt.) (Compl., filed on June 20, 2008).)  Separately, another group of plaintiffs—which the Court will refer to as the

---

[7] These plaintiffs include Catskill Mountains Chapter of Trout Unlimited, Inc.; Theodore Gordon Flyfishers, Inc.; Catskill–Delaware Natural Water Alliance, Inc.; Federated Sportsmen's Clubs of Ulster County, Inc.; Riverkeeper, Inc.; and Waterkeeper Alliance, Inc.

[8] The Complaint originally named as a defendant Stephen L. Johnson, who was the EPA Administrator at the time the Complaint was filed.  However, because Mr. Johnson is no longer the Administrator, the Court has automatically substituted Gina McCarthy, the current Administrator, as a defendant.  *See* Fed. R. Civ. P. 25(d) ("[W]hen a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[,] [t]he officer's successor is automatically substituted as a party.").

24

"State Plaintiffs"[9]—filed a Complaint a few months later, also against EPA.  (*See* Dkt. No. 1 (08-CV-8430 Dkt.) (Compl., filed on Oct. 2, 2008).)  On October 8, the Court granted the State Plaintiffs' request to consolidate both cases.  (*See* Dkt. No. 18 (08-CV-5606 Dkt.) (entered Oct. 10, 2008).)[10]

At approximately the same time that the actions were filed in this Court, a number of parallel actions were filed in other courts, some by Parties to this Consolidated Action.  *See, e.g.*, *Env't Am. v. EPA*, No. 08-1853 (1st Cir.); *Jones River Watershed Ass'n v. EPA*, No. 08-2322 (1st Cir.); *Catskill Mountain Chapter of Trout Unlimited, Inc. v. EPA*, No. 08-3203 (2d Cir.); *New York v. EPA*, No. 08-8444 (2d Cir.); *Pennsylvania v. EPA*, No. 08-4178 (3d Cir.); *Mich. Chapter of Trout Unlimited, Inc. v. EPA*, No. 08-4366 (6th Cir.); *Sierra Club v. EPA*, No. 08-14921 (11th Cir.); *Miccosukee Tribe of Indians of Fla. v. EPA*, No. 08-13652 (11th Cir.); *Fla. Wildlife Fed'n v. EPA*, No. 08-13657 (11th Cir.); *Friends of the Everglades v. EPA*, No. 08-CV-21785 (S.D. Fla.); *Miccosukee Tribe of Indians of Fla. v. EPA*, No. 08-CV-021858 (S.D. Fla.); *Rivers Coal. Def. Fund, Inc. v. EPA*, 08-CV-80922 (S.D. Fla.).  "On July 22, 2008, pursuant to 28 U.S.C. § 2112(a)(3), the United States Judicial Panel on Multidistrict Litigation . . . consolidated the five petitions for review of the Water Transfers Rule then pending in the First, Second, and Eleventh Circuit Courts of Appeal and randomly assigned them to the Eleventh Circuit."  *Catskill Mountains Chapter of Trout Unlimited, Inc. v. U.S. E.P.A.*, 630 F. Supp. 2d 295, 304 (S.D.N.Y. 2009).  The Eleventh Circuit then "granted in part the parties' joint motion to

---

[9] These Plaintiffs include New York, Connecticut, Delaware, Illinois, Maine, Michigan, Minnesota, Missouri, Washington, and the Government of the Province of Manitoba, Canada.

[10] Because the Court consolidated the cases under the 08-CV-5606 Docket, all subsequent citations to docket entries will refer to that Docket, unless otherwise noted.

consolidate those petitions," consolidated a sixth petition for review, and stayed all of those petitions pending disposition of the appeal of *Friends of the Everglades v. South Florida Water Management District*, No. 07-13829-HH (11th Cir.), a separate but conceptually related case filed in August 2007 and on appeal to the Eleventh Circuit. *Id.* The District Court for the Southern District of Florida also stayed proceedings in its case pending disposition of that appeal. *Id.* at 304 n.6.

In December 2008, EPA filed a Motion To Stay or, in the alternative, To Dismiss the Case for lack of subject-matter jurisdiction in light of both the *Friends of the Everglades* appeal and the consolidated petitions. (*See* Dkt. No. 28 (Mot.); Dkt. No. 29 (Mem. of Law in Supp. of Defs.' Mot. for Stay or, in the Alternative, To Dismiss).) On April 29, 2009, the Court granted the Motion To Stay "pending the Eleventh Circuit's resolution of *Friends of the Everglades* and the Consolidated Petitions." *Catskill Mountains*, 630 F. Supp. 2d at 307.[11] Two months later, the Eleventh Circuit decided the appeal in *Friends of the Everglades*, applying *Chevron* deference to the Water Transfers Rule and reversing the district court's ruling that the water transfer at issue required an NPDES permit. *See Friends of the Everglades v. S. Fla. Water Mgmt. Dist. ("Friends I")*, 570 F.3d 1210, 1228 (11th Cir. 2009). But, in September 2012, because the Eleventh Circuit had not yet resolved the Consolidated Petitions, the Court placed this Case on the Suspense Calendar. (*See* Dkt. No. 79.)

Then, on October 26, 2012, the Eleventh Circuit issued an opinion dismissing the consolidated petitions for lack of subject-matter jurisdiction under 33 U.S.C. § 1369(b)(1). *See*

---

[11] The Court did not address EPA's Motion, in the alternative, To Dismiss the Case. *See Catskill Mountains*, 630 F. Supp. 2d at 307 n.8.

*Friends of the Everglades v. U.S. E.P.A. ("Friends II")*, 699 F.3d 1280 (11th Cir. 2012).[12]
Thereafter, pursuant to this Court's Order, the Stay lifted on December 17, 2012, when the
Eleventh Circuit's mandate dismissing the case was scheduled to issue.  (*See* Dkt. No. 84.)

 Subsequently, a number of other plaintiffs and defendants waded into the case when,
after a pre-motion conference held on January 30, 2013, the Court granted, on the Parties'
consent, multiple applications to intervene as plaintiffs and defendants under Rule 24 of the
Federal Rules of Civil Procedure.  (*See* Dkt. No. 114.)  This added, as Intervenor–Plaintiffs, the
Miccosukee Tribe of Indians of Florida, Friends of the Everglades, the Florida Wildlife
Federation, and the Sierra Club (collectively, "Environmental Intervenor–Plaintiffs"), and, as
Intervenor–Defendants, Alaska, Arizona, Colorado, Idaho, Nebraska, Nevada, New Mexico,
North Dakota, Texas, Utah, and Wyoming (collectively, "State Intervenor–Defendants"); South
Florida Water Management District ("SFWMD"); and multiple municipal water providers from
western states ("Western Water Providers").  (*See id.*)  In joining the case as intervenors, these
Parties followed the City of New York, which previously joined as an Intervenor–Defendant
after the Court granted its Rule 24 Motion To Intervene in October 2008.  (*See* Dkt. No. 22).

 At the same time that it granted the Parties' applications to intervene, the Court also
adopted a briefing schedule, whereby the Parties could file motions and cross-motions to dismiss
or for summary judgment.  (*See* Dkt. No. 114.)  Initially, both EPA and SFWMD filed motions
to dismiss for lack of subject matter jurisdiction, arguing that, pursuant to 33 U.S.C.
§ 1369(b)(1), and contrary to the Eleventh Circuit's ruling in *Friends II*, this Court did not have
original jurisdiction over the Complaint.  (*See* Dkt. No. 122 (EPA's Mot.); Dkt. No. 125

---

 [12] The Eleventh Circuit also declined to exercise so-called "hypothetical jurisdiction."
*See Friends II*, 699 F.3d at 1288–89.

(SFWMD's Mot.).)  However, pursuant to a later Stipulation of Dismissal, the Court dismissed these Motions without prejudice pending further action by the Supreme Court on the Eleventh Circuit's decision, which decision the Parties acknowledged had collateral-estoppel effect.  (*See* Dkt. No. 154.)  The Supreme Court ultimately declined to hear the appeal.  *See U.S. Sugar Corp. v. Friends of the Everglades*, 134 S. Ct. 422, No. 13-6, 2013 WL 3283513 (Oct. 15, 2013); *Envmtl. Prot. Agency v. Friends of the Everglades*, 134 S. Ct. 421, No. 13-10, 2013 WL 3283503 (Oct. 15, 2013); *S. Fla. Water Mgmt. Dist. v. Friends of the Everglades*, 134 S. Ct. 422, No. 13-23, 2013 WL 3341202 (Oct. 15, 2013).

Prior to the Supreme Court's denial of certiorari and pursuant to the Court's January 2013 scheduling order, the Parties submitted multiple Motions and Cross-motions for Summary Judgment.  (*See* Dkt. No. 136 (Envtl. Pls.' Mot. for Summ. J.); Dkt. No. 142 (Envtl. Intervenor–Pls.' Joint Mot. for Summ. J.); Dkt. No. 148 (State Pls.' Mot. for Summ. J.); Dkt. No. 158 (EPA's Cross-Mot. for Summ. J.); Dkt. No. 165 (SFWMD's Cross-Mot. for Summ. J.); Dkt. No. 167 (City of New York's Mot. for Summ. J.); Dkt. No. 170 (State Intervenor–Defs.' Mot. for Summ. J.); Dkt. No. 174 (Western Water Providers' Cross-Mot. for Summ. J.).)  These Motions were fully submitted as of August 2013.  (*See* Dkt.)  Thus, after it received notice of the certiorari denial, the Court scheduled oral argument on the motions, (*see* Dkt. No. 216), which hearing it held on December 19, 2013, (*see* Dkt. No. 219 (Hr'g Tr.)).  Having held oral argument, and after reviewing thoroughly the Parties' submissions and the Administrative Record, the Court is now ready to resolve the Motions.

28

## II.  Discussion

### A.  Legal Standard

#### 1.  Summary Judgment

Summary judgment shall be granted where it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

Where a court reviews agency action under the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Bennett v. Donovan*, — F. Supp. 2d —, 2013 WL 5424708, at *2 (D.D.C. Sept. 30, 2013); *see also Physicians Comm. for Responsible Med. v. Johnson*, 436 F.3d 326, 331 (2d Cir. 2006) (resolving conflict over agency action and interpretation of a statute in the context of cross-motions for summary judgment); *Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of Health & Human Servs.*, 83 F.3d 1497, 1501 (D.C. Cir. 1996) (same).  Thus, "[w]here, as here, a party seeks review of agency action under the APA and the entire case on review is a question of law, summary judgment is generally appropriate."  *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also Just Bagels Mfg., Inc. v. Mayorkas*,

900 F. Supp. 2d 363, 372 (S.D.N.Y. 2012) ("When a party seeks review of agency action under the APA, . . . judicial review of agency action is often accomplished by filing cross-motions for summary judgment." (internal quotation marks and alterations omitted)).

### 2.  Review of Agency Rulemaking

"The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances," and this understanding "has produced a spectrum of judicial responses, from great respect at one end . . . to near indifference at the other." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (citations omitted).  In certain circumstances, an agency's interpretation of a statute "is 'entitled to respect' only to the extent it has the 'power to persuade.'" *Gonzales v. Oregon*, 546 U.S. 243, 256 (2006) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  But, where, as here, "Congress has unambiguously vested [an agency] with general authority to administer [a statute] through rulemaking . . . and the agency interpretation at issue was promulgated in the exercise of that authority," the Court analyzes the agency's interpretation under the two-step framework established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *City of Arlington v. F.C.C.*, 133 S. Ct. 1863, 1874 (2013).  At step one, the Court asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.  "If the intent of Congress is clear, . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.  However, where the statute "simply does not speak with the precision necessary to say definitively whether it applies" to the precise question, *United States v. Eurodif S. A.*, 555 U.S. 305, 319 (2009), the Court "must uphold the [agency's] judgment as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation," *Sebelius v. Auburn Reg'l Med.*

*Ctr.*, 133 S. Ct. 817, 826 (2013).  The agency's interpretation is thus "binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute."  *Mead*, 533 U.S. at 227.

    B.  *Chevron* Step One

    To determine "whether Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, it is first necessary to define the precise question.  The Water Transfers Rule merely adds "[d]ischarges from a water transfer" to its list of NPDES "[e]xclusions."  40 C.F.R. § 122.3(i).  Reading this text in isolation, the rule arguably addresses the precise question whether Congress intended to require NPDES permits for water transfers as defined by the rule—or, put differently, whether Congress intended to allow EPA to decide whether to exclude water transfers from NPDES regulation.  But if this were the question, then EPA would lose at step one, because courts have consistently held that EPA does not have statutory authority to create NPDES exclusions.  *See, e.g.*, *Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1021–22 (9th Cir. 2008) (holding that "[§] 402 allows the [EPA] to issue a permit, but it does not provide that the [EPA] may entirely exempt certain categories of discharges from the permitting requirement"—a conclusion that "EPA [did] not seriously contest"); *N. Plains Res. Council v. Fid. Exploration & Dev. Co.*, 325 F.3d 1155, 1164 (9th Cir. 2003) ("EPA does not have the authority to exempt discharges otherwise subject to the CWA.  Only Congress may amend the CWA to create exemptions from regulation."); *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1377 (D.C. Cir. 1977) ("The wording of the statute, legislative history, and precedents are clear: the EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of [§] 402."); *see also Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1331 (2013) (noting, without comment, the D.C.

31

Circuit's holding in *Castle* "that the [CWA] did not give the EPA 'authority to exempt categories of point sources from the permit requirements' of the Act" (quoting *Castle*, 568 F.2d at 1377)).

Consequently, EPA claims to have answered the broader question whether Congress intended to prohibit water transfers generally under § 301(a), such that water transfers would be subject to regulation under NPDES, among other programs. (*See* EPA's Mem. of Law in Opp'n to Pls.' & Intervenor Pls.' Mots. for Summ. J. & in Supp. of the Federal Defs.' Cross-Mot. for Summ. J. ("EPA Mem.") (Dkt. No. 173) 24 ("[T]he statutory question at issue is whether the NPDES regime extends to water transfers in the first place."); *id.* at 36 n.11 ("EPA in promulgating the Water Transfers Rule did not create a regulatory exemption, but rather exercised its inherent authority to interpret ambiguous provisions of a statute administered by the agency."); EPA's Reply Mem. of Law in Supp. of Its Cross-Mot. for Summ. J. ("EPA Reply") (Dkt. No. 206) 3 ("EPA at no point 'created,' nor indeed presumed to have the authority to create, any exemptions from the NPDES permitting scheme that were not already contained within the CWA. Rather, EPA interpreted the CWA applying traditional principles of statutory construction, and concluded that the CWA itself, as reasonably interpreted, excludes certain water transfers from NPDES permitting requirements. The Water Transfers Rule, therefore, merely clarifies the relevant ambiguous statutory provisions in manner [sic] consistent with EPA's longstanding practice."); AR 1428 at 11 ("[T]he principal issue in [the Water Transfers Rule] is not whether EPA may exempt from NPDES permit obligations a class of entities responsible for the discharge of a pollutant, but the conditions under which one would properly have a discharge of a pollutant.").) Because § 301(a) provides that "the discharge of any pollutant by any person shall be unlawful," 33 U.S.C. § 1311(a), the question then becomes whether a water transfer, as defined by the rule, is a "discharge of a pollutant." That question, in

turn, requires an analysis of § 502(12), which defines "discharge of a pollutant" to mean, in

relevant part, "any addition of any pollutant to navigable waters from any point source."  *Id.*

§ 1362(12).

  The focal point of the Court's *Chevron*-step-one analysis, therefore, is whether Congress

clearly answered the precise question whether a transfer of water and any pollutants contained

therein is an "addition" of those pollutants "to navigable waters."  *See* 73 Fed. Reg. 33,700 ("The

legal question addressed by [the Water Transfers Rule] is whether a water transfer as defined in

the new regulation constitutes an 'addition' within the meaning of section 502(12).").  (*See* AR 5

at 2 & n.3 ("The precise legal question addressed here is whether the movement of pollutants

from one navigable water to another by a water transfer is the 'addition' of a pollutant

potentially subjecting the activity to the permitting requirement under section 402 of the Act.").)

If Congress clearly intended not to consider water transfers to be "addition[s] . . . to navigable

waters" under § 502(12), then it would follow that EPA has authority to adopt a regulation

"excluding" water transfers from programs that regulate such "additions," including the NPDES

program.  But if Congress clearly intended EPA to consider water transfers to be "addition[s] . . .

to navigable waters," then the Water Transfer Rule would violate the statute.  And if it were

unclear whether Congress intended either interpretation, then it would follow that EPA could use

its general delegation of authority to "prescribe such regulations as are necessary to carry out

[its] functions under" the CWA to choose an interpretation of § 502(12) that does not include

water transfers, thereby allowing EPA to promulgate a regulation "exempting" them from the

NPDES program.  33 U.S.C. § 1361(a) ("The Administrator is authorized to prescribe such

regulations as are necessary to carry out his [or her] functions under [the CWA].");  *see also* 73

Fed. Reg. 33,698 ("This final rule is issued under the authority of sections 402 and 501 of the

Clean Water Act[,] 33 U.S.C. [§§] 1342[,] 1361.").[13]  The focal point of the step-one analysis, therefore, is whether Congress directly spoke to the issue of whether a water transfer is an "addition . . . to navigable waters" under § 502(12).[14]

"Because the judiciary functions as the final authority on issues of statutory construction, an agency is given no deference at all on the question whether a statute is ambiguous." *Wells Fargo Bank, N.A. v. F.D.I.C.*, 310 F.3d 202, 205–06 (D.C. Cir. 2002) (internal quotation marks and alterations omitted).  It is thus the Court's task to determine, at step one, whether Congress has answered the "precise question at issue." *See Vill. Of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659–60 (D.C. Cir. 2011) ("Because at *Chevron* step one we alone are tasked with determining the Congress's unambiguous intent, we answer [the step-one question] without showing the agency any special deference.").  This determination requires a multipart analysis.  First, the Court asks whether "[any] court's prior judicial construction of [the] statute" conflicts with EPA's interpretation.  *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).  If such a conflicting interpretation "follow[ed] from the unambiguous terms of the statute," such that the court specifically held "that the statute unambiguously forecloses the agency's interpretation," then that court's interpretation "displaces [the] conflicting agency construction" and the analysis ends at step one.  *Id.* at 982–83.  However, if the court merely

---

[13] In similar circumstances, EPA has previously invoked its authority to interpret general terms in § 502 to promulgate an NPDES "exception."  *See* 71 Fed. Reg. 68,483, 68,488 (Nov. 27, 2006) (promulgating pesticide "exception" under 40 C.F.R. § 122.3 by interpreting "pollutant" in § 502(6) not to include pesticides).

[14] For this reason, the Court rejects Plaintiffs' arguments that the rule is invalid because EPA has no statutory authority to create NPDES exemptions.  (*See* Dkt. No. 138 at 3, 7 (Envtl. Pls.' Mem. of Law); Dkt. No. 143 at 15 & n.1 (Envtl. Intervenors' Mem. of Law); Dkt. No. 150 at 9, 36 (State Pls.' Mem. of Law); Dkt. No. 197 at 2 n.1 (Envtl. Intervenors' Opp'n & Reply Mem.); Dkt. No. 201 at 7 (Envtl. Pls.' Opp'n & Reply Mem.).)

identified the "*best* reading" of the statute, but not the "*only permissible* reading," *id.* at 984,

then this Court must employ "traditional tools of statutory construction[ to] ascertain[] [whether]

Congress had an intention on the precise question at issue," *Chevron*, 467 U.S. at 843 n.9.  In

conducting this analysis, the Court should "begin with the statutory text" of §§ 301(a) and

502(12).  *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 116 (2d. Cir. 2007).  Then, "[i]f the

statutory language is ambiguous . . . [the Court] [would] resort first to canons of statutory

construction, and, if the [statutory] meaning remains ambiguous, to legislative history, to see if

these interpretive clues permit [the Court] to identify Congress's clear intent."  *Id.* (citations and

internal quotation marks omitted) (fifth alteration in original).  If, after this analysis, the Court

determines that Congress has not spoken to the precise question at issue, it proceeds to step two.

### 1.  Prior Judicial Constructions

Initially, Plaintiffs argue that the Second Circuit's interpretations of the CWA in *Catskills*

*I & II* foreclose EPA's interpretation at step one.  (*See* Dkt. No. 1 (08-CV-8430 Dkt.) ¶¶ 26, 47

(State Pls.' Compl.); Dkt. No. 3 ¶ 33 (Envtl. Pls.' First Am. Compl.); Dkt. No. 121 ¶ 27 (Envtl.

Intervenors' Compl.); Trout Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Envtl. Pls.'

Mem.") (Dkt. No. 138) 12–15; Trout Pls.' Reply Mem. of Law in Supp. of Their Mot. for

Summ. J. & in Opp'n to Defs.' Cross-Mots. for Summ. J. ("Envtl. Pls.' Opp'n & Reply Mem.")

(Dkt. No. 201) 8.)  In *Catskills I*, the Second Circuit based its holding that § 301(a) prohibits

discharges of pollutants during water transfers on "what [it] f[ou]nd to be the plain meaning of

[the statute's] text."  273 F.3d at 494.  It also implied that the text was unambiguous in this

context.  *See id.* at 493 ("*Even if we were to conclude* that the proper application of the statutory

text to the present facts was *sufficiently ambiguous* to justify reliance on the legislative history of

the statute, that source of legislative intent would not help [the defendant]." (emphasis added)

35

(citation omitted)).  Based on this language, it is possible to construe *Catskills I* as holding that the statute unambiguously forecloses EPA's interpretation.

But, in that case, the Second Circuit also explicitly held that EPA's interpretation was not entitled to *Chevron* deference—not because the statute was unambiguous, but because EPA had not yet sufficiently formalized its interpretation.  *See id.* at 490 ("If the EPA's position had been adopted in a rulemaking or other formal proceeding, [*Chevron*] deference . . . might be appropriate.").  And, in *Catskills II*, the court again applied a lower level of deference, *see* 451 F.3d at 82 ("The City concedes that this EPA interpretation is not entitled to *Chevron* deference. . . .  We thus defer to the agency interpretation according to its power to persuade." (internal quotation marks omitted)), while reaffirming its holding in *Catskills I* rejecting EPA's interpretation in light of the "plain language" of the statute, *see id.* at 84–85.  Given that the Second Circuit did not clearly hold in either case that the statute unambiguously forecloses EPA's interpretation, and given that the court explicitly left open the door to *Chevron* analysis, this Court rejects Plaintiffs' argument that the Water Transfers Rule fails at *Chevron* step one in the context of these prior judicial constructions.  *See Brand X*, 545 U.S. at 985 ("Before a judicial construction of a statute . . . may trump an agency's, the court *must hold* that the statute *unambiguously requires* the court's construction." (emphasis added)).  The Court therefore proceeds to its own analysis of the statute.

## 2.  Statutory Text

"As with any question of statutory interpretation, [the Court] begin[s] with the text of the statute . . . ."  *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning . . . .").  As

36

discussed, the statutory text at issue is § 502(12)'s definition of "discharge of a pollutant" to mean an "addition . . . to navigable waters."  33 U.S.C. § 1362(12).  The phrase itself suggests a two-part analysis.

Initially, EPA identifies ambiguity in the term "addition," which it noted, in the preamble to the rule, is "undefined by the statute."  73 Fed. Reg. at 33,701.  (*See* EPA Mem. 20 ("[A]mbiguity is introduced . . . because the term 'addition' is not defined under the Act.").)  But here, none of the Parties really disputes the meaning of "addition," which they variously define to mean, essentially, a "joining" or "uniting."  (*See* Envtl. Pls.' Mem. 9 (defining "add" to mean "'to join or unite so as to increase in size, quantity, quality, or scope[.]'" (alteration in original) (quoting Am. Heritage Dictionary 19 (4th ed. 2000))); Intervenor–Pls. Miccosukee Tribe of Indians of Florida; Friends of the Everglades; Florida Wildlife Federation, & Sierra Clubs' Joint Mem. of Law in Supp. of Mot. for Summ. J. ("Envtl. Intervenor's Mem.") (Dkt. No. 143) 7 (defining "addition" to mean "the 'joining of one thing to another'" (quoting Webster's Third Int'l Dictionary Unabridged 24 (1993))); Intervenor South Florida Management District's Mem. of Law in Resp. to All Pls.' Mots. for Summ. J. & in Supp. of Intervenor, South Florida Water Management District's Cross-Mot. for Summ. J. ("SFWMD Mem.") (Dkt. No. 164) 17–18 (defining "addition" to mean "'the joining or uniting of one thing to another'" (quoting Webster's Third New Int'l Dictionary 24 (2002))); EPA Mem. 21 ("An '[a]ddition' is the 'result of adding; anything added,' and to 'add' is to 'join, annex, or unite . . . so as to bring about an increase (as in number [or] size).'" (alterations in original) (quoting Webster's Third New Int'l Dictionary 24 (1993))).)  Moreover, these definitions are consistent with the Supreme Court's recent interpretation of "addition" as it is used in § 502(12).  *See L.A. Cnty. Flood Control Dist. v. Natural Res. Def. Council, Inc.*, 133 S. Ct. 710, 713 (2013) (defining "add" to mean "'to join,

37

annex, or unite (as one thing to another) so as to bring about an increase (as in number, size, or importance) or so as to form one aggregate'" (quoting Webster's Third New Int'l Dictionary 24 (2002))).

In this context, EPA unsurprisingly conceded at oral argument that, to the extent that the phrase "addition . . . to navigable waters" creates a statutory ambiguity, "a lot of the work is done on the [']navigable waters['] side of the phrase."  (Hr'g Tr. 40.)   As EPA put it, in the context of water transfers, the "ordinary definition of the term 'addition' leaves open whether, under [§] 502(12) . . . , pollutants are only 'joined' or 'united' with ['navigable waters']—and therefore are only added—when they first enter those waters as a whole, or whether pollutants are 'added' to ['navigable waters'] every time they move to new [sic] body of 'navigable water' . . . ."  (EPA Mem. 21 (citations omitted).)  The Water Transfers Rule would be permissible under the former interpretation, but not under the latter.  *See Catskills I*, 273 F.3d at 494.  The question at this part of the step-one analysis, therefore, is whether EPA is correct that the text is ambiguous enough to support both interpretations.

At one extreme, Plaintiffs contend that the statute unambiguously means that an "addition of . . . pollutants" occurs when polluted water is transferred from one distinct body of water to another distinct body of water.  (*See* Mem. of Law in Supp. of State Pls.' Mot. for Summ. J. ("State Pls.' Mem.") (Dkt. No. 150) 34 ("[W]hen pollutants are transferred from one waterbody into a distinctly different waterbody from a point source such as a pipe or pump, they are 'added' to the receiving waterbody because the transfer 'joins' pollutants from the donor waterbody with the receiving waters, bringing about 'an increase' in the amount of pollutants found in the receiving waters."); Envtl. Pls.' Mem. 10–12; Envtl. Intervenor's Mem. 5–7; State Pls.' Mem. of Law in Reply to Defs.' Opp'n to Their Mot. for Summ. J. & in Opp'n to Defs.'

Cross-Mots. for Summ. J. ("State Pls.' Opp'n & Reply Mem.") (Dkt. No. 199) 4–8; Envtl. Pls.'

Opp'n & Reply Mem. 4–10.)  They claim support for their argument in both Second Circuit and

Supreme Court cases that purportedly agree with their interpretation.  *See, e.g.*, *L.A. Cnty. Flood*

*Control Dist.*, 133 S. Ct. at 713 ("In [*SFWMD*], . . . . [w]e held that [the relevant] water transfer

would count as a discharge of pollutants under the CWA only if the canal and the reservoir were

'meaningfully distinct water bodies.'" (quoting *SFWMD*, 541 U.S. at 112)); *SFWMD*, 541 U.S.

at 107–08 ("[Section 303] suggests that the Act protects individual water bodies as well as the

'waters of the United States' as a whole. . . .  The NPDES program thus appears to address the

movement of pollutants among water bodies, at least at times."); *Catskills II*, 451 F.3d at 84

(reaffirming *Catskills I* and rejecting EPA's interpretation because it "simply overlook[s] [the

statute's] plain language"); *Catskills I*, 273 F.3d at 491 ("[T]he transfer of water containing

pollutants from one body of water to another, distinct body of water is plainly an addition and

thus a 'discharge' that demands an NPDES permit.").  In particular, in *Catskills I*, the Second

Circuit employed an analogy to explain the difference between discharges within a single body

of water, and discharges between two distinct bodies of water: "If one takes a ladle of soup from

a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything

else to the pot."  273 F.3d at 492; *see also SFWMD*, 541 U.S. at 109–10 (quoting the Second

Circuit's soup analogy and characterizing the issue as a dispute over whether the waters in

question were "two pots of soup, not one").  The implication of the analogy is that ladling one type of soup—say, mulligatawny—into a pot containing another type of soup—say, wild mushroom—adds "pollutants" to the recipient pot of soup, spoiling the soup and leaving *no soup for you*.[15]  *See also Catskills II*, 451 F.3d at 81 ("In *Catskills I*, we analogized the dams cases to a soup ladle scooping soup out of a pot and returning it to that pot, a type of water transfer known as an intrabasin transfer.  The Tunnel's discharge, in contrast, was like scooping soup from one pot and depositing it in another pot, thereby adding soup to the second pot, an interbasin transfer.").  If it adopted the interpretation of the statute represented in this analogy and supported by these cases, the Court would invalidate the Water Transfers Rule under the theory that the statute unambiguously prohibits water transfers between distinct bodies of water.

At the other interpretive extreme, Intervenor–Defendant SFWMD argues that the statute unambiguously *requires* the Court to adopt an interpretation of § 502(12) that does not treat water transfers as "addition[s] . . . to navigable waters."  (*See* SFWMD Mem. 15 ("[T]he plain meaning of the Act . . . reflects an unequivocal intent to leave water transfers to non-NPDES authorities."); Mem. in Resp. to the EPA's Cross Mots. for Summ. J. ("SFWMD Reply Mem.") (Dkt. No. 196) 7 ("EPA's rule should be upheld not as an ambiguous option and, therefore, out of deference to the agency, but as the proper *de novo* construction of the Act.").)[16]  It argues that the statute defines "navigable waters" to mean "the waters of the United States," *see* 33 U.S.C.

---

[15] *See Seinfeld: The Soup Nazi* (NBC television broadcast Nov. 2, 1995).  (*See also* Hr'g Tr. 10.)

[16] In fact, even though SFWMD, like EPA, argues in favor of upholding the Water Transfers Rule, it presents its argument as an attack on EPA's argument.  (*See, e.g.*, SFWMD Reply Mem. 2–3 (arguing that "EPA . . . misapplies[] two important interpretive principles," that "EPA manipulates its result by selectively discussing isolated terms," and that "EPA misreads the natural and ordinary meaning of the relevant text").)

§ 1362(7), and that in substituting the latter phrase for the former, the statute applies only to the first "joining" of a pollutant to any part of "the" waters as a whole. (*See* SFWMD Mem. 18–20.) In support of its argument, it offers an analogy explaining the difference between "adding" (or "importing") something to an entity and "moving" something between subparts of an entity:

> Consider the phrase "addition of wine to the United States." A court would find absurd any argument that the distribution of wine from California to Florida would be considered an "addition" to the "United States." To constitute an "addition . . . to the United States," the wine must enter from outside the United States. This straightforward principle is unaffected by the reality that the United States is not monolithic, but rather comprises fifty meaningfully distinct states.

(*Id.* at 18 (alteration in original).)

Finally, in between the extremes, EPA argues that the statutory language is reasonably susceptible of either interpretation. (*See* EPA Mem. 16 ("The term 'navigable waters' is ambiguous and can be construed in at least two reasonable ways."); EPA Reply 13 (arguing that "navigable waters" in § 502(12) "can refer either to 'individual water bodies' or to 'a collective whole'").) It finds support in the Eleventh Circuit's opinion in *Friends I*, which held that "[t]here are two reasonable ways to read the § [502(12)] language . . . . One is that it means 'any addition . . . to [any] navigable waters;' the other is that it means 'any addition . . . to navigable waters [as a whole].'" *Friends I*, 570 F.3d at 1227 (third and fourth alterations in original). In so holding, the Eleventh Circuit contributed to the collection of analogies attempting to add analytical clarity to the issue:

> Consider the issue this way: Two buckets sit side by side, one with four marbles in it and the other with none. . . . A person comes along, picks up two marbles from the first bucket, and drops them into the second bucket. Has the marble-mover "add[ed] any marbles to buckets"? On the one hand, . . . there are now two marbles in a bucket where there were none before, so an addition of marbles has occurred. On

> the other hand, . . . there were four marbles in buckets before, and there are still four
> marbles in buckets, so no addition of marbles has occurred.

*Id.* at 1228 (second alteration in original).

Ultimately, the Court agrees with EPA that the statutory text alone is ambiguous and is arguably susceptible of either interpretation.  Specifically, it is persuaded by the Eleventh Circuit's analysis, which concluded that "[t]he statutory context indicates that sometimes the term 'navigable waters' was used in one sense[, i.e. to refer to 'the waters collectively,'] and sometimes in the other sense[,  i.e. to refer to 'many individual water bodies']."  *Id.* at 1224–25. Moreover, the use of "warring analogies"—such as soups, states, and buckets—to explain the statute's meaning is another good indication that the statutory text is sufficiently ambiguous.  *See Brand X*, 545 U.S. at 991–92 ("Because the term 'offer' can sometimes refer to a single, finished product and sometimes to the 'individual components in a package being offered' . . . , the statute fails unambiguously to classify the telecommunications component of cable modem service as a distinct offering.  This leaves federal telecommunications policy in this technical and complex area to be set by the [FCC], not by warring analogies.").  The Court thus proceeds to a holistic analysis of the statute's "structure, purpose, and history to determine whether these construction devices can convincingly resolve the ambiguity."  *Cohen*, 498 F.3d at 120 (internal quotation marks omitted).

### 3.  Holistic Analysis

In *Catskills I*, the Second Circuit recognized that the CWA "is among the most complex" statutes because it "balances a welter of consistent and inconsistent goals."  273 F.3d at 494. EPA agrees, as it explained in its Memorandum of Law:

> In the CWA, Congress balanced the goals to maintain and restore the quality of the
> nation's waters with the need "to recognize, preserve, and protect the primary

> responsibilities and rights of the States to prevent, reduce, and eliminate pollution"
> and "to plan the development and use . . . of land and water resources," as well as its
> "policy" that "the authority of each State to allocate quantities of water within its
> jurisdiction shall not be superseded, abrogated or otherwise impaired" by the CWA.

(EPA Mem. 22–23 (alteration in original) (quoting 33 U.S.C. §§ 1251(a), 1251(b), 1251(g)); *see also* EPA Reply 14 (noting the "competing goals" within the CWA).)  As EPA also explains, when Congress created the CWA's federal regulatory scheme, it "was keenly aware of the importance of balancing a federal water pollution control regime with the preservation of the states' primacy in water quality protection and land and water resource management."  (EPA Mem. 23–24.)  Indeed, throughout the process of promulgating the Water Transfers Rule—from the Klee Memorandum, to the proposed rule, to the responses to comments in the administrative record, to the final rule itself—EPA has acknowledged this "delicate balance."  (*See* AR 5 at 2 ("Th[is] question touches on the delicate balance created in the statute between protection of water quality to meet federal water quality goals, and the management of water quantity left by Congress in the hands of States and water resource management agencies."); AR 1428 at 12 ("[T]he heart of this matter is the balance Congress created between Federal and State oversight of activities affecting the nation's waters.  Among the purposes of the CWA is protection of water quality.  Congress nevertheless recognized that programs already existed at the State and local levels for managing water quantity; and it recognized the delicate relationship between the CWA and State and local programs."); *see also* Hr'g Tr. 59–60 ("THE COURT: [H]ow would you describe . . . the purpose of the [CWA] . . . ?  [EPA]: . . . I would say the [CWA] has a welter of consistent and inconsistent goals.  And I would say without a doubt, the objective of the [CWA] is to restore and maintain the physical, biological and chemical integrity of the nation's waters, but at the same time, the [CWA] recognizes the states' primary responsibility on

43

matters of water [allocation] and water use[,] creating a tension in the purposes as applied to this particular issue of water transfers.").) *See* 71 Fed. Reg. at 32,889 ("[T]he heart of this matter is the balance Congress created between federal and State oversight of activities affecting the nation's waters.  The purpose of the CWA is to protect water quality.  Congress nonetheless recognized that programs already existed at the State and local levels for managing water quantity, and it recognized the delicate relationship between the CWA and State and local programs."); 73 Fed. Reg. at 33,701 (same).

On one side of this balance, many CWA provisions support an interpretation of § 502(12) that is consistent with Congress's goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a); *see also Riverside Bayview Homes*, 474 U.S. at 132 (noting that the objective expressed in § 101(a) "incorporated a broad, systemic view of the goal of maintaining and improving water quality").  First, to the extent that water transfers might produce harmful environmental consequences, *see Catskills I*, 273 F.3d at 494 ("Artificially transferring water and pollutants between watersheds . . . might well interfere with [water] integrity."), classifying them as discharges of pollutants under § 502(12) and thereby regulating them generally under § 301(a) and specifically under the NPDES program would be entirely consistent with that goal.  Indeed, Congress established the NPDES program specifically "to prevent harmful discharges into the Nation's waters."  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007).

Second, in at least one part of the statute, Congress did express an intent to use the NPDES permit program to protect marine life against the potential negative effects of pollution transfers.  Specifically, in § 403 of the Act—which regulates NPDES permits specifically for discharges into the subset of navigable waters that includes "the territorial sea, the waters of the

44

contiguous zone, [and] the oceans," 33 U.S.C. § 1343(a)—Congress indicated its concern for

"the effect of disposal of pollutants on marine life" in these waters, "including the *transfer*,

concentration, and dispersal of *pollutants* or their byproducts through biological, *physical*, and

chemical processes," *id.* § 1343(c)(1)(B) (emphases added).

Finally, in § 302 of the Act—which addresses EPA's authority to impose "[w]ater quality

related effluent limitations" to "discharges of pollutants from a point source or group of point

sources"—Congress provided that, in certain circumstances, EPA "shall" establish "effluent

limitations . . . which can reasonably be expected to contribute to the attainment or maintenance

of such water quality."  *Id.* § 1312(a).  This duty is triggered

> [w]henever, in the judgment of the [EPA], . . . *discharges of pollutants* from a point
> source or group of point sources, with the application of effluent limitations required
> under [§ 301(b)(2)], would interfere with the attainment or maintenance of that water
> quality in a *specific portion of the navigable waters* which shall assure protection of
> public health, public water supplies, agricultural and industrial uses, and the
> protection and propagation of a balanced population of shellfish, fish and wildlife,
> and allow recreational activities in and on the water.

*Id.* (emphases added).  Because an interpretation of "discharge of a pollutant" as used in § 301(a)

and as defined in § 502(12) would also apply to an interpretation of "discharges of pollutants" in

§ 302(a), the latter provision offers persuasive evidence that Congress intended, at least in

certain circumstances, to regulate "discharges of pollutants" into "specific portion[s] of the

navigable waters."  *Id.*

On the other side of the balance, interpreting § 502(12) such that water transfers are

prohibited under § 301(a) might be inconsistent with multiple statutory provisions that arguably

prioritize states' rights to manage water resources at the expense of federal regulatory authority.

First, in § 101(b), Congress communicated its desire "to recognize, preserve, and protect the

primary responsibilities and rights of States . . . to plan the development and use (including

restoration, preservation, and enhancement) of land and water resources, and to consult with the [EPA] in the exercise of [its] authority under [the CWA]."  33 U.S.C. § 1251(b).  Second, in § 101(g), Congress expressed its intent "that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by [the CWA]," and that "nothing in [the CWA] shall be construed to supersede or abrogate rights to quantities of water which have been established by any State."  *Id.* § 1251(g).  Third, § 510(2) provides that "nothing in [the CWA] shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters . . . of such States."  *Id.* § 1370.  Finally, in a House Report explaining § 208 of the Act, the House Public Works Committee recognized that,

> in some States water resource development agencies are responsible for allocation of stream flow and are required to give full consideration to the effects on water quality.  To avoid duplication, the Committee believes that a State which has an approved program for the handling of permits under section 402, and which has a program for water resource allocation, should continue to exercise the primary responsibility in both of these areas and thus provide a balanced management control system.

H.R. Rep. No. 92-911, at 96–97 (1972).  Taken together, these provisions indicate what EPA describes as "Congress's general direction against unnecessary federal interference with state water allocation rights."  (EPA Mem. at 25.)

Many of these general expressions of congressional recognition of the states' role in water-allocation management are limited, however, by specific language qualifying that intent, and by specific provisions within the NPDES program indicating the precise balance that Congress intended to strike.  First, the Supreme Court has conclusively rejected the argument that "§§ 101(g) and 510(2) exclude the regulation of water quantity from the coverage of the Act" when it held that, even though those sections "preserve the authority of each State to

46

allocate water quantity as between users," "they do not limit the scope of water pollution controls that may be imposed on users who have obtained, pursuant to state law, a water allocation."  *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 720 (1994) (citations omitted).  EPA does not address this holding in any of its Memoranda of Law, but it did address it in the preamble to the Water Transfers Rule, where it conceded that § 101(g) "does not prohibit EPA from taking actions under the CWA that it determines are needed to protect water quality."  73 Fed. Reg. 33,702.

Second, § 510(2)'s supposed limitation on "impairing or in any manner affecting" state water rights applies "[e]xcept as expressly provided in [the Act]."  *See* 33 U.S.C. § 1370(2). Because this language does not address what other provisions of the Act "expressly provide[]," this provision has little bearing on an interpretation of those other provisions—i.e., §§ 301(a) and 502(12).

Third, some of the provisions prioritizing states' rights actually appear to support an interpretation allowing for meaningful federal regulation of water transfers.  For example, § 101(b)'s statement of a policy "to recognize, preserve, and protect the *primary* responsibilities and rights of States . . . to plan the development and use . . . of land and water resources" implicitly recognizes a *secondary* role for the federal government, which role could include regulation of water transfers.  *Id.* § 1251(b) (emphasis added).  Moreover, the aforementioned House Report discussing § 208 actually makes explicit this understanding of the federal government's "secondary" role, suggesting that, "[t]o avoid *duplication*, . . . a State which has an approved program . . . under [§] 402, and which has a program for water resource allocation, should continue to exercise the *primary* responsibility in both of these areas and thus provide a *balanced* management control system."  H.R. Rep. No. 92-911, at 96 (1972) (emphasis added).

47

In fact, even in the reading most favorable to the states' authority, this language implies that states should have control over water-resource allocation *only* where they have an EPA approved § 402 program and a water-resource-allocation program.  *See id.* (recognizing "primary responsibility" for states which have "an approved program . . . under [§] 402" and "a program for water resource allocation"); *cf. Cent. Hudson Gas & Elec. Corp. v. U.S. E.P.A.*, 587 F.2d 549, 552 (2d Cir. 1978) ("In recognition of 'the primary responsibilities and rights of States,' the [CWA] allows the States to assume control of the administration of the NPDES permit program, provided their own programs meet minimum federal standards." (citation omitted) (quoting 33 U.S.C. § 1251(b))).  Where a state has neither, this language implies that the federal government should exercise primary responsibility.  *See* H.R. Rep. No. 92-911, at 96 (1972) (recognizing Congress's intent to "avoid duplication" but also recognizing the baseline need for a "management control system"); *cf. Mianus River Pres. Comm. v. Adm'r, E.P.A.*, 541 F.2d 899, 905 (2d Cir. 1976) ("Such a system for the mandatory approval of a conforming State program and the consequent suspension of the federal program creates a *separate and independent* State authority to administer the NPDES pollution controls, in keeping with the stated Congressional purpose 'to recognize, preserve, and protect the primary responsibilities and rights of the States . . . .'" (emphasis added) (quoting 33 U.S.C. § 1251(b))).[17]

Fourth, these provisions and their general indications of congressional intent must be interpreted in the context of the specific, carefully designed balance between federal and state

---

[17] Although not material to resolution of these Motions, the Court notes that four states—Idaho, Massachusetts, New Hampshire, and New Mexico—and a number of other jurisdictions—including the District of Columbia and Puerto Rico—currently do not have an approved State NPDES program.  *See U.S. E.P.A., NPDES State Program Status*, http://cfpub.epa.gov/npdes/statestats.cfm (last visited Mar. 25, 2014); *see also Akiak Native Cmty. v. U.S. E.P.A.*, 625 F.3d 1162, 1164 (9th Cir. 2010) ("As of this time, 46 states . . . have been authorized to administer the NPDES program.").

authority Congress created within the NPDES program—a balance that is entirely consistent

with a "secondary" federal role.  As discussed, § 402(b) provides that states may establish their

own permit programs that, once established, supplant the federal NPDES program.  *See* 33

U.S.C. § 1342(b) ("[T]he Governor of each State desiring to administer its own permit program

for discharges into navigable waters within its jurisdiction may submit to the Administrator a full

and complete description of the program it proposes to establish and administer under State law

. . . .  The Administrator shall approve each submitted program unless he determines that [the

program does not meet certain requirements]."); *id.* § 1342(c)(1) ("[A]fter . . . a State has

submitted a program . . . pursuant to subsection (b) . . . , the Administrator shall suspend

issuance of permits under subsection (a) . . . as to those discharges subject to such program

. . . ."); *see also Wis. Res. Prot. Council v. Flambeau Mining Co.*, 727 F.3d 700, 703 (7th Cir.

2013) ("Once the EPA has approved a state's program, the EPA no longer has authority to issue

NPDES permits under the CWA; at that point the state permitting authority is the only entity

authorized to issue NPDES permits within the state's jurisdiction." (internal citation omitted)).

But state programs still must comply with federal requirements ensuring that the permits are

consistent with the CWA.  *See* 33 U.S.C. § 1342(b) (permit-program guidelines); *id.*

§ 1342(c)(2) ("Any State permit program under this section shall at all times be in accordance

with this section and guidelines promulgated pursuant to [§] 1314(i)(2) . . . ."); *see also Natural*

*Res. Def. Council, Inc. v. U.S. E.P.A.*, 859 F.2d 156, 173 (D.C. Cir. 1988) ("[T]he CWA

provides for state assumption of the NPDES permit program.  It specifies some prerequisites to

states' assuming permitting responsibilities, authorizes the Administrator to supplement them,

and requires him to approve a state's application once satisfied that these standards have been

met." (internal citations omitted)).  If a proposed state program does not meet the requirements,

or if an existing state program at any point fails to meet the requirements, the EPA Administrator must refuse to approve or must withdraw approval of the program if the state does not take sufficient corrective action.  *See* 33 U.S.C. § 1342(c)(1) ("[A]fter . . . a State has submitted a program . . . , the Administrator shall suspend issuance of permits . . . unless he determines that the State permit program does not meet the requirements of subsection (b) . . . or does not conform to the guidelines issued under [§] 1314(i)(2) . . . ."); *id.* § 1342(c)(3) ("Whenever the Administrator determines . . . that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken . . . the Administrator shall withdraw approval of such program."); *see also Nat'l Ass'n of Home Builders*, 551 U.S. at 688–89 ("After EPA has transferred NPDES permitting authority to a State, the Agency continues to oversee the State's permitting program."); *Wis. Res. Prot. Council*, 727 F.3d at 703 ("EPA retains supervisory authority over the state program and is charged with 'notify[ing] the State of any revisions or modifications [to the State's program] necessary to conform to [CWA] requirements or guidelines.'" (alterations in original) (quoting 33 U.S.C. § 1342(c)(1))).  Moreover, under § 402(d), the EPA Administrator has authority to object to any permit issued under an approved state program.  *See* 33 U.S.C. § 1342(d); *Nat'l Ass'n of Home Builders*, 551 U.S. at 689 ("If a state permit is 'outside the guidelines and the requirements' of the CWA, EPA may object to it and block its issuance." (quoting 33 U.S.C. § 1342(d)(2))); *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 857 (8th Cir. 2013) ("States are . . . required to forward a copy of each permit application they receive to the EPA, which is afforded an opportunity to block the issuance of the permit.").

Finally, although one might read §§ 101(b) and 101(g) to reflect Congress's strong intent to elevate states' rights to manage their own water resources over other priorities, Congress also both effected and constrained this intent through provisions protecting states against the negative effects of unwanted interstate water pollution.  It is true that Congress intended that states address interstate-pollution issues through "cooperative activities by the States for the prevention, reduction, and elimination of pollution," including "uniform State laws" and "compacts between States for the prevention and control of pollution."  33 U.S.C. § 1253(a). However, perhaps recognizing that such cooperation would not solve every issue, it also passed specific provisions establishing a federal conflict-resolution role, "the primary purpose" of which "was to provide uniformity among the federal and state jurisdictions enforcing the NPDES program and prevent the 'Tragedy of the Commons' that might result if jurisdictions [could] compete for industry and development by providing more liberal limitations than their neighboring states."  *Costle*, 568 F.2d at 1378.  Under the previously discussed NPDES-program provisions, in particular, "Congress provided ample opportunity for a State affected by decisions of a neighboring State's permit-granting agency to seek redress," such that "the EPA itself [could] issue permits if a stalemate between an issuing and objecting State develop[ed]."  *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 326 (1981); *see also id.* ("The statutory scheme established by Congress provides a forum for the pursuit of such claims before expert agencies by means of the permit-granting process.").  Moreover, this understanding of the NPDES program and the CWA in general is consistent with § 510(1), which provides that nothing in the CWA "shall . . . preclude or deny the right of any State . . . to adopt or enforce . . . any standard or limitation respecting discharges of pollutants, or . . . any requirement respecting control or abatement of pollution," but that any such standard, limitation, or requirement cannot be "less

stringent" than any standard, limitation, or prohibition established by the CWA.  33 U.S.C.

§ 1370(1).  In other words, the CWA respects states' rights by sometimes removing a federal

regulatory ceiling, but it also protects states' rights by maintaining a federally enforced floor.

 In addition to provisions related to the statute's conflicting purposes, other statutory

provisions also address but ultimately do not resolve the textual ambiguity.  On the one hand,

certain provisions support the argument that Congress did not intend to regulate water transfers

because it conceptualized pollution associated with water transfers the same way it

conceptualized pollution associated with "nonpoint sources," which the CWA does not regulate

under § 301(a).  *See* 33 U.S.C. § 1362(12) (defining "discharge of a pollutant" as an "addition

. . . from [a] point source").  First, in § 304(f) of the Act—a section which EPA argues "is

focused primarily on addressing pollution sources outside the scope of the NPDES program,"

(EPA Mem. At 26)—Congress provided that

> [t]he Administrator, after consultation with appropriate Federal and State agencies
> and other interested persons, shall issue to appropriate Federal agencies, the States,
> [and other entities] . . . information including (1) guidelines for identifying and
> evaluating the nature and extent of nonpoint source of pollutants, and (2) processes,
> procedures, and methods to control pollution resulting from . . . (F) changes in the
> movement, flow, or circulation of any navigable waters or ground waters, including
> changes caused by the construction of dams, levees, channels, causeways, or flow
> diversion facilities.

33 U.S.C. § 1314(f)(2).  EPA interprets this provision—which references "changes in the

movement, flow, or circulation of any navigable waters"—"to reflect an understanding by

Congress that water movement could result in pollution, and that such pollution would be

managed by States under their nonpoint source program authorities, rather than the NPDES

program."  (EPA Mem. 27).  But EPA concedes that § 304(f) "does not address nonpoint sources

of pollution exclusively," and thus it also concedes that this section "does not resolve the ambiguity of the specific terms under [§§] 301 and 501 [sic] at issue here."  (*Id.* at 26–27)

Second, EPA argues that "NPDES permits are not generally required for other activities" that might implicate water-pollution control, including "hydroelectric dams," "movements of water through reservoir systems," and "nonpoint sources such as runoff."  (*Id.* at 25.)  According to EPA, the CWA instead "encourages the states to develop local programs, which may include techniques such as land-use requirements, to control various sources of pollution."  (*Id.*)  In addition to § 304(f), the provisions relating to these programs include § 102(b), 33 U.S.C. § 1252(b) (state programs using reservoir planning to provide for streamflow-regulation-related storage); § 208(b)(2)(F), *id.* § 1288(b)(2)(F) (state programs using land-use planning to address certain nonpoint pollution sources); § 309, *id.* § 1329 (state programs addressing nonpoint source pollution); and § 401, *id.* § 1341 (state-certification requirement for federally issued licenses and permits)).  These provisions thus represent parts of the "complex framework of federal–state cooperation which includes, but is certainly not limited to, the NPDES permitting program." (EPA Mem. 25.)

On the other hand, although Congress has previously passed specific exemptions to the NPDES program, it has never passed an exemption addressing water transfers.  Thus, in § 402(l), entitled "[l]imitation on [NPDES] permit requirement," Congress provided that EPA "shall not require a permit," nor shall it "directly or indirectly[] require any State to require such a permit," for "discharges composed entirely of return flows from irrigated agriculture," and for "discharges of stormwater runoff" from certain sources.  33 U.S.C. §§ 1342(l)(1)–(2). Moreover, in § 404, Congress created a separate permit program that applies specifically to "discharge[s] of dredged or fill material into the navigable waters at specified disposal sites," *id.*

§ 1344(a), even though those materials also fall under the general definition of "pollutant" and thus would otherwise be subject to the NPDES permit program, *see id.* § 1362(6) (defining "pollutant" to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, . . . rock, sand, cellar dirt and industrial, municipal, and agricultural waste").  Three regulatory NPDES-program "exclusions" are based on these statutory exemptions.  *See* 40 C.F.R. §§ 122.3(f) (excluding "[r]eturn flows from irrigated agriculture"), 122.3(e) (excluding "[a]ny introduction of pollutants from . . . storm water runoff"), 122.3(b) (excluding "[d]ischarges of dredged or fill material . . . which are regulated under [§] 404").  To some extent, one could therefore infer from Congress's failure to include an express statutory exemption for water transfers that Congress did not intend to exempt them.  *See Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013) ("[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (internal quotation marks omitted)); *United States v. Pettus*, 303 F.3d 480, 485 (2d Cir. 2002) (same); *cf. Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1293 (D.C. Cir. 1989) ("For example, if Congress banned the importation of apples, oranges, and bananas from a particular country, the canon of *expressio unius est exclusio alterius* might well indicate that Congress *did not* intend to ban the importation of grapefruits.  In that event, an agency decision to ban grapefruits would be contrary to Congress' specific intent.").

In the face of ambiguity at *Chevron* step one, the Court's task is not to resolve it, but rather to determine whether Congress unambiguously resolved it.  Here, the Court has already found that the statutory text, by itself, does not resolve the issue.  Now, it further finds that a holistic analysis of the statute does not help clarify the statutory text.  It therefore agrees with

54

EPA that "the overall statutory context and legislative history do not resolve, but rather reinforce, the[] textual ambiguities," (EPA Reply 14), and thus it also agrees with EPA and the Eleventh Circuit that "the 'broader context of the statute as a whole' [leaves] ambiguous whether the NPDES program was intended to apply to water transfers," (EPA Mem. 27 (quoting *Friends I*, 570 F.3d at 1225).)  Accordingly, because "[t]he only certainty that [the Court] can discern from the statutory scheme is that it is unclear," it proceeds to *Chevron* step two.  *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 700 (D.C. Cir. Jan. 24, 2014).[18]

## C.  *Chevron* Step Two

Because Congress did not answer the precise question whether a water transfer constitutes an "addition" of pollutants "to navigable waters," the Court considers the CWA to contain a "delegation[] of authority to the agency to fill the statutory gap in reasonable fashion." *Brand X*, 545 U.S. at 980; s*ee also Mead*, 533 U.S. at 229 (recognizing that *Chevron* deference applies where "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which Congress did not actually have an intent as to a particular result" (internal quotation marks omitted)); *Chevron*, 467 U.S. at 843–44 ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of

---

[18] The Court notes that Intervenor–Defendants offer other arguments in favor of interpreting the CWA not to prohibit water transfers, including one based on the Rule of Lenity, one based on the Tenth Amendment's "clear statement rule," and one based on the doctrine of constitutional avoidance.  (*See* SFWMD Mem. 22–25; Western States' Mem. of Law in Supp. of Cross-Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J. (Dkt. No. 171) 5, 9; Western Water Providers' Mem. of Law in Supp. of Cross-Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J. (Dkt. No. 188) 15; Western States' Mem. of Law in Reply to Pls.' Opp'n to Their Cross Mot. for Summ. J. (Dkt. No. 204) 4–5.)  Even if these arguments helped to reduce the statutory ambiguity, however, none of them indicates that Congress unambiguously answered the precise question at issue.  The Court therefore need not resolve these arguments before proceeding to step two.

the statute by regulation."). Here, EPA has been "called upon to balance two legislative policies

in tension"—which is "precisely the paradigm situation *Chevron* addressed," *Mich. Citizens for*

*an Indep. Press*, 868 F.2d at 1293; *see also City of Arlington*, 133 S. Ct. at 1873 (describing

"archetypal *Chevron* questions" as those "about how best to construe an ambiguous term in light

of competing policy interests"). In such a situation, where "[f]illing the[] gap[] . . . involves

difficult policy choices," deference is appropriate because "agencies are better equipped to make

[these choices] than courts." *Brand X*, 545 U.S. at 980. *Chevron*'s high level of deference is

generally thus "justified because the responsibilities for assessing the wisdom of such policy

choices and resolving the struggle between competing views of the public interest are not

judicial ones, and because of the agency's greater familiarity with the ever-changing facts and

circumstances surrounding the subjects regulated." *FDA v. Brown & Williamson Tobacco*

*Corp.*, 529 U.S. 120, 132 (2000) (internal quotation marks, citations, and alterations omitted);

*see also Brand X*, 545 U.S. at 1003 (upholding agency action where agency "use[d] . . . its expert

policy judgment to resolve . . . difficult questions"); *Chevron*, 467 U.S. at 844 (deferring to

agency interpretations "whenever decision as to the meaning or reach of a statute has involved

reconciling conflicting policies, and a full understanding of the force of the statutory policy in

the given situation has depended upon more than ordinary knowledge respecting the matters

subjected to agency regulations"); *cf. United States v. Shimer*, 367 U.S. 374, 383 (1961) ("If [the

agency's] choice represents a reasonable accommodation of conflicting policies that were

committed to the agency's care by the statute, [a court] should not disturb it unless it appears

from the statute or its legislative history that the accommodation is not one that Congress would

have sanctioned.").

"But courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 132 S. Ct. 476, 483–84 (2011); *see also Brand X*, 545 U.S. at 980 (noting that agencies must resolve statutory ambiguities in a "reasonable fashion"). Therefore, to help courts ensure that an interpretation is permissible, an agency must "provide a reasoned explanation for its action." *Judulang*, 132 S. Ct. at 479; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (noting that "it is the agency's responsibility, not [a court's], to explain its decision," and rejecting an agency interpretation where "the agency ha[d] failed to supply the requisite 'reasoned analysis'"); *Vill. of Barrington*, 636 F.3d at 660 ("At *Chevron* step two we defer to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose that interpretation."); *Cablevision Sys. Corp. v. F.C.C.*, 570 F.3d 83, 92 (2d Cir. 2009) ("An administrative agency has a duty to explain its ultimate action."); *Ne. Md. Waste Disposal Auth. v. E.P.A.*, 358 F.3d 936, 949 (D.C. Cir. 2004) (noting the "fundamental requirement of nonarbitrary administrative decisionmaking: that an agency set forth the reasons for its actions"); *cf. Brand X*, 545 U.S. at 1000–01 (deferring to agency interpretation where agency "provided a reasoned explanation" for the interpretation). Furthermore, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," *State Farm*, 463 U.S. at 50, and a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *id.* at 43 (internal quotation marks omitted).[19]

---

[19] In disputing whether the Court should analyze the Water Transfers Rule under *State Farm*, the Parties are like two ships passing in the night. Because *State Farm* identifies certain factors relevant to whether an agency's action is "arbitrary and capricious" under the APA, those same factors are relevant to whether EPA's action is "arbitrary and capricious" under *Chevron* step two. *See Am. Petroleum Inst. v. U.S. E.P.A.*, 216 F.3d 50, 57 (D.C. Cir. 2000) ("The second step of *Chevron* analysis and *State Farm* arbitrary and capricious review overlap, but are not identical."); *Arent v. Shalala*, 70 F.3d 610, 616 (D.C. Cir. 1995) (applying *State Farm* analysis at

Courts have found the requisite "reasoned explanation" lacking and have refused to defer to agency interpretations in a number of circumstances.  For example, an agency cannot "entirely fail[] to consider an important aspect of the problem," which includes the factors Congress deemed relevant to the decision.  *Id.*; *see also Gen. Am. Transp. Corp. v. I.C.C.*, 872 F.2d 1048, 1053 (D.C. Cir. 1989) (noting that step two "require[s] [courts] to determine whether the [agency], in effecting a reconciliation of competing statutory aims, has rationally considered the factors deemed relevant by the [statute]").  Or, if an agency chooses not to consider an arguably important aspect of the problem, it must explain, at the very least, the reasons for its decision not to consider it.  *See Massachusetts v. EPA*, 549 U.S. 497, 534 (2007) (rejecting EPA action in part because "EPA ha[d] offered no reasoned explanation for its refusal to decide" an issue).  The agency thus also has a duty to consider alternative policies and explain why it chose one option over others.  *See State Farm*, 463 U.S. at 48 ("At the very least this alternative way of achieving

_____

*Chevron* step two because "whether the [agency's] discharge of . . . authority was reasonable . . . falls within the province of traditional arbitrary and capricious review under [the APA]"); *Dovid v. U.S. Dep't of Agric.*, No. 11-CV-2746, 2013 WL 775408, at *6 (S.D.N.Y. Mar. 1, 2013) (applying *State Farm* factors at *Chevron* step two).  Whether this is a case where the step-two analysis and the APA are "the same," *see Judulang*, 132 S. Ct. at 483 n.7 ("Were we to [apply *Chevron* step two], our analysis would be the same, because under *Chevron* step two, we ask whether an agency interpretation is arbitrary or capricious in substance." (internal quotation marks omitted)), is irrelevant, because it is certainly a case where the Court analyzes an agency's action and questions whether that action was reasonable.

EPA argues that *State Farm* does not apply here because it is not required to undertake a detailed scientific or technical analysis of the environmental impacts of water transfers.  (*See* EPA Reply 2–3, 5.)  That may be true, but EPA's obligation to provide a reasoned explanation for its decision requires it to undertake *some* kind of analysis—scientific, technical, or otherwise—and it is the Court's job, at step two, to determine whether that analysis was sufficient.  Here, EPA chose to undertake a statutory—or, in its words, "legal"—analysis.  (*See* AR 1428 at 8 ("This rulemaking is based on a legal analysis of the [CWA] as a whole, not a scientific analysis of water transfers.").)  Assuming that this choice was appropriate, EPA still had to apply the analysis in a reasonable fashion.

the objectives of the Act should have been addressed and adequate reasons given for its

abandonment.").

       Aside from what the agency does not consider or chooses not to adopt, the agency must

also "ground its reasons for action . . . in the statute," and thereby demonstrate that the

interpretation it did choose is consistent with statutory purposes. *Massachusetts*, 549 U.S. at

535; *see also Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 126 (1985)

(acknowledging deference to EPA interpretation at step two "unless the legislative history or the

purpose and structure of the statute clearly reveal a contrary intent on the part of Congress");

*Vill. of Barrington*, 636 F.3d at 660 ("[C]onsidering only the rationales the [agency] actually

offered in its decision, [the court] determine[s] whether [the agency's] interpretation is

'rationally related to the goals of' the statute." (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S.

366, 388 (1999))); *Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 866 (D.C. Cir. 2000) (asking, at

step two, whether EPA's interpretation was "a permissible construction of the statute, *i.e.*,

whether it [was] reasonable and consistent with the statute's purpose" (citation and internal

quotation marks and citations omitted)); *Continental Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d

1444, 1449 (D.C. Cir. 1988) ("[R]easonableness in this context is to be determined by reference .

. . to the compatibility of th[e] interpretation with the Congressional purposes informing [it].");

*cf. Chevron*, 467 U.S. at 863 (deferring to EPA interpretation where "EPA ha[d] advanced a

reasonable explanation for its conclusion that the regulations serve[d] the environmental

objectives" of the statute); Laurence H. Silberman, *Chevron—The Intersection of Law & Policy*,

58 Geo. Wash. L. Rev. 821, 827 (1990) (arguing that a court may invalidate an agency

interpretation at step two if a party "establish[es] that the agency's construction is inconsistent

with the structure and purpose of the statute and therefore impermissible").

Moreover, the agency must actually answer the precise question left open by a statute's ambiguity. *See Lopez v. Terrell*, 654 F.3d 176, 182 (2d Cir. 2011) ("Although the framework of deference set forth in *Chevron* applies to an agency interpretation contained in a regulation, where the regulation identified by the agency does not speak to the statutory ambiguity at issue, *Chevron* deference is inappropriate." (citations, internal quotation marks, and alterations omitted)).  And it must do so in a "rational" way. *See State Farm*, 463 U.S. at 43 ("[T]he agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotation marks omitted)).  The agency therefore must employ a rational methodology. *See Judulang*, 132 S. Ct. at 485 ("If the BIA proposed to narrow the class of deportable aliens eligible to seek . . . relief by flipping a coin . . . we would reverse the policy in an instant."); *Vill. of Barrington*, 636 F.3d at 660 ("If an agency fails or refuses to deploy [its] expertise—for example, by simply picking a permissible interpretation out of a hat—it deserves no deference.").  It must apply that methodology in a way that is logical and internally consistent. *See Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 95 (2d Cir. 2001) ("[A]pplication of agency standards in a plainly inconsistent manner across similar situations evinces such a lack of rationality as to be arbitrary and capricious."); *Iavorski v. U.S. I.N.S.*, 232 F.3d 124, 133 (2d Cir. 2000) ("When Congress has not directly addressed an issue, our review is not merely for minimum rationality but requires that the administrative agency articulate a logical basis for its judgment." (internal quotation marks omitted)); *cf. Brand X*, 545 U.S. at 981 ("Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the [APA].."); *Huntington Hosp. v. Thompson*, 319 F.3d 74, 79 (2d Cir. 2002) ("[A]n agency . . . cannot simply adopt inconsistent positions without presenting 'some reasoned analysis.'").  And it has "a duty" to "examine" and

to "justify" the "key assumptions" underlying its interpretation. *Appalachian Power Co. v. E.P.A.*, 135 F.3d 791, 818 (D.C. Cir. 1998) ("EPA retains a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule and therefore . . . EPA must justify that assumption even if no one objects to it during the comment period." (internal quotation marks omitted)).

Finally, even if an agency provides a reasoned explanation, the Court still must reject an interpretation that is "manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. Thus, "where Congress has established an ambiguous line, [an] agency can go no further than the ambiguity will fairly allow." *City of Arlington*, 133 S. Ct. at 1874. And courts therefore must reject an agency's action that "go[es] over the edge of reasonable interpretation" and "completely nullifies textually applicable provisions meant to limit [the agency's] discretion." *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 485 (2001); *see also Indep. Ins. Agents of Am., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 838 F.2d 627, 632 (2d Cir. 1988) ("Though the classification of congressional intent as clear or ambiguous will sometimes be in the eye of the beholder, courts construing statutes enacted specifically to prohibit agency action ought to be especially careful not to allow dubious arguments advanced by the agency in behalf of its proffered construction to thwart congressional intent expressed with reasonable clarity, under the guise of deferring to agency expertise on matters of minimal ambiguity.").

With these principles in mind, the Court turns to an analysis of the Water Transfers Rule under the *Chevron* framework.

### 1. EPA's Answer to the Precise Question

When it promulgated the Water Transfers Rule, EPA explained that "[t]he legal question addressed by [the] rule is whether a water transfer as defined in the new regulation constitutes an

'addition' within the meaning of [§] 502(12)."  73 Fed. Reg. at 33,700.  This question, in turn, depends on the answers to two sub-questions.  First, what is an "addition . . . to navigable waters"?  Second, does a water transfer, as defined by the rule, fall within that definition?  The first question is effectively the "precise question" the Court analyzed at step one.  And although the answer to the second question depends, in large part, on the answer to the first question, it is nevertheless an independent question that, as will become clear, relies on ambiguity in the term "navigable waters."

To answer the first question, EPA initially reaffirmed its "longstanding position . . . that an NPDES pollutant is 'added' when it is introduced into a water from the 'outside world' by a point source."  *Id.* at 33,701; *see also id.* at 33,700 (noting the D.C. Circuit's "agree[ment] with EPA that the term 'addition' may reasonably be limited to situations in which 'the point source itself physically introduces a pollutant into a water from the outside world'" (quoting *Gorsuch*, 693 F.3d at 175)).  At a high level of generality, this is substantively the same interpretation of "addition" the Second Circuit endorsed in *Catskills I*: "EPA's position, upheld by the *Gorsuch* and *Consumers Power* courts, is that for there to be an 'addition,' a 'point source must *introduce* the pollutant into navigable water from the outside world.'  *We agree with this view* . . . ."  273 F.3d at 491 (citation omitted) (second emphasis added) (quoting *Gorsuch*, 693 F.2d at 165).  The Second Circuit ultimately rejected EPA's interpretation in that case, however, because it differed with EPA's definition of "outside world," as the full quotation makes clear:

> We agree with this view *provided that* "outside world" is construed as any place outside the particular water body to which pollutants are introduced.  Given that understanding of "addition," the transfer of water containing pollutants from one body of water to another, distinct body of water is plainly an addition and thus a "discharge" that demands an NPDES permit.

*Id.* (emphasis added).  Thus, EPA adopted the Water Transfers Rule, at least in part, to

express—authoritatively—its disagreement with the Second Circuit's interpretation, and to

clarify its own interpretation of "outside world."  As EPA explained, it "does not agree with [the

*Catskills I*] understanding of the term 'outside world' . . . .  Rather, EPA believes that an addition

of a pollutant under the Act occurs when pollutants are introduced from *outside the waters being*

*transferred*."  73 Fed. Reg. at 33,701 (emphasis added).  In other words, from the perspective of

an individual waterbody, EPA disagreed with an interpretation that considered other waterbodies

to be part of the "outside world," and it adopted an interpretation that implicitly created a binary

distinction between "navigable waters" as a whole and the "outside world."

   Having adopted this interpretation, EPA proceeded to consider the question whether a

water transfer would constitute an addition of a pollutant from the outside world.  Referencing

§ 502(7)'s definition of "navigable waters" as "the waters of the United States," 33 U.S.C.

§ 1362(7), the final rule defines a "water transfer," in part, to mean "an activity that conveys or

connects waters of the United States."  40 C.F.R. § 122.3(i).  In the preamble, EPA explained

that, "[to] be exempt from the requirement to obtain an NPDES permit" under the Water

Transfers Rule, "the water being conveyed must be a water of the U.S. prior to being discharged

to the receiving waterbody. . . .  Additionally, the water must be conveyed from one water of the

U.S. to another water of the U.S."  73 Fed. Reg. at 33,699 (footnote omitted).  But in the context

of EPA's outside-world interpretation of § 502(12), this interpretation raises the question

whether a water enters the outside world during the transfer itself—i.e., when it leaves a

navigable waterbody and is *conveyed* to another water—and thus whether it is possible for a

conveyed water to meet EPA's requirement that it be a navigable water "prior to being

discharged to the receiving waterbody."  For example, if one conveyed water by building a canal

to connect two navigable waters, it is conceivable that the canal could be considered a "navigable water," such that the transferred water never leaves the "navigable waters" or enters the outside world during the conveyance. *See SFWMD*, 541 U.S. at 102 (accepting parties' assumption that a canal was a "navigable water"). But if, instead, one conveyed the water through a "pipe" or a "tunnel" or any other "discrete conveyance" that the CWA would otherwise define to be a "point source," 33 U.S.C. § 1362(14), it is not entirely clear whether the water would enter the outside world under EPA's interpretation when it left the navigable waterbody.

In the context of this issue, EPA adopted a "status-based" concept of "water" to accompany its outside-world concept of "navigable waters." Under this interpretation, "water" has a "status," such that it is either part of "navigable waters" or part of the "outside world." Accordingly, "when a pollutant is conveyed along with, and already subsumed entirely within, navigable waters and . . . the water never loses its status as 'waters of the United States,' . . . nothing is added to those waters from the outside world" because "the pollutants in transferred water are already *in* 'the waters of the United States' before, during, and after the water transfer." (AR 1428 at 25.)[20] Or, as EPA put it in the preamble to the final rule, "pollutants moved from the donor water into the receiving water, which are contained in navigable waters throughout the transfer, would not be 'added' by the [transferrer] and would therefore not be subject to NPDES permitting requirements." 73 Fed. Reg. at 33,705 n.10.

---

[20] This language also appears in the preamble to the final rule in the form of an excerpt from the Government's Brief in *Friends I. See* 73 Fed. Reg. at 33,701. In the context of that excerpt, EPA noted that "the United States has taken the position" quoted in the language, but it did not expressly adopt that position as its own. *Id.* The Court cites, instead, to the identical (and unattributed) language from EPA's responses to comments in the administrative record because it is only in that context that EPA appears to adopt this language as directly representative of its own views.

As with EPA's outside-world interpretation, competing interpretations of the scope of "navigable waters"—or, more specifically, "water"—surfaced in an apparent disagreement between two circuit court opinions.  In *Consumers Power*, the Sixth Circuit upheld EPA's interpretation that a hydropower-generating facility in Lake Michigan did not require an NPDES permit for pollutants contained in temporarily impounded water, in part because it agreed that "the Lake water [did] not lose its status as navigable water simply because it [was] removed from the Lake" by the facility.  862 F.2d at 589.  In its view, because the facility "merely change[d] the movement, flow, or circulation of navigable waters when it temporarily impound[ed] waters . . . in a storage reservoir," the facility "[did] not alter their character as waters of the United States."  *Id.*  In *Dubois*, by contrast, the First Circuit disagreed with the Forest Service's determination that a ski resort did not require an NPDES permit for a discharge of one "distinct" navigable water into another.  102 F.3d at 1299.  It based its determination, in large part, on its finding that, where the water passed through "pipes" during the transfer, the water "[left] the domain of nature and [was] subject to private control rather than purely natural processes.  As such, it [had] lost its status as waters of the United States."  *Id.* at 1297.

In the Water Transfers Rule, EPA sided with the Sixth Circuit.  Adopting its logic, it declared that, "[b]ecause water transfers simply change the flow, direction or circulation of navigable waters, they would not themselves cause the waters being moved to lose their status as waters of the United States."  73 Fed. Reg. at 33,705 n.10.  But then EPA went a step further and clarified when a water *can* "lose" its status—finding, specifically, that such a loss occurs when the "water is withdrawn from waters of the U.S. for an intervening industrial, municipal or commercial use."  *Id.* at 33,704 n.8.  According to EPA, "[t]he reintroduction of the intake water and associated pollutants from an intervening use through a point source is an 'addition' and has

long been subject to NPDES permitting requirements" because such a reintroduction "physically introduces pollutants from the outside world." *Id.* at 33,704. Thus, under the Water Transfers Rule, which defines a "water transfer," in full, to be "an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use," 40 C.F.R. § 122.3(i), "[a] discharge of a pollutant associated with a water transfer resulting from an intervening . . . use . . . would require an NPDES permit as any discharge of a pollutant from a point source into a water of the U.S. would," 73 Fed. Reg. at 33,704. EPA clarified, however, that "a water pumping station, pipe, canal, or other structure used solely to facilitate the transfer of the water is not an intervening use." *Id.* This, in turn, supported its definition of "activity"—as in a "water transfer . . . activity" under the Water Transfers Rule—to mean "any system of pumping stations, canals, aqueducts, tunnels, pipes, or other such conveyances constructed to transport water from one water of the U.S. to another water of the U.S." *Id.* Therefore, as defined in the rule, water transfers do not cause waters to lose their "status" as "navigable waters," and thus the discharge of transferred water into a receiving waterbody is not an "addition" from the "outside world."

Because the validity of the Water Transfers Rule depends on the validity of the answers to both of these questions—one addressing "addition . . . to navigable waters," and one addressing "navigable waters" alone—the Court will address each question separately. In so doing, it will determine, for each, whether EPA has "provide[d] a reasoned explanation for its action," *Judulang*, 132 S. Ct. at 479, and whether EPA's action is "manifestly contrary to the statute," *Mead*, 533 U.S. at 227.

2.  "Addition . . . to Navigable Waters"

a.  EPA's Explanation

Sometimes, to understand something found downstream, it helps to examine the source. For the rationale underlying EPA's interpretation of "addition . . . to navigable waters" in the Water Transfers Rule, this means analyzing the 2005 Klee Memorandum, which represented EPA's first attempt at formalizing its interpretation.  Addressing "[t]he precise legal question . . . whether the movement of pollutants from one navigable water to another by a water transfer is the 'addition' of a pollutant potentially subjecting the activity to the [NPDES] permitting requirement," the Memorandum concluded that the CWA does not prohibit such an activity. (AR 5 at 2–3.)  Although it recognized that "focusing solely on the term 'addition' is one approach to interpreting the statute," it ultimately concluded that "the better approach . . . takes a holistic view and also gives meaning to those statutory provisions where Congress expressly considered the issue of water resource management, as well as Congress' overall division of responsibility between State and federal authorities under the statute."  (*Id.* at 13.)  The "holistic approach" was warranted "here in particular because the heart of this matter is the balance Congress created between federal and state oversight of activities affecting the nation's waters," and thus "[l]ooking at the statute as a whole is necessary to ensure that the analysis here is consonant with Congress' overall policies and objectives in the management and regulation of the nation's water resources."  (*Id.* at 5.)

Applying this holistic approach, the Klee Memorandum never directly analyzed the text of either § 301(a) or § 502(12).  Instead, it based its interpretation on an analysis of many of the same provisions the Court analyzed at step one.  Thus, the Memorandum noted that, "[w]hile the statute does not define 'addition,' sections 101(g), 102(b), 304(f) and 510(2) provide a strong

67

indication that the term 'addition' should be interpreted in accordance with those more specific sections of the statute." (*Id.* at 7.)  Based on this analysis, it concluded that,

> [i]n light of Congress' clearly expressed policy not to unnecessarily interfere with water resource allocation and its discussion of changes in the movement, flow or circulation of any navigable waters as sources of pollutants that would not be subject to regulation under [NPDES], it is reasonable to interpret "addition" as not generally including the mere transfer of navigable waters.

(*Id.*)  The Memorandum also found further support for its interpretation in other parts of the statute and its legislative history that the Court discussed in its step-one analysis, including provisions of the Act representing Congress's "general[] inten[t] that pollutants be controlled at the source whenever possible," and excerpts from the aforementioned House Report.  (*Id.* at 7–9 (citing 33 U.S.C. §§ 1252(b), 1288(b)(2)(F), 1329, 1341; H.R. Rep. No. 92-911, at 96, 109 (1972)).)

In *Catskills I*, the Second Circuit gave little deference to EPA's interpretation of the CWA because "EPA's position had [not] been adopted in a rulemaking or other formal proceeding," but instead was "based on a series of informal policy statements made and consistent litigation positions taken by the EPA over the years, primarily in the 1970s and 1980s."  273 F.3d at 490.  But this was no longer true in *Catskills II*, because the Second Circuit had the opportunity to consider the Klee Memorandum as a formal expression of EPA's position. Nevertheless, because the memorandum did not qualify for *Chevron* deference under the Supreme Court's holding in *Mead*, the Second Circuit applied the same level of deference to EPA's position as it applied in *Catskills I* and rejected EPA's interpretation for the same reasons it articulated in that case.  *See Catskills II*, 451 F.3d at 82 (deferring to EPA's interpretation "according to its 'power to persuade'" (quoting *Mead*, 533 U.S. at 235)).  The Second Circuit's decision not to accord *Chevron* deference to the Klee Memorandum was consistent with its

decision not to accord such deference in *Catskills I*, which decision it based on its conclusion

that EPA's position "lack[ed] the indicia of expertise, regularity, rigorous consideration, and

public scrutiny that justify *Chevron* deference." *Catskills I*, 273 F.3d at 491.

Perhaps in recognition of the lower level of deference usually accorded to interpretive

memoranda, the Memorandum itself noted that EPA "intend[ed] to initiate a rulemaking process

to address water transfers." (AR 5 at 3.) That process formally began in June 2006, when EPA

published the "[NPDES] Water Transfers Proposed Rule." *See* 71 Fed. Reg. 32,887 (June 7,

2006). Notably, EPA recognized in the preamble that the "proposed rule [was] based on the

legal analysis contained in" the Klee Memorandum, which it referred to as an "interpretive

memorandum." *Id.* at 32,889. In fact, the acknowledgment that the proposed rule was "based

on" the Klee Memorandum is somewhat of an understatement, because much, if not most, of the

language in the preamble to the proposed rule is almost identical to language in the Klee

Memorandum.[21] Indeed, aside from the apparently obligatory "General Information" and

"Statutory and Executive Order Reviews" sections, the only part of the preamble that went

beyond the exact same substantive analysis contained in the Klee Memorandum was a section

entitled "Designation Authority." There, EPA noted that, in conceptualizing the proposed rule, it

---

[21] The Court does not find it necessary to conduct a detailed comparative analysis
between the two documents. Nevertheless, it notes that even a cursory comparison reveals
multiple "similarities" (to be generous) between them. Examples of language in the preamble
that is highly similar to language in the Klee Memorandum include the first four paragraphs of
the "Background" section, *compare* 71 Fed. Reg. 32,888–89, *with* AR 5 at 1, 3–4; all but the first
and fourth paragraphs—which contained, respectively, a brief summary of the Klee
Memorandum and a single sentence generally outlining the preamble's analytical
framework—of the twenty-paragraph-long "Rationale" section, *compare* 71 Fed. Reg. at
32,889–91, *with* AR 5 at 2 n.3, 4–9; and the second, sixth, seventh, and eighth paragraphs, and
most of the fourth paragraph, in the "Scope of [the] Proposed Rule" section, *compare* 71 Fed.
Reg. at 33,891–92, *with* AR 5 at 18 & n.18, 19 & n.19.

considered adopting "an additional provision allowing States to designate particular water transfers as subject to the NPDES program on a case-by-case basis." *Id.* at 32,892. "Under this approach, the permitting authority would have the discretion to issue a permit on a case-by-case basis if a transfer would cause a significant impairment of a designated use and no State authorities are being implemented to adequately address the problem." *Id.* at 32,892–93. Such an impairment "would occur when, as a result of the water transfer, the designated use of the receiving water could no longer be maintained." *Id.* at 32,893. Ultimately, however, EPA decided "not [to] propos[e] to establish designation authority," but it was nevertheless "interested in the programs States have to address water quality impacts from water transfers, how they are being implemented, and what is the best way to fill any gaps in how States address those impacts currently." *Id.*

After publishing the proposed rule, EPA navigated it through the notice-and-comment-rulemaking process, during which it received and responded to many comments addressing various aspects of the proposed rule. (*See* AR 1428.) Eventually, almost two years after it published the proposed rule, EPA issued a final rule that it described as "nearly identical to the proposed rule." 73 Fed. Reg. at 33,699.[22] But this was also an understatement because, not only was the final rule nearly identical to the proposed rule, but much of the language in many sections of the final rule's preamble was also nearly identical to various parts of the proposed rule's preamble—which, again, was nearly identical in many respects to parts of the Klee

---

[22] According to EPA, the rule was only "nearly" identical, but not actually identical, because "[m]inor changes ha[d] been made for clarity." 73 Fed. Reg. at 33,699. Apparently, the "minor change" in question was from the proposed rule's definition of "water transfer" to mean "an activity that conveys waters of the United States to another water of the United States" to the final rule's definition of that term to mean "an activity that conveys or connects waters of the United States." 40 C.F.R. § 122.3(i).

Memorandum.[23]  EPA thus employed the same "holistic analysis" it used in the Klee

Memorandum and analyzed the same statutory provisions and excerpts of legislative history to

support the same conclusion it adopted in the Klee Memorandum—namely, that "Congress

generally did not intend to subject water transfers to the NPDES program."  *Id.* at 33,703.

"Interpreting the term 'addition' in [the] context [of its holistic analysis], EPA conclude[d] that

water transfers, as defined by [the Water Transfers Rule], do not constitute an 'addition' to

navigable waters to be regulated under the NPDES program."  *Id.* at 33,701.

Despite the strong similarities between language used in the final rule and in both the

proposed rule and the Klee Memorandum, there are a number of material differences between

the final rule and its interpretive antecedents.  For example, in the "Public Comment" section,

EPA responded directly to general categories of public comments it received during the notice-

and-comment process.  In responses to certain comments arguing that the Water Transfers Rule

would conflict with existing interpretations of NPDES and other provisions of the CWA, EPA

asserted that the rule would not affect any of these existing interpretations or programs.  *See id.*

at 33,703 (responding to comments that the rule could interfere with water-quality-standards

programs by addressing that argument only as it applies to certain kinds of waste-treatment

systems and subsequently asserting that the rule "does not affect the permitting of such

---

[23] Again, without conducting a detailed analysis, the Court notes many comparative
similarities between the final-rule preamble and the proposed-rule preamble, including the first,
second, and fourth paragraphs, and most of the third paragraph, in the nine-paragraph-long
"Background and Definition of Water Transfers" section, *compare* 73 Fed. Reg. at 33,698–700,
*with* AR 5 at 1–2 & n.2, 3–4; the final thirteen paragraphs of the nineteen-paragraph-long
"Statutory Language and Structure" subsection of the "Rationale" section, *compare* 73 Fed. Reg.
at 33,700–03, *with* AR 5 at 4–8; all five of the substantive paragraphs in the "Rationale"
section's "Legislative History" subsection, *compare* 73 Fed. Reg. at 33,703, *with* AR 5 at 8–9;
and even parts of three paragraphs in the newly added "Public Comment" section, *compare* 73
Fed. Reg. at 33,703–06, *with* AR 5 at 5, 18–19 (containing similarities in paragraphs three, ten,
and twelve).

facilities"); *id.* (responding to comments that the rule is inconsistent with the § 404 permitting program for dredged or fill material by asserting that the rule "has no effect on the 404 permit program"); *id.* at 33,705 (responding to comments that the rule might subject certain hydroelectric operations to NPDES permitting requirements by asserting that the rule "does not affect the longstanding position of EPA and the Courts that hyrdroelectric dams do not generally require NPDES permits").  And in responses to other comments directly challenging EPA's interpretation, EPA sometimes rejected those comments based on an assertion that states are free to regulate water transfers even where the federal government chooses not to regulate.  Thus, in the preamble's sole paragraph addressing concerns "that water transfers may have significant impacts on the environment, including (1) the introduction of invasive species, toxic blue-green algae, chemical pollutants, and excess nutrients; (2) increased turbidity; and (3) alteration of habitat (e.g., warm water into cold water or salt water into fresh water)," EPA responded that the Water Transfers Rule "does not interfere with any of the states' rights or authorities to regulate the movement of waters within their borders," that "[s]tates currently have the ability to address potential in-stream and/or downstream effects of water transfers through their [Water Quality Standards (WQS)] and [Total Maximum Daily Load (TMDL)] programs," and that "[n]othing in [the rule] affects the ability for states to establish WQS appropriate to individual waterbodies or waterbody segments."  *Id.* at 33,705.  Finally, in the section of the preamble that addressed EPA's designation-authority proposal, EPA disagreed with comments supporting the proposal and reaffirmed its decision not to adopt it.  *See id.* at 33,706.  Among the comments EPA identified as supporting the proposal were comments arguing that the proposal "would be helpful in instances where the transfer involves interstate waters because NPDES permits would provide a tool to protect receiving water quality—especially in situations in which water quality

standards differed in two relevant states." *Id.*  EPA also noted that "several states" submitted

comments citing "three reasons for supporting this approach," namely

> (1) The designation option is consistent with Congress's general direction against
> unnecessary federal interference with state allocation of water rights and states'
> flexibility on handling water transfers; (2) states would be unable to require NPDES
> permits for water transfers on a case-by-case basis in the absence of the designation
> option; and (3) some water transfers should be considered discharges of pollutants,
> so it is important to retain NPDES authority in these cases.

*Id.*  "After considering these comments," EPA "decided not to include a mechanism . . . for the

permitting authority to designate water transfers on a case-by-case basis as needing an NPDES

permit," *id.*, and it based its decision on two rationales.  First, its decision was "consistent with

EPA's interpretation of the CWA as not subjecting water transfers to" NPDES permitting

requirements.  *Id.*  Second, as it stated when it rejected comments addressing the possible

negative environmental impacts of the rule, EPA again asserted that "states currently have the

ability to address potential in-stream and/or downstream effects of water transfers through their

WQS and TMDL programs and pursuant to state authority preserved by section 510, and [the]

final rule does not have an effect on these state programs and authorities."  *Id.*

　　　In promulgating the Water Transfers Rule, therefore, EPA relied entirely on a "holistic

approach" to statutory interpretation that it applied to answer the narrow question whether

Congress intended to regulate water transfers under the NPDES program.  Applying this

approach, it focused almost exclusively on the statutory provisions supporting the CWA's states'

rights goals.  And, declining to require NPDES permits for water transfers or to adopt the

designation-authority option, it ultimately concluded that the rule was "within [its] authority and

consistent with the CWA."  73 Fed. Reg. at 33,703.  For multiple reasons, the Court finds EPA's

analysis to be arbitrary and capricious.

b.  Flawed Methodology

As discussed, EPA used a "holistic approach" to determine whether Congress intended to regulate water transfers under the NPDES program.  Logically, its rationale proceeds in three parts.  First, EPA concluded, based on "the language, structure, and legislative history of the statute," "that Congress generally did not intend to subject water transfers to the NPDES program."  *Id.* at 33,703.  Second, because Congress did not intend to regulate water transfers under the NPDES program, "water transfers . . . do not constitute an 'addition' to navigable waters."  *Id.* at 33,701 ("Congress generally did not intend to subject water transfers to the NPDES program.  Interpreting the term 'addition' in that context, EPA concludes that water transfers, as defined by [the] rule, do not constitute an 'addition' to navigable waters to be regulated under the NPDES program."); *see also id.* at 33,701–02 ("In light of Congress' clearly expressed policy . . . , it is reasonable to interpret 'addition' as not including the mere transfer of navigable waters."); *id.* at 33,703 ("Congress generally did not intend to subject water transfers to the NPDES program.  Interpreting the term 'addition' in that context, EPA concludes that water transfers, as defined by [the] rule, do not constitute an 'addition' to navigable waters to be regulated under the NPDES program.").  Third, because water transfers do not constitute an "addition" under § 502(12), they do not constitute a prohibited "discharge of a pollutant" under § 301(a), and therefore they do not require an NPDES permit.  *See id.* at 33,699 ("[EPA] concludes that water transfers, as defined by the rule, do not require NPDES permits because they do not result in the 'addition' of a pollutant.").  EPA's rationale thus depends on the logical inference in the second part that congressional intent not to regulate water transfers under the NPDES program necessarily implies that Congress did not consider water transfers to be "additions" under § 502(12) that would therefore be prohibited under § 301(a).

74

This inference fails for a number of a reasons.  By its own terms, § 301(a) provides that "the discharge of any pollutant by any person shall be unlawful" "[e]xcept as in compliance with [§ 301] and [§§] 1312, 1316, 1317, 1328, 1342, and 1344."  33 U.S.C. § 1311(a).  The NPDES program—referenced in § 301 as "[§] 1342," *see id.*—is thus only one of many provisions that regulate discharges made unlawful under § 301(a).  For example, under § 302, the Administrator *must* establish effluent limitations where he or she determines that "discharges of pollutants . . . would interfere with the attainment or maintenance of . . . water quality in a *specific portion* of the navigable waters."  *Id.* § 1312(a) (emphasis added).  And under § 404, the Secretary of the Army Corps of Engineers "may issue permits . . . for the discharge of dredged or fill material into the navigable waters."  *Id.* § 1344(a).[24]  Thus, the conclusion that Congress intended to exempt water transfers from the NPDES program does not establish that water transfers are not "discharges" under § 301—or, more specifically, "additions" under § 502(12)—because Congress still might have intended to make water transfers unlawful under § 301(a) for the purposes of other statutory provisions.  Logically, because the NPDES program is a subset of the provisions covered by § 301(a)'s ban, EPA's conclusion that an intent to exempt from § 402 implies an intent to exempt from § 301(a) relies on a fallacious contrapositive inference.[25]  Put

---

[24] Although the Supreme Court has held that the term "discharge" used in § 404 is "broader" than the phrase "discharge of a pollutant" used in § 301, *see S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 376 (2006), the statute still defines "'discharge' when used without a qualification [to] include[] a discharge of a pollutant," 33 U.S.C. § 1362(16).

[25] In logical terms, "if *A*, then *B*" implies "if not *B*, then not *A*"—a categorical proposition known as the "contrapositive"—only if, under the former proposition, *A* necessarily implies *B*. But if *A* does not imply *B*, then "not *B*" cannot necessarily imply "not *A*" because elements within category *A* might not exist within category *B*.  *See, e.g., Xpedior Creditor Trust v. Credit Suisse First Bos. (USA), Inc.*, 309 F. Supp. 2d 459, 462 n.1 (S.D.N.Y. 2003) (describing the "contrapositive" as, "[i]f 'if X then Y' is true, then 'if not Y then not X' is also *necessarily* true," so that "if 'If you didn't pay us, then you didn't get an allocation' is true, then so is 'If you did get an allocation, then you paid us'"); *cf. In re Zarnel*, 619 F.3d 156, 167–68 (2d Cir. 2010)

75

differently, even if EPA could use § 301(a) to create an NPDES exemption, it cannot use

NPDES to create a § 301(a) exemption.

EPA compounded this problem further when it promulgated the rule.  Section 404

establishes a permit program specifically for discharges of "dredged or fill material."  *See id.*

§ 1344.  Such discharges are prohibited under § 301(a), which bars "the discharge of any

pollutant," *id.* § 1311(a), where "pollutant" is further defined to include "dredged spoil," *id.*

§ 1362(6).  EPA recognized that "'dredged spoil' . . . by its very nature comes from a

waterbody," and thus many commenters were concerned "that the [Water Transfers Rule]

implies that dredged material never requires a permit unless the dredged material originates from

a waterbody that is not a water of the U.S."  73 Fed. Reg. at 33,703.  Indeed, under EPA's

interpretation of "addition," a transfer of dredged spoil from one water to another might not be

unlawful under § 301(a) in certain circumstances, meaning that its limitation on the scope of

§ 301(a) also necessarily limits the scope of § 404's permit program.  EPA responded to this

concern, however, by stating that it "believe[d] that [the Water Transfers Rule] will not have an

effect on the 404 program."  *Id.*  It further explained that, "[b]ecause Congress explicitly forbade

discharges of dredged material except as in compliance with the provisions cited in [§] 301, [the]

rule has no effect on the 404 permit program, under which discharges of dredged or fill material

may be authorized by a permit."  *Id.*  But Congress also explicitly forbade discharges of

---

(noting that, "if a case exists under [the Bankruptcy Code], the district court . . . has jurisdiction
over it," and then noting that "[t]he contrapositive of this statement . . . is also true," namely that
"if the court has no jurisdiction, then there is no case under the Bankruptcy Code").  *See
generally* William T. Parry & Edward A. Hacker, Aristotelian Logic 233–36 (1991)
("Contraposition of a standard categorical proposition is an immediate inference in which the
conclusion contains the terms of the premiss, negated and in reverse order, and has the same
quality.").  Here, the contrapositive inference fails because regulation under § 301(a) does not
necessarily imply regulation under NPDES—in other words, *A* does not imply *B*—and thus an
exemption under NPDES cannot imply an exemption under § 301(a).

*pollutants* except as in compliance with the provisions cited in § 301, and the rule clearly has an effect on the § 402 permit program. The Court thus fails to see EPA's explanation as anything other than a recognition that its narrow focus on § 402 is insufficient to support its general interpretation of § 301(a).

Even assuming that EPA answered the broader question whether Congress intended to regulate water transfers under § 301(a) as a whole, its methodology still fails to support its interpretation of "addition" in § 502(12). First, because there are multiple ambiguities in § 502(12), EPA did not explain why congressional intent not to regulate under § 301(a) necessarily implies a resolution of the ambiguity within "addition . . . to navigable waters." Indeed, EPA's own analysis supports the argument that Congress might have considered water transfers to be non-point sources. *See* 73 Fed. Reg. at 33,702 (identifying multiple statutory provisions indicating Congress's "general[] inten[t] that pollutants be controlled at the source wherever possible."); *id.* ("[S]ection 304(f) . . . reflects an understanding by Congress that water movement could result in pollution, and that such pollution would be managed by States under their nonpoint source program authorities, rather than the NPDES program."). In this context, it might be more reasonable to conclude that, if Congress did not intend to regulate water transfers under § 301(a), it did so because they do not constitute an "addition of [a] pollutant to navigable waters *from [a] point source*." 33 U.S.C. § 1362(12) (emphasis added). But EPA summarily rejected this interpretation without explanation. (*See* AR 1428 at 11 ("Nor, as some commenters suggested, is EPA defining a water transfer as a non-point source. For the reasons described in the preamble . . . EPA is interpreting the statutory term 'addition' . . . in a manner that does not include the flow of water through a water transfer.").)

Second, to the extent that EPA's non-point-source arguments are based on a supportable inference, they still fall short of supporting EPA's interpretation of "addition."  The first argument—i.e., that "pollution from transferred waters is more sensibly addressed through water resource planning and land use regulations, which attack the problem at its source," 73 Fed. Reg. at 33,702—fails to leave the port, because whether it is more appropriate to use other statutory provisions—or even other statutes—to regulate water transfers does not answer the precise question whether Congress intended *this* provision of *this* statute to regulate water transfers. Relatedly, EPA recognized the weakness in its argument that "Congress generally intended that pollutants be controlled at the source whenever possible" when it conceded that "point sources need only convey pollutants into navigable waters to be subject to the Act."  73 Fed. Reg. at 33,702 n.7 (citing *SFWMD*, 541 U.S. at 105 ("[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters' . . . .")).  If it is true that the Act controls discharges of pollutants away from the original source, then EPA has still failed to answer whether the Act controls discharges of pollutants in water transfers.

The second argument—based on EPA's interpretation of § 304(f)(2)—also fails, but for different reasons.  In the preamble to the rule, EPA conceded that "[m]ere mention of an activity in [§] 304(f) does not mean it is exclusively nonpoint source in nature."  *Id.*; *see also id.* ("[S]ection 304(f) does not exclusively address nonpoint sources of pollution . . . .").  It did cite legislative history implying that "nonpoint sources" include "natural and manmade changes in the normal flow of surface and ground waters."  *Id.* at 33,703 (internal quotation marks and emphasis omitted) (quoting H.R. Rep. No. 92-911, at 109 (1972)).  But its "holistic" analysis of the statute and legislative history arbitrarily ignored at least two contrary indications of congressional intent.  First, in citing only to the House Report, EPA ignored the Senate Report

discussing § 304(f), which explained that the "non-point sources" referenced in the statute "[i]ncluded . . . activities such as agriculture, forestry, mining, construction, disposal of material in wells, and salt water intrusion." S. Rep. No. 92-414, at 52 (1972). This list tracks precisely the sources listed in § 304(f)(2)(A)–(E), but it conspicuously omits the source listed in § 304(f)(2)(F), on which EPA entirely relies. *See* 33 U.S.C. § 1314(f)(2). The Conference Report on the final bill did not address this issue, leaving the apparent inconsistency between the two reports unresolved. *See* S. Rep. No. 92-1236, at 124 (1972) (Conf. Rep.). Second, in the context of subsections (A) and (B) of § 304(f)(2), which refer to "agricultural . . . activities" and "mining activities," respectively, *see* 33 U.S.C. §§ 1314(f)(2)(A)–(B), EPA fails to explain why Congress would specifically exempt types of pollution associated with these activities from the NPDES program despite their presence in § 304(f). *See* 33 U.S.C. § 1342(l)(1) ("The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture . . . ."); *id.* § 1342(l)(2) ("The Administrator shall not require a permit under this section . . . for discharges of stormwater runoff from mining operations . . . ."). EPA's exemption-by-association argument for § 304(f) thus fails because it actually appears that Congress considered exemptions to be necessary for at least some of the listed activities.

Taken together, this analysis demonstrates that EPA's interpretation was not supported by a reasoned explanation because it chose a flawed methodology from the start. To resolve the ambiguity within § 502(12), it asked questions that were too narrow and thus could not logically support EPA's conclusion. *See State Farm*, 463 U.S. at 44 (rejecting agency interpretation, in part, because its "path of analysis was misguided and the inferences it produced [were] questionable"). For this reason alone, EPA is not entitled to deference because it did not actually

answer the precise question at issue.  *See Lopez*, 654 F.3d at 182 ("Although the framework of

deference set forth in *Chevron* applies to an agency interpretation contained in a regulation,

where the regulation identified by the agency does not speak to the statutory ambiguity at issue,

*Chevron* deference is inappropriate." (citations, internal quotation marks, and alterations

omitted)); *Iavorski*, 232 F.3d at 133 ("When Congress has not directly addressed an issue, our

review is not merely for minimum rationality but requires that the administrative agency

articulate a logical basis for its judgment." (internal quotation marks omitted)).

<u>c.  Flawed Application of the Methodology</u>

Even if EPA's methodology were logically sound, EPA's arbitrary and capricious

application of the methodology provides an independent reason to reject its interpretation at step

two.  As the Court has explained, EPA chose to apply a "holistic approach" to interpreting the

statute because "the heart of this matter is the balance Congress created between federal and

State oversight of activities affecting the nation's waters" and the tension within that balance

between the CWA's purpose "to protect water quality" and its "recogni[tion] [of] the delicate

relationship between the CWA and State and local programs."  73 Fed. Reg. at 33,701.  At step

one, EPA acknowledged that the statute does not clearly address how to interpret § 502(12) in

light of that balance.  (*See* EPA Mem. 20, 22 (concluding that "[t]raditional tools of statutory

construction . . . do not resolve the statutory ambiguity regarding the term 'navigable waters,'"

and that these tools "do not resolve the statutory ambiguity regarding the term 'addition'").)

Therefore, EPA's interpretation deserves deference in direct proportion to the extent that it

"use[d] . . . its expert policy judgment to resolve [the] difficult question[]" introduced by these

seemingly competing statutory goals.  *See Brand X*, 545 U.S. at 1003; *see also Chevron*, 467

U.S. at 844 (deferring to agency interpretations "whenever decision as to the meaning or reach of

a statute has involved reconciling conflicting policies, and a full understanding of the force of

the statutory policy in the given situation has depended upon more than ordinary knowledge

respecting the matters subjected to agency regulations").

   In the face of two statutory purposes supporting conflicting interpretations of the statute,

EPA expressly stated that it "resolve[d]" the "conflicting approaches" by searching for "indices

of Congressional intent."  *See* 73 Fed. Reg. 33,701 ("To resolve the confusion created by these

conflicting approaches, the Agency has looked to the statute as a whole for textual and structural

indices of Congressional intent on the question whether water transfers that do not themselves

introduce new pollutants require an NPDES permit.").  It further justified its decision to employ

a so-called "holistic approach" when it noted that "[l]ooking to the statute as a whole is

necessary to ensure that the analysis herein is consonant with Congress's overall policies and

objectives in the management and regulation of the nation's water resources."  *Id.*  However,

when it employed this approach, it focused exclusively on certain of the provisions and pieces of

legislative history and concluded that "the language, structure, and legislative history of the

statute all support the conclusion that Congress generally did not intend to subject water

transfers to the NPDES program."  *Id.* at 33,703.  In so doing, it entirely ignored other provisions

of the statute that evidence contrary congressional intent, including §§ 101(a), 302(a), 403(a),

and the provisions of § 402 that both establish the NPDES programs' specific federal–state

balance and exempt certain kinds of pollution but do not exempt water transfers—all of which

the Court discussed in its step-one analysis.  *See id.* at 33,700 ("[T]oday's rule appropriately

*defers to congressional concerns* that the statute not *unnecessarily burden water quality*

*management activities* and excludes water transfers from the NPDES program." (emphases

added)).  Then, having interpreted Congress's intent based on its one-dimensional analysis, EPA

81

claimed that the Water Transfers Rule "simply clarif[ies]" or "simply codif[ies]" Congress's

intent, such that the rule, in EPA's view, is properly characterized as an expression of the

statute's true meaning.  *See id.* at 33,706–07 (describing the regulation as "*simply codifying* the

Agency's longtime positions that *Congress did not generally intend* for the NPDES program to

regulate the transfer of one water of the United States into another water of the United States"

(emphases added)); *id.* at 33,707 (same); *id.* ("Today's rule *clarifies* that *Congress did not*

*generally intend* for the NPDES program to regulate the transfer of waters of the United States

into another water of the United States." (emphases added)); *id.* at 33,708 ("Today's rule would

*simply clarify Congress' intent* that water transfers generally be subject to oversight by water

resource management agencies and State non-NPDES authorities, rather than the permitting

program under section 402 of the CWA." (emphasis added)); *id.* (same).  Finally, EPA used its

imbalanced reading of the statute to reject competing interpretations, responding multiple times

to reasonable counter-interpretations with the assertion that those interpretations were

inconsistent with EPA's previously determined view of Congress's intent.  *See id.* at 33,703–04

("EPA disagrees that Congress generally intended water transfers to obtain NPDES permits.

EPA believes that this action will add clarity to an area in which judicial decisions have created

uncertainty, and . . . concludes that Congress generally intended to leave the oversight of water

transfers to authorities other than the NPDES program.").

       The Court finds EPA's decision to rely exclusively on one statutory goal while largely

ignoring the other to be arbitrary and capricious for a number of reasons.  First, it is internally

inconsistent with the methodology EPA deemed best to apply to the statute.  For example, when

it described its "holistic approach," EPA noted that that approach requires that "*each* part or

section should be construed in connection with *every other* part or section so as to produce a

*harmonious whole*."  73 Fed. Reg. 33,701 (emphases added) (internal quotation marks omitted).

Moreover, in its Memoranda of Law in this Action, EPA asks the Court to reject Plaintiffs'

interpretations of the CWA, in part, because those interpretations "focus exclusively on the

CWA's objective of reducing or eliminating pollution of the 'navigable waters,' [and thus]

simply ignore the CWA's other stated policies."  (EPA Mem. 23; *see also id.* at 19 (accusing

Plaintiffs of "ignor[ing] other aspects of the CWA's regime"); EPA Reply 14 ("[I]t would be

inappropriate to focus exclusively on the CWA's objective of reducing or eliminating pollution

. . . and ignore the CWA's other stated policies.").)  Finally, at the hearing on these Motions,

EPA's description of the holistic approach that it supposedly employed did not reflect the

approach that it actually employed:

> THE COURT: [I]n evaluating the purpose, the holistic approach and whether or not
> the [Water Transfers Rule] is consistent with the purpose of the [CWA], how do you
> ignore the impact on certain bodies of water from the [rule]?
>
> [EPA]: . . . .  I would say [that] the purposes in the [CWA] are in tension.  So EPA's
> resolution of this was a resolution of the competing policy tensions between
> [§§] 101(a) and 101(b) and (g).  So it's different from the scenario where there's an
> agreed purpose of the statute and something technical is happening that has to
> scrutinize it.

(Hr'g Tr. at 58.)  In other words, EPA tries to have it both ways by claiming that it deserves

deference for employing its holistic approach and then failing actually to employ that approach

and resolve the "competing policy tensions."  (*Id.*)

Second, even if EPA's methodology were internally consistent—such that it supported

EPA's decision to ignore entirely certain statutory provisions—this approach would be

inconsistent with EPA's congressionally delegated authority under the CWA, which requires

EPA to interpret the statute in the context of both of its goals—including, specifically, its

environmental goals—and to provide a reasoned explanation justifying its interpretation in light

83

of those goals. *Massachusetts*, 549 U.S. at 535 (holding, in the Clean Air Act context, that EPA "must ground its reasons for action . . . in the statute"); *Chem. Mfrs. Ass'n*, 217 F.3d at 866 (asking, at step two, whether EPA's interpretation was "a permissible construction of the statute, *i.e.*, whether it [was] reasonable and consistent with the statute's purpose" (citations and internal quotation marks omitted)); *cf. Chem. Mfrs. Ass'n*, 470 U.S. at 126 (deferring to EPA interpretation of CWA "unless the legislative history or the purpose and structure of the statute clearly reveal a contrary intent on the part of Congress"); *Chevron*, 467 U.S. at 863 (deferring to EPA interpretation where "EPA ha[d] advanced a reasonable explanation for its conclusion that the regulations serve[d] the environmental objectives" of the statute). And if there were any doubt that EPA was under a duty to interpret the CWA in light of the statute's purposes, EPA conclusively resolved that doubt when it grounded its decision to employ a holistic analysis in the "necess[ity] [of] ensur[ing] that the analysis . . . is consonant with Congress's overall policies and objectives." 73 Fed. Reg. 33,701; *see also* 71 Fed. Reg. 32,889 (same). (*See also* AR 5 at 5 (same).) In this context, EPA's argument that the CWA "does not require a cost benefit balancing" of the scientific impacts of water transfers, (Hr'g Tr. 58–59), is a red herring, because while it may be true that the statute does not require such an analysis in this case, it still requires, at the very least, consideration of whether the interpretation would serve the statute's environmental goals, or, alternatively, a reasoned explanation for not taking those goals into account. The Court thus finds that EPA's interpretation lacks the requisite reasoned explanation because it was "not so much a balance of conflicting policy goals as the acceptance of one without any real consideration of the other." *Nat'l Ass'n of Regulatory Util. Comm'rs v. I.C.C.*, 41 F.3d 721, 728 (D.C. Cir. 1994); *cf. Catskills II*, 451 F.3d at 84–85 (classifying the CWA as a

"complex statute[]" with "seemingly inconsistent goals that must be balanced," and rejecting

EPA's approach, which "tip[ped] the balance toward the allocation goals").

Third, even if EPA argued that it is entitled to accord disproportionate weight to one

statutory purpose and to accord almost no weight to a competing purpose, in choosing this one-

sided balance, EPA still must provide a reasoned explanation for its choice.  *See Massachusetts*,

549 U.S. at 534–35 (finding EPA action to be arbitrary and capricious because EPA failed to

provide a "reasoned justification for declining to form a scientific judgment" and failed to offer a

"reasoned explanation for its refusal to decide" an issue, and holding that "EPA must ground its

reasons for . . . inaction in the statute").  Here, EPA's "justification" for ignoring the

environmental side of the balance was based on its unexplained predetermination that that side

of the balance did not matter.  (*See* AR 1428 at 31 ("EPA recognizes that water transfers may

connect waterbodies of differing water chemistry and quality[] . . . .  As the legal analysis

presents in the preamble to the rule, the language, structure, and legislative history of the CWA

indicate that Congress did not intend to leave oversight of water transfers to the NPDES

program.  Rather[,] Congress intended to leave oversight of water transfers, and any potential

environmental effects they may have, to water resource management agencies and the States in

cooperation with Federal authorities.").[26]

---

[26] The Court notes that EPA did provide one rationale that might have justified its
decision to ignore the statute's environmental goals.  In response to comments expressing
concern over the environmental impacts of water transfers, EPA asserted that it "believes that
most of the thousands of water transfers in the United States do not result in any substantial
impairment."  (AR 1428 at 31.)  This assertion is entirely unsupported, however, by *any* kind of
analysis—scientific, technical, legal, or otherwise—that would allow the Court to accept this as
a reasoned explanation for EPA's decision entirely to discount this argument.  An agency gets no
deference for its "beliefs."  *See State Farm*, 463 U.S. at 52–53 (rejecting agency's finding where
there was "no direct evidence" in the record to support that finding).

Therefore, in light of the foregoing, the Court finds that EPA applied its chosen methodology in a way that was internally inconsistent and was not sufficiently explained in light of EPA's self-imposed and statutory duty to consider multiple and competing statutory goals.  It thus rejects EPA's interpretation at step two based on this independent ground.  *See Vill. of Barrington*, 636 F.3d at 660 ("[C]onsidering only the rationales the [agency] actually offered in its decision, [the court] determine[s] whether [the agency's] interpretation is 'rationally related to the goals of' the statute." (quoting *Iowa Utils. Bd.*, 525 U.S. at 388)); *Zhao*, 265 F.3d at 95 ("[A]pplication of agency standards in a plainly inconsistent manner across similar situations evinces such a lack of rationality as to be arbitrary and capricious."); *Chem. Mfrs. Ass'n*, 217 F.3d at 866 (asking, at step two, whether EPA's interpretation was "a permissible construction of the statute, *i.e.*, whether it [was] reasonable and consistent with the statute's purpose" (citations and internal quotation marks omitted)).

### d.  Flawed Conclusions

Finally, even if EPA had chosen a reasoned methodology, and even if it had applied it in a reasoned fashion, the Court would still reject EPA's interpretation at step two because EPA failed to support its ultimate conclusion in two ways.  First, it failed to consider whether other alternatives—specifically, regulating water transfers under NPDES and adopting a designation-authority option—were consistent with the reasons it gave for excluding water transfers from NPDES regulation.  And second, it failed to demonstrate how the option it did choose was consistent with its analysis of congressional intent.

### i.  Failure To Consider Alternative Policies

In choosing to exclude water transfers from the NPDES program based on its analysis of congressional intent, EPA failed to consider whether regulating water transfers under the

86

NPDES program would have also been consistent with that intent.  As the Court discussed at step one, an interpretation supporting water-transfer regulation under NPDES is one of two permissible interpretations of the CWA, even in the context of the lone provisions EPA cited in support of its decision.  Thus, although §§ 101(b) and 101(g) establish Congress's general policies "to recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources," and not to "supersede[], abrogate[] or otherwise impair[]" states' authority "to allocate quantities of water within [their] jurisdiction," both of these provisions also implicitly contemplate that the federal government might have a *secondary* role in both regulating and supporting states' resource-management rights.  33 U.S.C. §§ 1251(b), 1251(g).  Furthermore, the NPDES program itself can be seen as an expression of the specific federal–state balance Congress wished to create in light of these policy statements.  Specifically, as the Court has discussed, under NPDES, a state may assume primary responsibility to issue NPDES permits if it establishes a program that meets baseline federal standards.  *See Wis. Res. Prot. Council*, 727 F.3d at 703 ("Once the EPA has approved a state's program, the EPA no longer has authority to issue NPDES permits under the CWA; at that point the state permitting authority is the only entity authorized to issue NPDES permits within the state's jurisdiction." (citation omitted)); *Natural Res. Def. Council*, 859 F.2d at 173 ("[T]he CWA provides for state assumption of the NPDES permit program.  It specifies some prerequisites to states' assuming permitting responsibilities, authorizes the Administrator to supplement them, and requires him to approve a state's application once satisfied that these standards have been met." (citations omitted)).  But EPA retains a supervisory and congressionally mandated role in overseeing those state programs and enforcing those baseline standards.  *See Nat'l Ass'n of Home Builders*, 551 U.S. at 688–89 ("After EPA has transferred

NPDES permitting authority to a State, the Agency continues to oversee the State's permitting program."); *Wis. Res. Prot. Council*, 727 F.3d at 703 ("EPA retains supervisory authority over the state program and is charged with 'notify[ing] the State of any revisions or modifications [to the State's program] necessary to conform to [CWA] requirements or guidelines.'" (alterations in original) (quoting 33 U.S.C. § 1342(c)(1))).  Therefore, in the specific context of NPDES permits, EPA's citations to §§ 101(b) and 101(g) do not provide a sufficient reasoned explanation for its decision not to require NPDES permits for water transfers because such a permit requirement might be entirely consistent with the goals expressed in those provisions.

In addition to failing to explain why it chose not to regulate water transfers under NPDES, EPA also failed to provide a reasoned explanation for its decision to reject the designation-authority option.  As discussed, this proposal would have allowed EPA, on a case-by-case basis, to designate certain water transfers as requiring an NPDES permit.  In this way, the designation-authority option was somewhat of a compromise between the "total regulation" approach EPA rejected and the "minimal regulation" approach it ultimately chose.

In the preamble to the final rule, EPA acknowledged that many states supported the option because it was "consistent with Congress's general direction against unnecessary federal interference with state allocation of water rights and states' flexibility on handling water transfers" while allowing EPA to "retain NPDES authority" in cases where "states would be unable to require NPDES permits . . . in the absence of the designation option."  73 Fed. Reg. 33,706.  But EPA, "[a]fter considering these comments, . . . decided not to include a [designation-authority] mechanism."  *Id.*  Notably, it justified its decision on two grounds.  First, it stated the truism that its decision to reject the option was "consistent with EPA's interpretation of the CWA as not subjecting water transfers to [NPDES] permitting requirements."  *Id.*

88

Second, it asserted that the Water Transfers Rule "does not have an effect" on states' "current[]

. . . ability to address potential in-stream and/or downstream effects of water transfers through

their WQS and TMDL programs and pursuant to state authorities preserved by section 510."  *Id.*

      Once again, EPA's explanation is insufficient to support its conclusion.  First, EPA

cannot bootstrap the reasonableness of its decision to reject the designation-authority option by

asserting that it is consistent with an interpretation that is insufficiently justified, in part, because

of EPA's unreasonable decision to reject the designation-authority option.  Second, EPA did not

address the states' comments to the effect that the designation-authority option would be entirely

consistent with the congressional purposes EPA relied on in promulgating the rule, as it would

conceivably allow states to manage water resources without "*unnecessary* federal interference"

while also preserving federal oversight to ensure that states could manage those resources

without unnecessary *state* interference.  Third, EPA never explained how states, post Water

Transfer Rule, can address interstate pollution effects "through their WQS and TMDL

programs" or "pursuant to state authorities preserved by section 510," given that states do not

have authority to require other states to adhere to effluent limitations or state-based regulations.

*See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 490–91 (1987) ("While source States have a

strong voice in regulating their own pollution, the CWA contemplates a much lesser role for

States that share an interstate waterway with the source (the affected States).  Even though it

may be harmed by the discharges, an affected State only has an advisory role in regulating

pollution that originates beyond its borders. . . .  [A]n affected State does not have the authority

to block the issuance of [a] permit [issued by another state] if it is dissatisfied with the proposed

standards.  An affected State's only recourse is to apply to the EPA Administrator . . . .  Also, an

affected State may not establish a separate permit system to regulate an out-of-state source.

Thus the [CWA] makes it clear that affected States occupy a subordinate position to source States in the federal regulatory program." (citations omitted)); *id.* at 487 ("[W]hen a court considers a state-law claim concerning interstate water pollution that is subject to the CWA, the court must apply the law of the State in which the point source is located.").

The insufficiency of EPA's rationale became especially apparent at oral argument, where the attorney for the State of Colorado, representing State Intervenor–Defendants, conceded that, absent federal regulation over water transfers, a state's only recourse to address interstate pollution would be through interstate compacts or common-law nuisance claims:

> THE COURT: Let's say Colorado's use of the waters within its borders adds pollutants to New Mexico, whatever water transfer process it has.  Now the poor folks in New Mexico are saying this is why the federal government enacted the [CWA].  Now we're having pollutants added to our waters because of Colorado's use and that's arguably exactly where the federal government comes in. . . .
>
> . . . .
>
> What are New Mexico's remedies in my hypo?
>
> MS QUILL: A common law nuisance claim under state law, not under federal law.
>
> THE COURT: So New Mexico sues Colorado in a New Mexico court.
>
> . . . .
>
> They have to win in court.  Is that their only remedy?
>
> MS QUILL: I think it's the main judicial remedy.  I also think that the [CWA] encourages interstate compacts where EPA takes the lead in assisting states.
>
> THE COURT: What does that mean?  Mediation? . . . .
>
> MS QUILL: If worse comes to worse and states can't play nice, they still have the state common law nuisance claim.
>
> THE COURT: That will take how many years?
>
> . . . .

90

. . . .  So the poor folks in New Mexico have to drink dirty water until this case makes its way up to the courts?

MS QUILL: That's a good point.  There are thousands and thousands of water transfers in the West.  Just because a permit requirement would impose very serious cost limitations on some of these . . . projects, it doesn't mean that there is this parade of horribles that is out there.  We have thousands of water transfers just within Colorado.  And there are none of them that have risen to the level of killing fish and killing people and hurting crops. . . .

THE COURT: Is the answer to my question that the good people in New Mexico have to drink dirty water until this case makes it up through the courts?

. . . .

. . . .  So it's really bad water, and EPA has no[] role and the federal court has no[] role, and people have to sue under common law . . . ?

MS QUILL: EPA does have a role and they're supposed to encourage states to work together and[] . . . to mediate.

THE COURT: So EPA, Colorado decides not to return their calls, we're going to win this court case, we don't have to listen to the EPA, we can just ignore them.

MS QUILL: In the context of water transfers, yes.

(Hr'g Tr. 98–102.)  In other words, EPA's decision appears to relegate states to interstate compacts and state-court common-law nuisance claims to solve interstate-pollution problems. And, in this context, EPA fails to explain how its decision is consistent with Congress's specific intent that the NPDES program would provide a forum for resolving these disputes, *see City of Milwaukee*, 451 U.S. at 326, and with Congress's intent—in § 101(g)—that EPA "co-operate with State and local agencies to develop *comprehensive solutions* to prevent, reduce and eliminate pollution in concert with programs for managing water resources," 33 U.S.C. § 1251(g).

In sum, EPA's failure to consider reasonable alternative policy choices that would have been consistent—indeed, possibly more consistent—with its interpretation of the statute renders

91

its ultimate policy choice arbitrary and capricious.  *See State Farm*, 463 U.S. at 51 (rejecting

agency action where agency chose one policy option "without any consideration whatsoever" of

an "alternative within the ambit of the existing standard"); *id.* at 47 (noting that agency's

acceptance of one conclusion "[did] not cast doubt on" the viability of an alternative conclusion,

and that, "[a]t the very least th[e] alternative way of achieving the objectives of the Act should

have been addressed and adequate reasons given for its abandonment").  The Court, therefore,

rejects EPA's interpretation at step two on this independent ground.

### ii.  Failure To Support the Chosen Policy

In addition to finding that EPA failed to consider and reject alternative options consistent

with its analysis, the Court also finds that EPA failed to explain how its chosen policy option

was consistent with the statutory goals it identified.  In general, EPA noted that "[w]ater

transfers are an integral part of water resource management," that "they embody how States and

resource agencies manage the nation's water resources and balance competing needs for water,"

and that they "physically implement State regimes for allocating water rights, many of which

existed long before enactment of the [CWA]."  73 Fed. Reg. 33,703.  In this context, multiple

times in the preamble, it acknowledged Congress's intent that the federal government not

"unnecessarily" or "unduly" burden or interfere with states' water-management activities.  *See*

*id.* at 33,700 (asserting that the rule "appropriately defers to congressional concerns that the

statute not *unnecessarily burden* water quantity management activities" (emphasis added)); *id.* at

33,701–02 ("In light of Congress' clearly expressed policy not to *unnecessarily interfere* with

water resource allocation . . . , it is reasonable to interpret 'addition' as not including the mere

transfer of navigable waters." (emphasis added)); *id.* at 33,702 ("Congress . . . made clear that

the [CWA] is to be construed in a manner that does not *unduly interfere* with the ability of States

92

to allocate water within their boundaries." (emphasis added)); *id.* ("[S]ection 101(g) . . . establishes in the text of the Act Congress's general direction against *unnecessary Federal interference* with State allocations of water rights." (emphasis added)); *id.* ("Because subjecting water transfers to a federal permitting scheme could *unnecessarily interfere* with State decisions on allocations of water rights, [§ 101(g)] provides additional support for the Agency's interpretation." (emphasis added)); *id.* ("[Section 501(2)] supports the notion that Congress did not intend administration of the CWA to *unduly interfere* with water resource allocation." (emphasis added)).

Based on these statements, one could infer that the Water Transfers Rule is consistent with this purpose because requiring NPDES permits for water transfers would "unnecessarily" or "unduly" interfere with state authority.  However, in the context of EPA's duty to provide a reasoned explanation for its resolution of the statutory ambiguity, its failure to articulate why water-transfer regulation is an "unnecessary" interference "[did] not so much answer the question as ask it."  *Shays v. FEC*, 414 F.3d 76, 101 (D.C. Cir. 2005) (rejecting a 120-day bright-line rule where agency failed to explain why it was "reasonably close" but not "so distant" from an ambiguous statutory deadline).  And where the Water Transfers Rule actually preserves some federal regulatory authority—specifically, where it requires permits for water transfers that "subject[] the transferred water to [an] intervening . . . use," and where "pollutants [are] introduced by the water transfer activity itself to the water being transferred," 40 C.F.R. § 122.3(i), EPA's failure to explain why those regulations are necessary or are not undue interferences is equally arbitrary.  *See also* 73 Fed. Reg. 33,704 ("A discharge of a pollutant associated with a water transfer resulting from an intervening . . . use, or otherwise introduced to the water by a water transfer facility itself would require an NPDES permit as any discharge of a

93

pollutant from a point source into a water of the U.S. would.").  EPA has thus drawn a regulatory

line that excludes certain types of water transfers from the NPDES program but includes others

based on an implicit, never-discussed determination of what it means to be a "necessary"

regulation.

    Absent a reasoned explanation for drawing the line in this manner, the line appears to be

arbitrary.  For example, under the Water Transfers Rule, "[a] discharge of a pollutant associated

with a water transfer resulting from an intervening . . . use . . . would require an NPDES permit

as any discharge of a pollutant from a point source into a water of the U.S. would."  *Id.*  "In these

situations," EPA explained, "the reintroduction of water and that water's associated pollutants

physically introduces pollutants from the outside world and, therefore, is an 'addition' subject to

NPDES permitting requirements."  *Id.*  Consistent with EPA's interpretation of "addition,"

therefore, the Water Transfers Rule requires an NPDES permit for *all* of the pollutants present in

water that is withdrawn and then *reintroduced* into navigable waters, even if those pollutants

were present before the water was put to an intervening use—i.e., while it was part of navigable

waters.  *See id.* ("The fact that some of the pollutants in the discharge from an intervening use

may have been present in the source water does not remove the need for a permit.")[27]  In certain

circumstances, water that is withdrawn, used, reintroduced, and transferred may have an impact

on a recipient waterbody that is functionally identical to the impact from water that is transferred

---

[27] EPA did note that, "under some circumstances, permittees may receive 'credit' in their
effluent limitations for such pollutants."  73 Fed. Reg. at 33,704 (citing 40 C.F.R. § 122.45(g)).
But the specific provision EPA cited includes a requirement that "[c]redit shall be granted *only if*
the discharger demonstrates that the intake water is drawn from *the same body of water into
which the discharge is made.*"  40 C.F.R. § 122.45(g)(4) (emphasis added).  In other words, this
provision does not apply to water transfers, which by definition involve two distinct bodies of
water.  *See* 40 C.F.R. § 122.3(i) (defining a "water transfer" to mean "an activity that conveys or
connects *waters*" (emphasis added)).

without being subject to an intervening use to the extent that the exact same pollutants existed in

the water both before and after the use.  But EPA did not explain its decision to exempt states

from NPDES-permit requirements in one scenario (no intervening use) while "burdening" them

with a "necessary" NPDES-permit requirement in another (intervening use), even when both

scenarios could effectively yield an identical result (recipient-waterbody pollution).  And where

the amount of pollution in transferred water changes during an intervening use, the Water

Transfers Rule appears to require permits for all of the pollutants in the reintroduced water that

preexisted the intervening use, even if pollutants were *removed* during the intervening use such

that the water transfer functionally results in a *net decrease* in the total amount of pollution in

navigable waters.  *See id.* (noting that "water . . . withdrawn to be used as . . . drinking water . . .

has been subjected to an intervening use").[28]  But EPA again failed to explain why requiring

NPDES permits for water transfers that *reduce* pollution in navigable waters are "necessary"

impositions on the states.  Perhaps EPA *could have* explained why its intervening-use exception

was consistent with its policy against "undue interference" with state authority.  But the Court

finds that the administrative record "is insufficient to permit [the] [C]ourt to discern [EPA's]

reasoning or to conclude that [EPA] has considered all relevant factors" related to this issue, and

---

[28] In the preamble, EPA explained that, as applied to drinking water, the Water Transfers Rule would require an NPDES permit for "waste material from the treatment process" that "originated in the withdrawn water," was "removed to make the water potable," and then is "discharged into waters of the U.S."  73 Fed. Reg. at 33,705.  But a discharge of the "purified water" into navigable waters, like a discharge of the waste water, would also require an NPDES permit for any pollutants not removed during the purification process, because that water "has been subjected to an intervening use," such that "it is no longer a water of the U.S."  *Id.* at 33,704–05.

the Court "may not itself supply a reasoned basis for [EPA's] action that the agency itself has not

given." *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) (internal

quotation marks omitted).

In addition to failing to demonstrate that the Water Transfers Rule is consistent with

EPA's favored statutory purpose, EPA also failed to demonstrate that the rule would not frustrate

that purpose in the context of the interstate effects of water pollution.  It is entirely conceivable

that Congress's "policy . . . to recognize, preserve, and protect the primary responsibilities and

rights of States to prevent, reduce, and eliminate pollution, to plan the development and use

(including restoration, preservation, and enhancement) of land and water resources," and "to

allocate quantities of water within [their] jurisdiction[s]," comprehends a federal regulatory role

that protects states from the effects of downstream pollution. 33 U.S.C. §§ 1251(b), 1251(g).  As

discussed, the NPDES program itself is a significant component of this role.  *City of Milwaukee*,

451 U.S. at 326 (noting that, in NPDES, "Congress provided ample opportunity for a State

affected by decisions of a neighboring State's permit-granting agency to seek redress," such that

"the EPA itself [could] issue permits if a stalemate between an issuing and objecting State

develop[ed]").  Moreover, EPA acknowledged that it received comments from many states

opposing the rule on the grounds that it might undermine their "interest in using their NPDES

authority to prevent potential water quality impairments caused by water transfers."  73 Fed.

Reg. 33,707.  And, in responses to comments in the administrative record, EPA further

acknowledged the specific comments addressing the fact that

> water quality standards vary from state-to-state and water transferred from one state
> could meet standards for that state and yet degrade the quality of the waters of the
> state downstream of a water transfer.  Some commenters expressed concern that
> without federal regulation, States downstream of a water transfer will have no ability
> to prevent harm to the water of their State from an upstream transfer. . . .  One

commenter argued that Federal oversight through the NPDES program would provide a mechanism for equilibrating states' standards and a forum for resolving interstate disputes.

(AR 1428 at 32.)

But EPA did not directly address this argument in the preamble to the final rule, and its response to comments in the administrative record only *appears* to address it:

> EPA appreciates the commenters' concerns.   Today's rule codifies EPA's longstanding practice of not requiring NPDES permits for water transfers and does not promote adding pollution to any waters. . . .
>
> . . . .   [T]here are other laws such as the Non-Indigenous Aquatic Nuisance Prevention and Control Act of 1990 . . . which are designed to prevent the introduction of, and to control the spread of, invasive species in waters of the United States.
>
> EPA acknowledges that invasive species can cause significant harm and that the spread of invasive species should generally be prevented.  However, EPA believes that regulation of invasive species in water transfers is not appropriate under the NPDES program.  Since water transfers are not additions they are not a discharge that would be covered under the NPDES program.

(*Id.* at 32–33.)  It thus appears that EPA relied on the presumed validity of its interpretation to justify its decision not to address an issue, consideration of which was necessary to establish the validity of its interpretation.  In other words, it put the motor before the boat.  Moreover, EPA's narrow focus on invasive species—and its identification of an entirely different statute that addresses this narrow problem—ignores other types of pollution—for example, chemical pollution—that might comprise an equal or greater component of the interstate-pollution threat.  Finally, even assuming EPA could appropriately address this issue by focusing on invasive species alone, its identification of another statute that addresses this problem does not answer the question whether *this* statute addresses the problem.  Applying this logic, EPA could ignore numerous provisions of the CWA that indicate Congress's clear intent to use the statute—and, in

97

particular, effluent limitations and NPDES permits—to protect species from waterborne threats. *See, e.g.*, 33 U.S.C. § 1251(a)(2) (describing a "national goal" to achieve "water quality which provides for the protection and propagation of fish, shellfish, and wildlife"); *id.* § 1312(a) (establishing EPA's authority to impose effluent limitations where "discharges of pollutants . . . would interfere with the attainment or maintenance of that water quality in a specific portion of the navigable waters which shall assure . . . the protection and propagation of a balanced population of shellfish, fish and wildlife"); *id.* § 1311(h)(2) (allowing EPA to issue NPDES permit modifying effluent limitation for a publicly owned treatment works "if the applicant demonstrates," *inter alia*, that "the discharge of pollutants . . . will not interfere . . . with the attainment or maintenance of that water quality which assures . . . the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife"); *id.* § 1311(m)(2) (mandating that an NPDES permit's effluent limitations in a certain context "shall be sufficient . . . to assure the . . . protection and propagation of a balanced, indigenous population of shellfish, fish, fauna, wildlife, and other aquatic organisms"); *id.* § 1344(c) (allowing EPA to revoke disposal-site designation under § 404 if EPA determines "that the discharge of [dredged or fill] materials into [an] area will have an unacceptable adverse effect on . . . shellfish beds and fishery areas (including spawning and breeding areas), [or] wildlife").

Therefore, in addition to finding that EPA did not provide a reasoned explanation for its decision in the context of its duty to balance the statute's competing goals, the Court also finds that EPA failed to explain how its action was consistent with and why it does not frustrate the one goal it did consider.  *See State Farm*, 463 U.S. at 43 (requiring an agency to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (internal quotation marks omitted)).

98

e.  *Friends I*

Taken together, the foregoing analysis demonstrates that, for multiple reasons, the Court rejects EPA's interpretation as arbitrary and capricious for failure to provide a reasoned explanation to support a number of critical choices and determinations EPA made, either implicitly or explicitly, when it adopted the Water Transfers Rule.  And although the Court conducted this analysis with reference to the specific issues that EPA failed to explain, it also notes, in general, that the primary flaw underlying EPA's entire analysis is that EPA effectively attempted to use *Chevron*-step-one arguments to justify its interpretation at step two.  Indeed, EPA employed the exact same "holistic approach" to statutory interpretation in both the Water Transfers Rule and in the step-one analysis in this case.  (*See* EPA Mem. 19–20, 22–27 (analyzing the CWA's "broader statutory context, including [its] structure, purpose, and legislative history," and acknowledging the "multiple goals" within the statute (citing 33 U.S.C. §§ 1251(b), 1251(g), 1288(b)(2)(F), 1314(f), 1329, 1370).)  But in this case, unlike in the Water Transfers Rule, EPA concluded that "the overall statutory context and legislative history do not resolve, but rather reinforce, these textual ambiguities."  (EPA Reply 14; *see also* EPA Mem. at 20 ("Traditional tools of statutory construction . . . do not resolve the statutory ambiguity regarding the term 'navigable waters' . . . ."); *id.* at 27 ("Section 304(f) does not resolve the ambiguity of the specific terms under [§§] 301 and 501 [sic] at issue here."); *id.* ("[T]his Court . . . should . . . conclude that the broader context of the statute as a whole left ambiguous whether the NPDES program was intended to apply to water transfers . . . ." (internal quotation marks omitted)).)  The Court agrees with EPA at step one that the statute is ambiguous.  However, in the context of what EPA acknowledges are two permissible interpretations, it cannot explain its choice of one of those interpretations by arguing only that the interpretation was permissible,

because permissibility alone is not a sufficient reasoned explanation.  *See Vill. of Barrington*, 636 F.3d at 660 ("If an agency fails or refuses to deploy [its] expertise—for example, by simply picking a permissible interpretation out of a hat—it deserves no deference.").

Indeed, it is primarily for this reason that this Court respectfully disagrees with the Eleventh Circuit's decision in *Friends I*.  In that case, the court upheld the Water Transfers Rule in a challenge brought by many of the Environmental Intervenor–Plaintiffs against Intervenor–Defendant SFWMD.  *See Friends I*, 570 F.3d at 1228.  Because EPA was not a party to the case, the court applied *Chevron* deference to the rule in the context of SFWMD's argument "based on the 'unitary waters' theory," which it described as holding that "[a]n addition [of pollutants to navigable waters] occurs . . . only when pollutants first enter navigable waters from a point source, not when they are moved between navigable waters."  *Id.* at 1217. The court noted that this theory "ha[d] a low batting average," in that "it ha[d] struck out in every court of appeals where it ha[d] come up to the plate," *id.* at 1217–18 (citing *Catskills II*, 451 F.3d 77; *N. Plains Res. Council*, 325 F.3d 1155; *Catskills I*, 273 F.3d 481; *Dubois*, 102 F.3d 1273; *Dague*, 935 F.2d 1343, and that "[e]ven the Supreme Court ha[d] called a strike or two on the theory," *id.* at 1218 (citing *SFWMD*, 541 U.S. 95).  But despite recognizing that "all of the existing precedent and the statements in [an Eleventh Circuit] vacated decision [were] against the unitary waters theory," the court gave EPA a home run when it became "the first court to address . . . whether the regulation [was] due *Chevron* deference," and decided that it was.  *Id.*

Although this Court agrees with the Eleventh Circuit that the statute is ambiguous at step one, it departs from that court's conclusion because that court attributed to EPA an interpretation that it did not actually adopt, and it otherwise failed to consider whether EPA provided a reasoned explanation for its interpretation.  Most telling is the court's language describing its

100

analysis.  At step one, the court found that "[t]here are two reasonable ways to read" the statute, *id.* at 1227, one of which was "[SFWMD's] unitary waters theory," *id.* at 1223.  Then, at the beginning of its step-two analysis, the court defined the question to be "whether the EPA's regulation, which accepts the unitary waters theory that transferring pollutants between navigable waters is not an 'addition . . . to navigable waters,' is a permissible construction of that language." *Id.* at 1227 (alteration in original).  Finally, after concluding that "EPA's construction [of the statute] is one of the two readings we have found reasonable," the court held that "EPA's regulation adopting the unitary waters theory is a reasonable, and therefore permissible, construction of the language." *Id.* at 1228.  In other words, the court found that, because the statute permitted the interpretation, EPA's choice of that interpretation was *per se* reasonable.

Yet, under *Chevron*, courts defer to an agency's action only to the extent that it is consistent with its "delegation[] of authority . . . to fill [a] statutory gap in a *reasonable fashion*." *Brand X*, 545 U.S. at 980 (emphasis added).  Thus, it is the court's task to "examin[e] the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang*, 132 S. Ct. at 484.  Indeed, the Eleventh Circuit's step-two approach renders step two almost entirely unnecessary, because if the question at step one is framed as whether the statute is ambiguous enough to support the agency's interpretation, then the analysis effectively ends at step one if the fact that the agency chose the interpretation is enough to trigger deference.  In other words, at step two, courts cannot infer permissible means from permissible ends—it is instead their duty independently to analyze the means.  *See id.* (noting the "important" role courts play "in ensuring that agencies have engaged in reasoned decisionmaking").

In addition to short-circuiting the step-two analysis, the Eleventh Circuit also relied on the incorrect assumption that EPA actually adopted one of the two readings the court had found to be permissible at step one.  The record reflects that nowhere in the Klee Memorandum, the proposed rule, the administrative record, or the final rule does EPA adopt the unitary waters theory.  In fact, to the extent EPA mentions the theory at all—which occurs only in the Klee Memorandum and in EPA's responses to comments in the administrative record—it merely notes the existence of the theory and the Supreme Court's disagreement with it in *SFWMD*.  (*See* AR 5 at 14 n.14 (noting the Supreme Court's recognition in *SFWMD* that "the unitary waters theory could be viewed as inconsistent with statutory provisions focusing on protection of individual water bodies, and that the theory was potentially inconsistent with [certain] NPDES regulations," but concluding that the Memorandum's "interpretation reflects EPA's consideration of the [Supreme] Court's concerns"); AR 1428 at 39 ("EPA acknowledges that the Supreme Court's majority opinion in [*SFWMD*] expresses some questions about the 'unitary waters' theory. . . .  [The Water Transfers Rule] provides a clear expression of the Agency's views following the standard informal rulemaking procedures.").)  Moreover, after EPA published the Klee Memorandum, Klee herself expressly disclaimed EPA's reliance on that theory in a voicemail to Peter Nichols, counsel for Western Water Providers—the transcript of which is part of the administrative record—wherein she stated that EPA "[was] not basing the interpretation or the memorandum on the unitary waters theory but instead [was] looking at a statutory construction based argument looking at [§§ 101(g)] and [304(f)] and the statute as a whole rather than simply trying to focus solely on the term addition."  (AR 1414 at 56 fig.33.) The Eleventh Circuit thus incorrectly attributed an interpretation to EPA that it did not expressly adopt in the rule.

In response, EPA argues that the Eleventh Circuit's decision was nevertheless correct because it upheld EPA's interpretation as *consistent* with the unitary waters theory.  At the hearing, EPA attempted to explain its position with regard to the theory:

> THE COURT: Is EPA embracing unitary water?

> [EPA]: It's not the word we use in the rule, but we think the Eleventh Circuit accurately described our position.

> THE COURT: Let's be clear.  Are you embracing unitary water or not?

> . . . .

> [EPA]: It's substantively the same as the theory in our rule.

> THE COURT: Is that a yes?

> [EPA]: That's a yes.

(Hr'g Tr. 74.)  EPA later explained that "the problem with the words [']unitary waters['] is that they seem to mean different things to different people," and that, ultimately, the theory the Eleventh Circuit attributed to EPA "is the theory embodied in the [Water Transfers Rule]."  (*Id.* at 129.)

To be clear, the specific interpretation EPA adopted in the Water Transfers Rule is that "an addition of a pollutant under the Act occurs when pollutants are introduced from *outside the waters being transferred*."  73 Fed. Reg. at 33,701 (emphasis added).  In isolation, this phrase is somewhat ambiguous, because if one interprets "waters" to mean the *bodies* of water involved in the transfer—i.e., the donor waterbody and the receiving waterbody, *see id.* at 33,699—then a water transfer still might result in a discharge of a pollutant, to the extent that water en route between the two bodies is not considered to be part of either waterbody, and thus it is introduced from outside both waterbodies because it was withdrawn.  EPA's interpretation, therefore,

103

depends on the subsidiary interpretation that transferred water retains its "status" as navigable while it is en route.  Under this interpretation, water transfers do not result in "discharges of a pollutant" because "pollutants moved from the donor water into the receiving water . . . are contained in navigable waters throughout the transfer."  *Id.* at 33,705 n.10.  This interpretation is perhaps consistent with the unitary waters theory, as EPA argues, but it is not the same thing. And to the extent that EPA's interpretation relies on the assumption of the correctness of the unitary waters theory—or at least the aspect of that theory that it is impossible to "join" or "unite" two navigable waters in a way that causes a "discharge"—the Court rejects its interpretation because agencies deserve deference only for reasonably explained choices, and not for assumptions.  The EPA's decision not to invoke the unitary waters theory thus dilutes the persuasive force of the Eleventh Circuit's holding in *Friends I.  See Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 192 (2d Cir. 2005) ("[T]he Supreme Court has made clear that 'it will not do for a court to be compelled to guess as the theory underlying a particular agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.' . . .  Were courts obliged to create and assess ex-post justifications for inadequately reasoned agency decisions, courts would, in effect, be conscripted into making policy.  Such an activity is, for myriad and obvious reasons, more properly the province of other bodies, particularly where . . . the other body is an agency that can bring to bear particular subject matter expertise.  Accordingly, we must reject [an agency's] entreaty to adjudicate by ex-post hypothesis." (some alterations omitted) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947))); *see also Brodsky*, 704 F.3d at 119 ("[A] court . . . may not itself supply a reasoned basis for the agency's action that the agency itself has not given." (internal quotation marks omitted)); *Matadin v. Mukasey*, 546 F.3d 85, 92 (2d Cir. 2008) ("[A court] may not enforce [an

104

agency's] order by applying a legal standard the [agency] did not adopt." (second and third alterations in original) (internal quotation marks omitted)); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("[A court] may not properly affirm an administrative action on grounds different from those considered by the agency." (internal quotation marks omitted)); *Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 101 (2d Cir. 2006) ("[A court] may [not] construct support for an agency's conclusion when the agency has not pointed to evidence on the record favoring its decision."); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("A reviewing court may not accept . . . counsel's *post hoc* rationalizations for agency action." (internal quotation marks omitted)).[29]

### 3. "Navigable Waters"

Thus far, the Court has focused entirely on EPA's interpretation of "addition . . . to navigable waters" in § 502(12). However, the Water Transfers Rule separately adopted an interpretation of "navigable waters"—namely, its "status-based" interpretation—that deserves an independent analysis. To recap, this interpretation contained two parts. First, it interpreted "navigable waters" such that water would be considered part of "navigable waters"—or, as the

---

[29] In *National Railroad Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407 (1992), the Supreme Court recognized an exception to the rule applied in these cases, deferring to an interpretation that was not explicitly invoked but was a "necessary presupposition" of the agency's overall interpretation. *See id.* at 420 ("[T]he fact that the [agency] did not in so many words articulate its interpretation of the [statutory phrase] does not mean that we may not defer to that interpretation, since the only reasonable reading of the [agency's] opinion, and the only plausible explanation of the issues that the [agency] addressed after considering the factual submissions by all of the parties, is that the [agency's] decision was based on the proffered interpretation."). Here, as the Court has already explained, the unitary waters theory is at best *consistent* with the Water Transfers Rule, but it is in no way a "necessary presupposition" of the rule, nor is it the "only reasonable reading" of the interpretation embodied in the rule or the "only plausible explanation" of EPA's decision to promulgate the rule in this way. Moreover, EPA's disavowal of the unitary waters theory after it issued the Klee Memorandum demonstrates that, whatever EPA now argues, it has acknowledged that the theory is not the basis for the rule.

statute also defines it, "the waters of the United States," 33 U.S.C. § 1362(7)—as long as it

retained its "status" as a "navigable water" or "water of the United States."  (*See* AR 1428 at 25

("[W]hen a pollutant is conveyed along with, and already subsumed entirely within, navigable

waters and the water . . . never loses its status as 'waters of the United States,' . . . nothing is

added to those waters from the outside world.").)  Second, it interpreted the scope of "navigable

waters" within this status-based interpretation to include waters that have been withdrawn from

navigable bodies of water but have not been subjected to an "intervening use."  *See* 73 Fed. Reg.

at 33,704 & n.8 (noting that "if water is withdrawn from waters of the U.S. for an intervening . . .

use, the reintroduction of the intake water and associated pollutants is an 'addition' subject to

NPDES permitting requirements," but clarifying that "a water pumping station, pipe, canal, or

other structure used solely to facilitate the transfer of the water is not an intervening use").

Again, the question is whether EPA provided a reasoned explanation for its interpretation and

whether it is consistent with the statute.

   The answer, in both respects, is no.  First, because EPA employed only its holistic

approach to justify the rule, all of the above-discussed shortcomings of EPA's rationale

underlying its outside-world interpretation of "addition" apply equally to its status-based

interpretation of "navigable waters."  But, the Court could also reject it on the independent

ground that EPA explicitly admitted that it did not consider this issue.  In its explanation of what

it takes to "constitute a 'water transfer' under [the] rule," EPA stated that "the water being

conveyed must be a water of the U.S. prior to being discharged to the receiving waterbody."  73

Fed. Reg. at 33,699 (footnote omitted).  Then, in a footnote attached to the phrase "water of the

U.S." within that statement, EPA acknowledged that "[w]aters of the U.S. are defined for

purposes of the NPDES program in [40 C.F.R. § 122.2] and *this rulemaking does not seek to*

*address what is within the scope of that term*." *Id.* at 33,699 n.2 (emphasis added).  But EPA actually *did* "address what is within the scope of that term" because it adopted an interpretation of "navigable waters" that expanded the scope of that phrase to include any water that has the "status" of "navigable water."  And it further expanded the scope of that interpretation when it clarified that water withdrawn from a navigable waterbody loses its status only when subjected to an "intervening use."  In this context, the Court cannot say that EPA "focuse[d] fully and directly upon the issue" such that it deserves deference for its interpretive regulation.  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173–74 (2007) (holding, in the context of an "interpretive regulation" adopted through notice-and-comment-rulemaking procedures, that, "[w]here an agency rule sets forth important individual rights and duties, where the agency focuses fully and directly upon the issue, where the agency uses full notice-and-comment procedures to promulgate a rule, where the resulting rule falls within the statutory grant of authority, and where the rule itself is reasonable, then a court ordinarily assumes that Congress intended it to defer to the agency's determination").  To the contrary, it is difficult to defer to an interpretation that EPA apparently did not even recognize that it had adopted.[30]

_____

[30] EPA's analysis in the preamble to the final rule and its litigating position in this case confirm the Court's conclusion that it failed to address this issue, because nowhere in the preamble or in any of EPA's Memoranda of Law—which both focus entirely on "addition . . . to navigable waters"—does EPA discuss any ambiguity as to the "scope" of  "navigable waters." In fact, the Court notes that the Klee Memorandum and the preamble to the proposed rule fail entirely even to mention EPA's status-based interpretation of navigable waters, *see* 71 Fed. Reg. 32,887, (*see* AR 5), except for one sentence in the Klee Memorandum that references the First Circuit's discussion of the concept in *Dubois*, (*see* AR 5 at 12).  Without deciding whether the final rule—which relies, in large conceptual part, on the status-based interpretation that EPA explained for the first time in the preamble to the rule—was a "logical outgrowth" of the proposed rule, or whether the final rule "deviates too sharply from the proposal" such that "affected parties [were] deprived of notice and an opportunity to respond to the proposal," *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 169–70 (2d Cir. 2013) (internal quotation marks omitted), the Court simply notes that EPA's failure to appreciate the actual implications of its

Furthermore, the interpretation itself must be rejected because it is "manifestly contrary to the statute." *Mead*, 533 U.S. at 227.  The statute defines "navigable waters" to mean "the waters of the United States," 33 U.S.C. § 1362(7), but nowhere does it define "water" as a concept that exists independent of a navigable body of water.  Moreover, to the extent that "navigable waters" implies the existence of a singular "navigable water"—or, that "waters of the United States' implies a singular "water of the United States"—the singular version of the term must be defined in reference to the plural.  *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words importing the plural include the singular . . . .").  Applying this principle, it is clear that a "navigable water" or a "water of the United States" must be an individual body of water, and not liquid water that exists outside of a waterbody.  First, "waters" ordinarily means "bodies" of water.  *See* Webster's Third New Int'l Dictionary 2581 (2002) (defining "waters" to mean "the water occupying or flowing in a *particular bed*" (emphasis added)).  The ordinary meaning of "navigable" confirms this interpretation, because only a body of water can be "navigable," not the liquid water itself.  *See id.* at 1509 (defining "navigable" to mean "capable of being navigated" and, more specifically, "deep enough and wide enough to afford *passage to ships*" (emphasis added)).  Second, the statute defines navigable waters as "the waters of the United States, *including the territorial seas.*" 33 U.S.C. § 1362(7).  In this sense, the phrase "waters of the United States" is "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008).  Thus, if the term "waters" "includ[es] the territorial seas," the term

interpretation is yet another reason why the Court moves further away from *Chevron* on the "spectrum" of deference.  *See Mead*, 533 U.S. at 228.

itself must generally refer only to things that are like "seas," i.e. other bodies of water. Third, EPA's regulatory interpretation of "waters of the United States" lists multiple examples of bodies of water to define the term "waters," including "lakes, rivers, streams . . . , or natural ponds." 40 C.F.R. § 122.2. Fourth, interpreting water to be "navigable" while outside of a navigable body of water would conflict with EPA's explanation of the rule, because where EPA would require permits for pollutants added to the transferred water, the permit covers the addition of pollutants, not to the transferred water itself, but to the receiving waterbody. *See* 73 Fed. Reg. at 33,705 ("[W]here water transfers introduce pollutants to water passing through the structure *into the receiving water*, NPDES permits are required." (emphasis added)). In other words, under EPA's status-based interpretation, if EPA considered transferred water to be "navigable," it *should* require an NPDES permit for the discharge into the transferred water, regardless of whether it was ultimately transferred to a navigable waterbody. Instead, it requires the permit for the discharge into the receiving water, implying that the transferred water is not, itself, navigable. Finally, the Court's interpretation—that liquid water is only "navigable" when it exists inside a navigable waterbody—is consistent with the First Circuit's decision in *Dubois*, because, in that case, the water "lost its status as waters of the United States" when it "le[ft] the domain of nature," i.e., when it left the navigable waterbody. 102 F.3d at 1297. Thus, for all of these reasons, interpreting a "water of the United States" to refer to liquid water outside of a body of water would be contrary to the statutory term "navigable waters."

After an opportunity for reconsideration, EPA might attempt to save its interpretation by clarifying that, instead of "water" having a status as "navigable," a "body" of water can have that status, and then by interpreting water-transfer conveyances as defined in the rule to be navigable waterbodies. This interpretation, however, might also fail, because of the statute's prohibition of

"discharges of [a] pollutant" where that prohibition applies to "any addition of any pollutant to navigable waters *from any point source*."  33 U.S.C. §§ 1311(a), 1362(12) (emphasis added). The statute's definition of a "point source," which generally "means any discernible, confined and discrete conveyance," specifically includes "any pipe, ditch, channel, tunnel, [or] conduit." 33 U.S.C. § 1362(14).  Thus, where the Water Transfers Rule defines NPDES-excluded water-transfer activities to include "any system of pumping stations, canals, aqueducts, tunnels, pipes, or other such conveyances," a status-based interpretation of these conveyances considering them to be "navigable waters" would exclude from NPDES regulation point-source pollutant discharges that Congress clearly intended to regulate.  It may be true that "certain water-bodies could conceivably constitute both a point source and a ['water.[']]" *Rapanos v. United States*, 547 U.S. 715, 772 (2006) (Kennedy, J., concurring in the judgment); *see also id.* at 807 (Stevens, J., dissenting) (joining this section of Justice Kennedy's concurrence without comment).  *But see id.* at 735 (plurality opinion) ("The [statute] thus conceive[s] of 'point sources' and 'navigable waters' as separate and distinct categories.").  But in classifying something as a "navigable water," the Supreme Court has been clear that "the qualifier 'navigable' is not devoid of significance," *id.* at 731 (plurality opinion), and "the traditional term 'navigable waters'—even though defined as 'the waters of the United States'—carries *some* of its original substance," *id.* at 734 (plurality opinion).  *See also id.* at 779 (Kennedy, J., concurring the judgment) ("[T]he word 'navigable' in the Act must be given some effect."); *SWANCC*, 531 U.S. at 172 ("[I]t is one thing to give a word limited effect and quite another to give it no effect whatever.  The term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made.").

110

In *Rapanos v. United States*, the Supreme Court wrestled with the precise significance to give that term, resulting in a 4–1–4 judgment applying three different approaches to deciding whether to uphold the Army Corps of Engineers' determination that four wetlands lying "near ditches or man-made drains that eventually empty into traditional navigable waters[] constitute[d] 'waters of the United States' within the meaning of the [CWA]."[31]  547 U.S. at 729 (plurality opinion).  A plurality of four justices, led by Justice Scalia, held that the fields were not "navigable waters," because,

> on its only plausible interpretation, the phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes. . . . [and] does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.

*Id.* at 739 (alterations and some internal quotation marks omitted).  It thus rejected the Corps' contrary interpretation as "impermissible" under *Chevron*.  *See id.*  Conversely, four dissenting justices, led by Justice Stevens, voted to uphold the Corps' determination that the wetlands at issue constituted "navigable waters."  Finding, initially, that "the fundamental significance of the [CWA]" in terms of congressional intent was "'clearly to establish an all-encompassing program of water pollution regulation,'" the dissent deferred to the Corps' interpretation "[b]ecause there is ambiguity in the phrase 'waters of the United States' and because interpreting it broadly to cover [the] ditches and streams [at issue] advance[d] the purpose of the Act" by "properly control[ling] water pollution."  *Id.* at 804 (Stevens, J., dissenting) (quoting *City of Milwaukee*, 451 U.S. at 318 (1981)).

---

[31] Because the case involved whether § 404 permits were required, the Court reviewed the Corps' interpretation of "navigable waters," instead of EPA's.  *See Rapanos*, 547 U.S. at 723–24 (plurality opinion).

Justice Kennedy, concurring in the judgment, applied a different standard than the other eight justices. Although he disagreed with the plurality's requirements of both "permanent standing water or continuous flow" and "a continuous surface connection to other jursidictional waters," *id.* at 769–75 (Kennedy, J., concurring in judgment), he also disagreed with the dissent to the extent that it, in his view, "read[] a central requirement out [of the Act]—namely, the requirement that the word 'navigable' in 'navigable waters' be given some importance," *id.* at 778–82. Instead, he held that "the Corps must establish a *significant nexus* on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries," a showing that he characterized as "necessary to avoid unreasonable applications of the statute" in light of the "potential overbreadth of the Corps' regulations." *Id.* at 782 (emphasis added). He further explained that "[t]he required nexus must be assessed in terms of the statute's goals and purposes," which he identified as "'restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters.'" *Id.* at 779 (quoting 33 U.S.C. § 1251(a)). And he explained that a water would "come within the statutory phrase 'navigable waters'" under the significant-nexus standard if it could be shown that the water "significantly affect[s] the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. Because he found that "neither the agency nor the reviewing courts properly considered the issue" under what he found to be the correct standard, *id.* at 783, he voted to "remand for consideration whether the specific wetlands at issue possess[ed] a significant nexus with navigable waters," *id.* at 787. He thus concurred in the judgment to the extent that his opinion, like the plurality's, vacated the judgments below because those

112

judgments had found that the waters at issue were "navigable waters" under different standards. *See id.* at 757 (plurality opinion) (vacating judgments below); *id.* at 787 (Kennedy, J., concurring in judgment) (vacating judgments below).

It appears, after *Rapanos*, that the "precise reach of the [CWA] remains unclear." *Sackett v. E.P.A.*, 132 S. Ct. 1367, 1375 (2012) (Alito, J., concurring); *see also Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring) ("It is unfortunate that no opinion commands a majority of the Court on precisely how to read Congress' limits on the reach of the [CWA].  Lower courts and regulated entities will now have to feel their way on a case-by-case basis.").  However, many of the types of conveyances contemplated by the Water Transfers Rule would not be considered a "navigable water" under any of the three standards used in *Rapanos*.  Under the plurality's standard, which adhered more closely to traditionally navigable bodies of water, "highly artificial, manufactured, enclosed conveyance systems—such as . . . mains, pipes, hydrants, machinery, . . . [or a] system of waterworks—likely do not qualify as 'waters of the United States,'" because "ordinary usage does not treat . . . elaborate, man-made enclosed systems as 'waters' on a part with 'streams,' 'rivers,' and 'oceans.'"  *Rapanos*, 547 U.S. at 736 n.7 (plurality opinion) (citations and some internal quotation marks omitted).  Under Justice Kennedy's standard, the determination would be made on a case-by-case basis and would depend both on the specific characteristics of the water at issue and would be "assessed in terms of the statute's goals and purposes," which he discussed with reference solely to the statutory goal of "'restor[ing] and maintain[ing] the . . . integrity of the Nation's waters.'"  *Id.* at 779 (Kennedy, J., concurring in judgment) (quoting 33 U.S.C. § 1251(a)).  And although the dissent applied a broader standard than Justice Kennedy did, it still implicitly agreed with his conclusion that an agency may broaden the reach of "navigable waters" if the broader interpretation

"advances the purpose of the Act," which is "to properly control water pollution." *Id.* at 804 (Stevens, J., dissenting).  Thus, where EPA defines a "water-transfer activity" to include "any system of pumping stations, canals, aqueducts, tunnels, pipes, or other such conveyances," 73 Fed. Reg. at 33,704, it is clear that the plurality opinion's interpretation of "navigable waters" would explicitly exclude these conveyances, Justice Kennedy's opinion would prohibit a blanket determination that these conveyances, in general, constitute "navigable waters," and both Justice Kennedy and the dissent would exclude these conveyances to the extent that they allow transfers of pollution to a navigable water in conflict with the statutory goal of "restor[ing]" and "maintain[ing]" water quality and "control[ling]" water pollution within bodies of water.

Because the Supreme Court in *Rapanos* analyzed the meaning of "navigable waters" in the context of *Chevron* deference, its definition of that phrase is binding on this Court and on the EPA.  *See Brand X*, 545 U.S. at 985 (finding that neither a court nor an agency were bound by a prior court decision where the prior court "was not presented with a case involving potential deference . . . pursuant to the *Chevron* doctrine" (internal quotation marks omitted)).  Therefore, because EPA may expand the scope of "navigable waters" only within the limits identified in *Rapanos*, and because it appears in this case that the Water Transfers Rule goes beyond those limits, the Court rejects EPA's interpretation.

D.  Remand or Vacatur

"If the record before the agency does not support the agency action[ or] if the agency has not considered all relevant factors . . . , the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  However, where, as here, in part, a court concludes "that the statutory text . . . forecloses" a final rule, the rule "cannot stand," and the court should vacate the

114

rule to the extent that it exceeds the agency's statutory authority.  *Nat'l Cotton Council of Am. v. U.S. E.P.A.*, 553 F.3d 927, 940 (6th Cir. 2009) (vacating EPA rule promulgated as an "exception" to the NPDES program and codified at 40 C.F.R. § 122.3(h) after finding that the text of the CWA "forceclose[d]" the rule at *Chevron* step two).

In determining whether to vacate or to remand the an agency rule based on the agency's failure to provide a reasonable explanation, the D.C. Circuit has identified two relevant factors to consider, including "whether (1) the agency's decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly."  *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860–61 (D.C. Cir. 2012).[32]  Here, although the Court has found that EPA's justification does not hold water, it cannot say that it maintains such "serious doubts" that would weigh against a remand. Moreover, the second factor appears to be a wash, because although Western Water Providers and Western States argue that vacating the rule would result in "prohibitively expensive" compliance costs, (*see* Western States' Mem. of Law in Supp. of Cross-Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J. (Dkt. No. 171) 13; Western Water Providers' Mem. of Law in Supp. of Cross-Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J. (Dkt. No. 188) 6, 12–13)), Environmental and State Plaintiffs argue that water transfers may result in serious disruption to the environment, (Envtl. Pls.' Mem. 31–35; State Pls.' Mem. 25–31).  Therefore, the Court will remand the Water Transfers Rule and give EPA a chance to reexamine and reevaluate some new ideas.

---

[32] As another court has noted, "[t]he Second Circuit has not discussed the standard for determining whether vacatur is appropriate" in a similar circumstance, "but it has shown a willingness to look to the law of other circuits—particularly the D.C. Circuit—for guidance on the issue."  *Natural Res. Def. Council v. U.S. E.P.A.*, 676 F. Supp. 2d 307, 312 n.5 (S.D.N.Y. 2009) (citing *Riverkeeper, Inc. v. E.P.A.*, 475 F.3d 83, 96 (2d Cir. 2007)).

115

III.  Conclusion

In light of the foregoing analysis, the Court grants Plaintiffs' and Intervenor–Plaintiffs' Motions for Summary Judgment, denies Defendants' and Intervenor–Defendants' Motions and Cross-motions for Summary Judgment, vacates the Water Transfers Rule to the extent it is inconsistent with the statute—and in particular the phrase "navigable waters" as interpreted in *Rapanos* and in this Opinion—and remands the Water Transfers Rule to the extent EPA did not provide a reasoned explanation for its interpretation.  The Clerk of the Court is respectfully directed to terminate the pending Motions.  (*See* Dkt. Nos. 136, 142, 148, 158, 165, 167, 170, 174.)  The Clerk is also directed to terminate the case captioned *Catskill Mountains Chapter of Trout Unlimited, Inc. et al. v. United States Environmental Protection Agency et al.*, Nos. 08-CV-5606 (KMK), 08-CV-8430 (KMK).

SO ORDERED.

Dated:        March 28, 2014
             White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE